Vineet Bhatia
David Peterson
SUSMAN GODFREY L.L.P.
1000 Louisiana St. 5100
Houston, Texas 77002
Telephone: 713-653-7855
Facsimile: 713-654-3344

Proposed Attorneys for Lyondell Chemical Company, et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LYONDELL CHEMICAL COMPANY, et al., | : | Case No. 09-10023 (REG) |
| | : | |
| Debtors. | : | Jointly Administered |

-----------------------------------------------------------------x

| | | |
|---|---|---|
| LYONDELL CHEMICAL COMPANY, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adv. Proc. No. 09-[_____] |
| | : | |
| CENTERPOINT ENERGY SERVICES INC.; | : | |
| COKINOS NATURAL GAS COMPANY; | : | |
| CONOCOPHILLIPS COMPANY; THE DOW | : | |
| CHEMICAL COMPANY; MARATHON | : | |
| PETROLEUM COMPANY; NALCO COMPANY; | : | |
| SARACEN ENERGY PARTNERS; SUNCOR | : | |
| ENERGY MARKETING INC.; WACHOVIA | : | |
| BANK, N.A., | : | |
| | : | |
| Defendants. | : | |

-----------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**(I) A PRELIMINARY INJUNCTION AND A TEMPORARY**
**RESTRAINING ORDER PURSUANT TO 11 U.S.C. § 105, RULE 65**
**OF THE FEDERAL RULES OF CIVIL PROCEDURE, AND RULES**
**7001(7) AND 7065 OF THE FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE AND/OR (II) EXTENDING THE AUTOMATIC STAY**
<u>**PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE**</u>

Lyondell Chemical Company and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>" and each, a "<u>Debtor</u>"),[1] respectfully submit this memorandum of law in support of their motion filed contemporaneously herewith (the "<u>Motion</u>") for an order prohibiting the defendant parties hereto, all other persons or entities acting in concert with any of them, and any other creditors of the Debtors from pursuing remedies against non-debtor LyondellBasell Industries AF S.C.A. and its non-debtor affiliates (together, "<u>LBIAF</u>") on account of any guaranty or similar assurance of performance by LBIAF of obligations of any of the Debtors (the "<u>Guaranty Claims</u>"). The relief requested is supported by section 105 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"), rule 65 of the Federal Rules of Civil Procedure (the "<u>Civil Rules</u>"), made applicable hereto by rule 7065 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Bankruptcy Rule 7001(7),

<u>**Preliminary Statement**</u>

Since the Debtors commenced their chapter 11 cases on January 6, 2009, certain of the Debtors' creditors have asserted claims against LBIAF, the Debtors' parent corporation, totaling in excess of $131 million under various prepetition guarantees issued by LBIAF. In each instance, the obligation guaranteed is the primary obligation of a Debtor. LBIAF has no assets other than the stock of its subsidiaries. As a consequence, LBIAF does not have liquid assets available to fund a defense against the Guaranty claims or to satisfy such claims. The defense costs and, if appropriate, claim payments would have to be funded by the Debtors. Further, at least one of the creditors making demand under a guaranty has indicated a willingness to commence an involuntary insolvency proceeding against LBIAF in either Luxembourg or the

---

[1] A list setting forth each of the Debtors is attached hereto as Schedule 1.

Netherlands. Upon commencement of an involuntary proceeding in either country, a foreign trustee would be appointed to take control of LBIAF and its subsidiaries, supplanting the role of LBIAF's current management and supervisory boards that currently oversee the operations and restructuring efforts of the Debtors and their non-debtor affiliates. The potential loss of control to a foreign liquidator would be disastrous to the Debtors' reorganization efforts.

Moreover, the commencement of an involuntary foreign insolvency proceeding against LBIAF would cause a default under the Debtors' postpetition financing facility (the "DIP Financing"). If there is no DIP Financing, there is no funding for the Debtors or their non-debtor affiliates. A default under the DIP Financing would then trigger a default under the forbearance agreements currently in place with the Debtors' prepetition senior secured and bridge lenders, thereby allowing such secured parties to assert remedies against the assets of the non-debtor affiliates. The commencement of an involuntary foreign insolvency proceeding would potentially also result in cross-defaults to certain contracts and other agreements to which the Debtors' non-debtor affiliates are parties. Any of these events could, in turn, cause a cascade of filings by the European entities in their respective jurisdictions – many of which provide for the liquidation rather than reorganization of debtors.

To state the obvious, an involuntary foreign insolvency proceeding of LBIAF would result in a substantial distraction of the attention of the Debtors and the distraction caused to the Debtors' senior management (which substantially overlaps with LBIAF's senior management) away from the Debtors' reorganization efforts at a critical juncture of the case.

In addition, because LBIAF lacks the personnel, information and financial resources to address and defend itself against the Guaranty Claims related to the Debtors'

business operations, the Debtors would be forced to bear these burdens and lose their entitlement to a breathing spell by reason of the automatic stay in place in these cases.

What is more, if the Defendants are permitted to pursue their claims against LBIAF in courts of competent jurisdiction, the Debtors will be exposed to a significant risk of collateral estoppel, stare decisis and evidentiary prejudice because the Defendants' claims are contingent upon a finding of liability of the Debtors, the primary obligors. A finding of liability against LBIAF would also likely give rise to contribution and/or indemnity claims by LBIAF against the Debtors.

As a result, allowing the Defendants to pursue the Guaranty Claims against LBIAF or otherwise exercise remedies against LBIAF, could imperil the Debtors' chances of successfully reorganizing and thus irreparably harm the Debtors at a very early stage in the chapter 11 cases. Accordingly, as a necessary measure that would serve the best interests of the Debtors' estates and their creditors, the Court should enjoin pursuit of the Guaranty Claims or the exercise of contractual or legal remedies against LBIAF with respect thereto until confirmation of a plan of reorganization in these cases.

## STATEMENT OF FACTS

**A.** **The Debtors**

On January 6, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their assets as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The chapter 11 cases are being jointly administered under Case No. 09-10023 pursuant to Bankruptcy Rule 1015. A statutory creditors' committee has been appointed in the chapter 11 cases. No trustee or examiner has been appointed in the chapter 11 cases.

3

The Debtors are among the world's largest refiners of heavy high-sulfur crude oil and producers of petrochemicals and plastics. In the past few months, these enterprises have been particularly hard hit by changing consumer demand for oil products, volatile commodity markets and prices, the deterioration of the credit markets, and the effective collapse of some of their largest direct and indirect customers, including customers in the automotive industry. The Debtors have sought protection under chapter 11 to provide them with the opportunity and the tools to restructure both their operations and their balance sheets and emerge from chapter 11 better equipped to survive in this changed and changing economic environment.[2] Although the Debtors are each independent legal entities, the Debtors, together with their non-debtor affiliates (together the "Company"), comprise a world-wide business, each aspect of which is vitally important to the others. Each of the other Debtors are indirect subsidiaries of LBIAF, which is a holding company. Neither LBIAF nor any of its European subsidiaries other than Basell Germany, is a debtor in these chapter 11 cases (collectively, the "Non-Debtors"). LBIAF has very limited assets other than its direct and indirect equity ownership in the Debtors and the non-debtor affiliates. Each of the entities owned directly and indirectly by LBIAF (with the exception of certain legacy entities that have no ongoing operations) is an important part of the integrated operations of the Debtors and non-debtors. These entities' operations – and the Debtors' restructuring and reorganization efforts – benefit substantially from maintaining coordinated control and management over all of these corporations. Operating together, these entities achieve substantial synergies, benefit from access to credit (especially in the very

---

[2]     Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of the chapter 11 cases is contained in the Affidavit of Alan S. Bigman Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, sworn to on January 6, 2009.

challenging capital markets) and other benefits such as value chain integration, operational improvement, customer and market focus and technological leadership.

Among the most critical factors supporting the Debtors' restructuring effort is the orderly continuation of the Company's operations in Europe and elsewhere.

**B.**           **The Transactions and Guaranty Claims**

Prior to the petition date, LBIAF agreed to guaranty various obligations of the Debtors (the "Guaranty Agreements"). A number of beneficiaries under the Guarantee Agreements have already made demands for the payment of prepetition debtor obligations, including: Centerpoint Energy Services Inc. ("Centerpoint"), Cokinos Energy Corporation ("Cokinos"), ConocoPhillips Company ("ConocoPhillips"), the Dow Chemical Company ("Dow"), Marathon Petroleum Company ("Marathon"), Nalco Company ("Nalco"), Saracen Energy Partners ("Saracen"), Suncor Energy Marketing Inc. ("Suncor"), Wachovia Bank, National Association ("Wachovia"). Specifically:

- On January 8, 2009, Wachovia made a demand for $63,445,000 in alleged early termination liability against LBIAF as parent-guarantor of a master ISDA agreement between Wachovia and Lyondell Chemical Company. The demand on LBIAF was triggered by the termination of the ISDA by Wachovia upon Lyondell's bankruptcy filing.

- On January 15, 2009, Centerpoint made a demand for approximately $3,610,000 against LBIAF as guarantor of sale and purchase agreements for natural gas between Equistar Chemicals, LP ("Equistar") and Centerpoint for prepetition amounts allegedly owing under such agreements.

- On January 14, 2009, Cokinos made a demand for $2,070,861.56 against LBIAF as guarantor of sale agreements between Equistar and Cokinos for the purchase of natural gas from Cokinos for prepetition amounts allegedly owing under such agreement.

- On January 30, 2009, ConocoPhillips made a demand for $37,611,919.64 against LBIAF as guarantor of a purchase and sale agreement for polypropylene between Basell USA, Inc. ("Basell USA") and

ConocoPhillips for prepetition amounts allegedly owing under such agreement.

- On January 7, 2009, Dow made a demand for $837,169 against LBIAF as guarantor of supply agreements between Dow, Basell USA and LyondellBasell Advanced Polyolefins USA Inc. for prepetition amounts allegedly owing under such agreement.

- On January 16, 2009, Marathon made a demand for $3,013,559.98 against LBIAF as guarantor of a sale agreement between Equistar and Marathon for product sales for prepetition amounts allegedly owing under such agreement.[3]

- On January 14, 2009, Nalco made a demand in the amount of $259,723.41 against LBIAF as guarantor of a sale agreement between Nalco and Basell USA for the purchase of chemicals from Nalco for prepetition amounts allegedly owing under such agreement.

- On January 14, 2009, Saracen made a demand in the amount of $127,995 against LBIAF as guarantor of transactions governed by the general terms and conditions dated May 1, 2008 between Saracen and Houston Refining LP ("Houston") for purported accelerated amounts owing pursuant to the transactions after Saracen declared a default.

- On January 12, 2009, Suncor made a demand in the amount of $3,167,070.50 against LBIAF as guarantor of a crude oil purchase, sale or exchange transaction between Suncor and Houston for purported settlement payments following Suncor's termination of such agreement.

- The Debtors have also received two notices of default, from Koch Supply & Trading, LP ("Koch") and Morgan Stanley Capital Group Inc. ("Morgan Stanley") for obligations that LBIAF may guarantee. Accordingly, Koch and Morgan Stanley may assert Guaranty Claims against LBIAF.

Certain of the Defendants are poised to take, or are considering taking, remedial action against LBIAF. LBIAF lacks separate assets with which to defend against such actions or exercise of remedies, much less pay on the Guaranty Claims.

---

[3] The Marathon demand also referenced two additional payments that were not yet past due on the date of the Marathon demand in the amounts of $302,660.63 and $422,667.72, and informed LBIAF it would also make demands for those payments upon Equistar's failure to pay them.

## ARGUMENT

## I.     THE BANKRUPTCY COURT HAS JURISDICTION OVER GUARANTY CLAIMS AGAINST LBIAF

The Court has subject matter jurisdiction over Guaranty Claims asserted against LBIAF because such claims are "related to" the chapter 11 cases within the meaning of 28 U.S.C. § 1334(b).  Section 1334(b) provides:

> Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to a case under title 11.

28 U.S.C. § 1334(b).  The United States Court of Appeals for the Second Circuit (the "Second Circuit") has held that a proceeding is "related to" a chapter 11 case if its outcome could have "any conceivable effect" on the bankruptcy proceeding, which includes any matter that "bring[s] into question the very distribution of the estate's property and its allocation." *Publicker Indus. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992) (citing *Pacor Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984)).

Courts also have found "related to" jurisdiction over an action "if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  *Hunnicutt Co., Inc. v. TJX Cos., Inc. (In re Ames Dep't Stores, Inc.)*, 190 B.R. 157, 160 (S.D.N.Y. 1995) (quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984); *In re Dow Corning Corp.*, 86 F.3d 482 (6th Cir. 1996) (finding that where the proceeding may have an effect on the debtor's estate there is related to jurisdiction); *see also In re River Center Holdings, LLC*, 288 B.R. 59, 65 (Bankr. S.D.N.Y. 2003) (litigation between non-debtors is related to a bankruptcy case if it gives rise to a claim against the estate); *Masterwear Corp. v. Rubin Baum*

*Levin Contant & Friedman (In re Masterwear Corp.)*, 241 B.R. 511, 516 (Bankr. S.D.N.Y. 1999) (same).

Under these standards, the acts that the Debtors seek to enjoin are clearly "related to" the chapter 11 cases. Indeed, the very nature of each of the Guarantor Claims is that they give rise to direct claims assertable by LBIAF against the Debtors and that have a reasonable legal basis. Moreover, the assertion of the Guaranty Claims by the Defendants against LBIAF pose a threat to the Debtors' reorganization efforts, given that if such claims remain unstayed, they could lead to defaults under the DIP Financing and the forbearance agreement, and the elimination of necessary liquidity, which would have a clear and direct impact on the Debtors' ability to reorganize. Courts have repeatedly found "related to" jurisdiction over requests for injunctive relief of the kind sought in the Complaint. Thus, "related to" jurisdiction exists over the Guaranty Claims.

II. **THE COURT SHOULD STAY ENFORCEMENT OF THE GUARANTY CLAIMS AGAINST LBIAF PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE**

The Court should stay prosecution of the Guaranty Claims against LBIAF pursuant to section 105(a) of the Bankruptcy Code, because (i) the Debtors have a reasonable likelihood of a successful reorganization, (ii) absent the relief requested, there is an imminent irreparable harm to the Debtors' estates, (iii) the balance of harm that would be suffered by the Debtors absent the relief requested dwarfs the harm that would be suffered by the Defendants if the relief is granted, and (iv) the public interest weighs in favor of an injunction. *See In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (enumerating the factors bankruptcy courts in this Circuit look to in determining whether to grant preliminary injunctions). Indeed, it is hard to

envision a set of circumstances where imposition of a stay would be more warranted than those present here.

Section 105(a) confers upon bankruptcy courts the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Specifically, bankruptcy courts may employ the equitable power granted by section 105(a) to enjoin actions against non-debtors when doing so would protect the debtor's estate. *See Johns-Manville*, 40 B.R. 219, 226 (S.D.N.Y. 1984) ("under section 105, the Bankruptcy Court may use its injunctive authority to protect the integrity of a bankrupt's estate [and] issue or extend stays to enjoin a variety of proceedings . . . which will have an adverse impact on the Debtor's ability to formulate a Chapter 11 plan.") (internal quotation marks omitted); *see also In re Ionosphere Clubs, Inc.*, 124 B.R. 635, 642 (S.D.N.Y. 1991) (affirming section 105(a) injunction precluding action against non-debtor and explaining that section 105(a) "extends to creditor's actions against third parties, when such an injunction is necessary to protect the debtors and the parties in interest to the reorganization in their attempt to reorganize successfully"); *In re Chateaugay Corp.*, 93 B.R. 26, 29 (S.D.N.Y. 1988) ("The Bankruptcy Court has authority under § 105 broader than the automatic stay provision of § 362 and may use its equitable powers to assure the orderly conduct of the reorganization process."); *Otero Mills, Inc.*, 21 B.R. 777, 778 (Bankr. D.N.M. 1982) (stating that a section 105 injunction is appropriate when action against the non-debtor would "affect the bankruptcy estate and adversely or detrimentally influence and pressure the debtor through the third party," and holding that a creditor "may not do indirectly that which he is forbidden to do directly"), *aff'd*, 25 B.R. 1018 (D.N.M. 1982).

The Second Circuit, courts in this District, and courts in other circuits have construed section 105 liberally to enjoin suits that might impede the reorganization process. *In re Adelphia Communications Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003). Not only could the Guaranty Claims impede the Debtors' reorganization process, allowing such claims to go forward could potentially derail the process altogether.

Courts in this Circuit have applied "the traditional preliminary injunction standard as modified to fit the bankruptcy context" in determining when an injunction should issue. *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401 (S.D.N.Y. 2007); *see also In re Chateauguy Corp.*, 201 B.R. 48, 71 (Bankr. S.D.N.Y. 1996) (it is well settled that a "debtor need not satisfy the more rigorous requirements for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure" to enjoin proceedings under Section 105"). Thus, courts evaluate the following factors: "(1) whether there is a likelihood of successful reorganization; (2) whether there in an imminent irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harm tips in favor of the moving party; and (4) whether the public interest weights in favor of an injunction." *In re Calpine Corp.*, 365 B.R. at 409 (noting that there is a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process). "In evaluating these factors, the court takes a 'flexible approach and no one factor is determinative.'" *Id.* These requirements are easily met here.

A.        **There is a Reasonable Likelihood of a Successful Reorganization**

The Debtors have a reasonable likelihood of a successful reorganization. The Debtors have obtained DIP Financing in excess of $8 billion. Moreover, the Debtors' reorganization efforts have the support of the Debtors' creditors. When, as here, a debtor's time

to submit a plan of reorganization has not yet expired, this element is satisfied so long as the debtor is actively pursuing its reorganization efforts and if the action taken against the debtor would impede the debtor's ability to file its plan. *See Gathering Rest., Inc. v. First Nat'l Bank (In re Gathering Rest., Inc.)*, 79 B.R. 992, 1001 (Bankr. N.D. Ind. 1986) ("[T]he Court at the early stages must make at least a rebuttable presumption that the [debtor has] made a good faith filing and [is] making a good faith effort to reorganize.").

The challenges overcome by the Debtors in obtaining the DIP Financing in the most difficult credit environment in decades and the Debtors' ongoing intensive engagement in efforts to reorganize its extensive business affairs indicate that the Debtors have the platform from which to formulate and effectuate a viable plan of reorganization. Permitting certain of the Debtors' creditors to assert claims that would precipitate a foreign filing involving LBIAF, thereby potentially undoing all of the progress made by the Debtors to date, would be unconscionable. Given the positive, good-faith steps that the Debtors have taken in these early stages of the chapter 11 cases, they should, at the very least, be given the opportunity to continue applying their energies toward the goal of reorganization. *See, e.g., Sudbury, Inc. v. Escott (In re Sudbury, Inc.),* 140 B.R. 461, 466 (Bankr. N.D. Ohio 1992) ("The evidence establishes that the Debtor is hard at work on a reorganization plan. Plaintiffs do not suggest that Debtor's effort will fail."). Emerging from the chapter 11 cases as a reorganized enterprise is a paramount goal of the Debtors and their creditors alike and should be supported by the imposition of injunctive relief.

**B.      There is Danger of Irreparable Harm to the Debtors in the Absence of an Injunction**

As is manifestly clear from the facts described above, any action to exercise remedies with respect to the Guaranty Claims would threaten the Debtors' reorganization

process. This, standing alone, satisfies the irreparable harm test. *In re Calpine Corp.*, 365 B.R. at 409 (there is an exception to the irreparable harm requirement in the bankruptcy context where the action to be enjoined threatens the reorganization process). However, even under the more stringent test, it is abundantly clear the Debtors' ability to reorganize will be irreparably harmed if the Defendants and others like them are not enjoined from prosecuting, making demand upon or exercising remedies with respect to the Guaranty Claims against LBIAF.

In assessing irreparable harm, courts have focused on several factors: (i) whether the debtors bear a risk of collateral estoppel effects if a judgment is entered against the non-debtor, (ii) whether the debtors' property would be harmed, and (iii) whether the debtors' key personnel would be distracted by actions against the non-debtor. *In re Calpine*, 365 B.R. at 410; *In re Lomas Fin.*, 117 B.R. at 66-67; *Malm v. Goldin*, No. 92 Civ. 8012 (LJF), 1993 WL 330489, at *2 (S.D.N.Y. Aug. 27, 1993). The Debtors would be irreparably harmed in each of these ways if the Guaranty Claims against LBIAF are not enjoined.

As noted above, absent funding by Debtors, enforcement of the guarantees against LBIAF could cause a bankruptcy filing of LBIAF, which would have negative repercussions throughout the Company's worldwide businesses and imperil the Debtors' opportunity to propose a viable plan of reorganization. Alsor, the initiation of an insolvency proceeding for LBIAF would constitute a default under the DIP Financing and the Debtors' forbearance agreements with their prepetition secured lenders. Courts have repeatedly found that foreclosing a debtor's ability to propose a plan constitutes irreparable harm. *See Lazarus Burman Assocs. v. Nat'l Westminster Bank USA (In re Lazarus Burman Assocs.)*, 161 B.R. 891, 899-900 (Bankr. E.D.N.Y. 1993); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660 (Bankr. D. Col. 1992); *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 751 (Bankr. E.D. Pa. 1986).

If nothing else, combating an involuntary filing in a European jurisdiction, on a timetable forced by third parties would cause serious distraction to the Debtors' senior management. That alone justifies imposition of an injunction. *See, e.g., In re Calpine Corp.*, 365 B.R. at 410 (finding that the burden and distraction to the restructuring efforts sufficient to establish irreparable harm).

Even absent the dire potential harm described above, the Debtors easily satisfy the factors that many courts have found to constitute irreparable harm. First, the only way the Defendants can establish liability against LBIAF on the Guaranty Claims is by proving the underlying liability of a Debtor. If the Guaranty Claims are not stayed, the Debtors would be forced to protect their interests and participate in any actions against LBIAF, thereby undermining the very purpose and benefits of the automatic stay in these early stages of the chapter 11 cases. Second, the Debtors' property would necessarily be harmed if these claims were allowed to proceed. LBIAF does not have unencumbered assets necessary to defend against these claims (much less pay them). Accordingly, any funding would necessarily come from the Debtors (or their non-debtor affiliates). In addition, the Debtors could face subsequent contribution or indemnification claims from LBIAF if the Defendants are successful. Finally, the Debtors' personnel would necessarily be distracted by the defense of these claims against the Debtors' parent.

## C.       The Balance of Hardships Favors the Debtors

The potential harm to the Debtors if the Defendants are permitted to continue prosecuting the Guaranty Claims against LBIAF is beyond measure. If left unstayed, the Defendants' actions in furtherance of the Guaranty Claims likely would result in an LBIAF insolvency proceeding which, in turn, could compromise the Debtors' ability to fund these

chapter 11 cases and the operations of their European affiliates, resulting in billions of dollars of lost enterprise value.

Granting the injunction, on the other hand, would cause minimal harm to the Defendants – at most, the injunction would affect the Defendants only temporally. As noted, LBIAF does not have any liquid assets other than the stock of its subsidiaries. Moreover, the claims underlying the Guaranty Claims will be dealt with under a plan of reorganization for the Debtors. Accordingly, granting the injunction gives the Debtors the ability to proceed with their reorganization, with only minimal harm to the Defendants.

**D.        The Granting of the Injunction Serves the Public Interest**

Granting the preliminary injunction will enable the Debtors to continue stabilizing their businesses with the liquidity they have obtained under the DIP Financing and to ultimately confirm a chapter 11 plan. Such a plan clearly serves the interests of the Debtors' creditors and those of several thousand employees and trade partners of the Debtors. There is more at stake than the Debtors' businesses alone. Courts have found that the "public interest" element is satisfied if granting the injunction would promote a successful reorganization. *See Johns-Manville*, 26 B.R. 420, 428 (Bankr. S.D.N.Y. 1983) ("this court finds the goal or removing all obstacles to plan formulation eminently praiseworthy and supports every lawful effort to foster this goal while protecting the due process rights of all constituencies."), *vacated in part*, 41 B.R. 926 (S.D.N.Y. 1984); *Sudbury*, 140 B.R. at 465 ("[c]ourts have generally recognized a public interest in reorganization") (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983)); *Am. Film Tech.*, 175 B.R. at 849 (stating that in the bankruptcy context, "public interest" is met by promoting successful reorganization).

Here, injunctive relief in favor of the Debtors will serve the public interest by preserving the Debtors' chances of reorganizing a multi-billion dollar global enterprise that has

the potential to emerge from the chapter 11 cases a stronger business. Further, an injunction would also serve the public interest by achieving the all-important goal of saving the thousands of jobs of individuals employed by the Debtors, ensuring the survival of a great many trade partners that are highly dependent on the Debtors, and maximizing the potential recovery that will redound to the benefit of all of the Debtors' creditors. Accordingly, pursuant to the Court's powers under section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," as well as the ability of the Debtors to meet all four elements of the test for injunctive relief, the Court should grant injunctive relief to bar the Defendants from pursuing the Guaranty Claims against LBIAF.

**E.     The Debtors Have Satisfied the Requirements for the Entry of a Temporary Restraining Order**

The facts presented here also satisfy the requirements under Rule 65 for a temporary restraining order pending hearing on the Debtor's motion for a preliminary injunction. A temporary restraining order is properly granted to preserve the status quo and prevent immediate and irreparable injury pending a hearing upon a motion for a preliminary injunction. *See* 13 James Wm. Moore et al., Moore's Federal Practice ¶¶ 65.30 and 65.36[1] (3d ed. 1997). The applicable standard for issuance of a temporary restraining order mirrors the standard governing the issuance of a preliminary injunction. *See Roberts v. Atl. Recording Corp.*, 892 F. Supp. 83, 86 (S.D.N.Y. 1995). Specifically, Rule 65(b) provides, as follows:

> A temporary restraining order may be granted without . . . notice to the adverse party . . . only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party . . . can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

Fed. R. Civ. P. 65(b).

The facts here warrant the imposition of a temporary restraining order because at least one of the Defendants appears to be poised to take action that could derail the Debtors' reorganization efforts – namely filing an involuntary foreign insolvency case against LBIAF or exercising other remedies against LBIAF. Such an action would result in default under the DIP Financing and the secured lender forbearance agreements and could potentially cause the Debtors to lose liquidity necessary to operating in bankruptcy and squander the significant value and operational synergies generated by the European non-debtor affiliates.

For these reasons, it is appropriate to grant a temporary restraining order pending a hearing on the Motion, staying, restraining and enjoining the commencement or continuation of any and all actions or other proceedings against LBIAF by the Defendants and other creditors, including, without limitation, on account of the Guaranty Claims.

## III. IN THE ALTERNATIVE, THE STAY SHOULD BE EXTENDED TO PRECLUDE EXERCISING REMEDIES AGAINST LBIAF

In the alternative, the Court should extend the automatic stay to prohibit the Defendants from exercising remedies against LBIAF.

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressure that drove him into bankruptcy.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 54-55 (1978), reprinted *in* 1978 *U.S. Code Cong. & Admin. News* 5787, 5840-41, 5963; *see also McCartney v. Integra Nat'l Bank North*, 106 F.3d 506, 509 (3d Cir. 1997); *In re The Drexel*

*Burnham Lambert Group, Inc.*, 113 B.R. 830, 837 (Bankr. S.D.N.Y. 1990) (the "automatic stay is key to the collective and preservative nature of a bankruptcy proceeding.").[4]

Although the express language of section 362(a)(1) refers only to actions against the debtor, courts have extended the automatic stay to enjoin actions against non-debtors when a claim against the non-debtor would have an immediate adverse economic consequence for the debtor's estate. *Queenie, Ltd. V. Nygard Int'l*, 321 F.3d 282, 287-88 (2d Cir. 2003) ("The automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtors); *A. H. Robins Co. v. Piccinin*, 788 F.2d at 998-1007 (recognizing the broad reach Congress intended for the automatic stay, and holding that the protection of the automatic stay reaches beyond direct actions against the debtor to actions against non-debtors in appropriate circumstances); *McCartney*, 106 F.3d at 510-511 (relying, in part, on *Robins*, and holding that the automatic stay prevented pursuit of a deficiency judgment against a non-debtor third party); *Gillman v. Continental Airlines, Inc.,* 177 B.R. 475, 479 (D. Del. 1993) (upholding the bankruptcy court's

---

[4]  Because the Defendants' actions are essentially an effort to take and place control of the Debtors' parent company in the hands of a foreign liquidator in order to ensure payment of their claims, the automatic stay already stays these actions without extension under the Court's 105 powers or otherwise. *See In re BiCoastal Corp.*, Case No. 89-8198-8P1, 1989 Bankr. LEXIS 2046 (Bankr. M.D. Fla. November 21, 1989).  In *Bicoastal*, the court found that the automatic stay prevented the debtor's creditors from taking control of the equity and board of directors of the Debtor for the purpose of "obtain[ing] control of the management in order to assure that [the creditor] was repaid.  Thus, it could be argued with some force that what [the shareholders] are attempting to do is indirectly force repayment of the loan, which would clearly be prohibited by 362(a)(1). . . . It is not farfetched to surmise that once [the shareholders] acquired control, they would elect to make provision for [payment of their own debt and which could] conceivably wreck the entire reorganization process by frustrating the attempt of other parties of interest, such as creditors, to effectuate a reorganization."  The court held that such a destructive attempt to exercise such rights would constitute an act to "obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" in violation of section 362(a)(3) of the Bankruptcy Code.  Likewise, here, any attempt to collect on a guaranty issued by LBIAF in support of a debt owed by one of the Debtors would effectively constitute an effort by LBIAF creditors to obtain control over LBIAF through an involuntary insolvency proceeding in Europe, which in turn could "conceivably wreck the entire reorganization process."

extension of the automatic stay to bar the prosecution of stockholder suits against non-debtor officers and directors).

The Debtors commenced the chapter 11 cases to preserve their assets for the benefit of their creditors. If the Defendants were permitted to continue prosecuting the Guaranty Claims against LBIAF, such actions would have the effect of depleting the Debtors' property because they would give rise to claims by LBIAF against the Debtors. Furthermore, the Guaranty Claims would be paid from funds that would otherwise be made available for use by the Debtors in the administration of their estates and for the satisfaction of claims because LBIAF has no unencumbered assets. Permitting such an erosion of assets would undermine the entire purpose for which the Debtors sought relief under the Bankruptcy Code.

In *Robins*, the United States Court of Appeals for the Fourth Circuit affirmed an order that enjoined litigation pending in various state and federal courts against the debtor's co-defendants, some of whom were non-debtor employees. The Fourth Circuit concluded that section 362(a)(1) applies to stay actions against non-debtors in "unusual circumstances[, including] when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Robins*, 788 F.2d at 999; *see also McCartney*, 106 F.3d at 511 (because the debtor would have been the real party in interest in a deficiency judgment action against his wholly owned, non-debtor corporation, the automatic stay precluded pursuit of such action against the non-debtor).

Further, in addition to the economic havoc the Guaranty Claims would wreak on the Debtors, the practical reality is that proceedings against LBIAF on account of such claims will have the same effect as proceedings against the Debtor itself because certain key personnel

of the Debtors would be forced to participate to the greatest extent possible to help prepare LBIAF to defend against the Guaranty Claims. The risk of adverse binding testimony by, or determinations made by other courts against the interests of, the Debtors, and the concomitant pressure on the Debtors to effectively waive the benefit of the automatic stay and devote their management's attention and valuable estate resources to preserve its rights, require prompt declaratory relief confirming that the automatic stay applies to stay the Guaranty Claims against LBIAF.

Based on the foregoing, it is clear that, absent extending the automatic stay to the Guaranty Claims against LBIAF, the Debtors will be deprived of the "breathing spell" contemplated by Congress to permit chapter 11 debtors an orderly environment in which to formulate and propose a chapter 11 plan.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that the Court enter an order (i) enjoining and restraining the Defendants, all other persons or entities acting in concert with any of them, and any other creditor of the Debtors from taking any action or commencing any proceeding to assert claims in respect of, or to enforce, any contractual or legal rights under or in connection with any Guaranty Claims against LBIAF, or (ii), in the alternative, extending the automatic stay to protect LBIAF from the assertion or pursuit in any manner of any of the Guaranty Claims; (iii) temporarily restraining the Defendants, all other persons or entities acting in concert with any of them, and any other creditor of the Debtors from taking any action with respect to a Guaranty Claim against any of LBIAF pending a hearing and ruling on the Motion; and (iv) granting such other relief that it deems just and proper.

Dated: New York, New York
February 6, 2009

SUSMAN GODFREY L.L.P.

*/s/ Vineet Bhatia*

Vineet Bhatia
David Peterson
1000 Louisiana St. 5100
Houston, Texas 77002
Telephone: 713-653-7855
Facsimile: 713-654-3344
vbhatia@SusmanGodfrey.com

Proposed Attorneys for Lyondell Chemical
Company, et al.