Edward S. Weisfelner (EW-5581)
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

Steven D. Pohl
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

Proposed Counsel for the Official Committee
of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Case No. 09-10023 (REG) |
| | : | |
| LYONDELL CHEMICAL | : | Chapter 11 |
| COMPANY, et al., | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

---------------------------------------------------------------x

| | | |
|---|---|---|
| | : | |
| LYONDELL CHEMICAL | : | |
| COMPANY, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adv. Pro. No. 09-1038 |
| | : | |
| CENTERPOINT ENERGY GAS SERVICES | : | |
| INC.; COKINOS NATURAL GAS COMPANY; | : | |
| CONOCOPHILLIPS COMPANY; THE DOW | : | |
| CHEMICAL COMPANY; GULFMARK | : | |
| ENERGY INC.; KOCH SUPPLY & TRADING, | : | |
| LP; KOCH SUPPLY & TRADING, SARL; | : | |
| MARATHON PETROLEUM COMPANY LLC; | : | |
| MORGAN STANLEY CAPITAL GROUP INC.; | : | |
| NALCO COMPANY; SARACEN ENERGY | : | |
| PARTNERS: LP; SUNCOR ENERGY | : | |
| MARKETING INC.; TARGA LIQUIDS | : | |
| MARKETING AND TRADE; TARGA | : | |
| MIDSTREAM SERVICES LIMITED | : | |

PARTNERSHIP; WACHOVIA BANK, N.A.       :
WELLS FARGO BANK NORTHWEST, N.A.    :
AL-WAHA PETROCHEMICAL CORPORATION :
ALON REFINING KROTZ SPRINGS INC.;    :
ALON USA ENERGY, INC.; ALON USA LP;   :
AMERICAN AGIP CO. INC.; ANADARKO    :
ENERGY SERVICES COMPANY; ASPEN     :
TECHNOLOGY, INC.; ASTRA OIL COMPANY :
LLC; AUX SABLE LIQUID PRODUCTS LP; BP :
OIL INTERNATIONAL LIMITED; BRENCO –  
COMPANHIA BRASILEIRA DE ENERGIA    :
RENOVAVEL; CENTER OIL COMPANY; CIMA :
ENERGY, LTD.; CITGO PETROLEUM       :
CORPORATION; COPERSUCAR; DCP      :
MIDSTREAM MARKETING LLC; DCP NGL   :
SERVICES LLC; ECOFUEL S.P.A.-ENI GROUP; :
ECOPETROL S.A.; ESSO SOCIETE ANONYME :
FRANCAISE; EXXONMOBIL CHEMICAL;   :
EXXON MOBIL CORPORATION; GATX;    :
GLENCORE COMMODITIES LTD.;       :
GLENCORE ENERGY UK LTD.; GLENCORE  :
LTD.; GLOBAL COMPANIES LLC; GUNVOR  :
INTERNATIONAL BV; HESS CORPORATION; :
HESS ENERGY SERVICES COMPANY, LLC;  :
HESS ENERGY TRADING COMPANY LLC;   :
HOUSTON PIPE LINE COMPANY LP; LOUIS  :
DREYFUS ENERGY SERVICES, L.P.; MF    :
GLOBAL INC.; METROPLEX ENERGY;    :
NORTHVILLE PRODUCT SERVICES;     :
PARAMOUNT PETROLEUM CORPORATION; :
PRUDENTIAL BACHE COMMODITIES LLC;  :
SHELL TRADING INTERNATIONAL LTD    :
AND SUBSIDIARIES; SONATRACH;      :
SUNOCO, INC.; TARGA LOUISIANA FIELD  :
SERVICES LLC; TEXAS AROMATICS, LP;   :
TRAFIGURA BEHEER BV; TRANSAMMONIA, :
INC.; TRAMMO GAS; UNION TANK CAR;   :
ADVANTUS CAPITAL MANAGEMENT INC.; :
AEGON ASSET MANAGEMENT NV      :
(NETHERLANDS); AEGON USA INVESTMENT :
MANAGEMENT LLC; ALLIANCEBERNSTEIN :
LP; AMERICAN MONEY MANAGEMENT   :
CORP.; AMERISURE INSURANCE;      :
ANALYTIC INVESTORS LLC; BANC OF    :
AMERICA SECURITIES LTD.; BARCLAYS   :
FIXED INCOME; BARCLAYS GLOBAL    :

INVESTORS; BAWAG PSK INVEST GMBH;          :
BLACKROCK FINANCIAL MANAGEMENT             :
INC.; BLUE CROSS BLUE SHIELD OF            :
MICHIGAN; BLUEMOUNTAIN CAPITAL             :
MANAGEMENT; BNY MELLON PRIVATE             :
WEALTH; BOA SECURITIES LTD.;               :
CALIFORNIA STRS; CLEARSTREAM               :
BANKING; CITY NATIONAL BANK;               :
COMINVEST ASSET MANAGEMENT GMBH;           :
CRÉDIT SUISSE ASSET MANAGEMENT             :
AMERICAS; CS SECURITIES LLC; CS            :
SECURITIES (EUROPE) LIMITED; CS            :
SECURITIES (SWITZERLAND) LLC; DBAG         :
LONDON GLOBAL; DELAWARE                    :
INVESTMENT ADVISERS; DEUTSCHE              :
ASSET MANAGEMENT (DEAM); DEUTSCHE          :
BANK SECURITIES; EMPLOYERS                 :
INSURANCE CO. OF NEVADA INC.;              :
EURIZON CAPITAL SGR SPA; EUROCLEAR         :
SA; F&C ASSET MANAGEMENT PLC;              :
FEDERATED INVESTORS INC.; FIDELITY         :
MANAGEMENT & RESEARCH CO.; FIFTH           :
THIRD ASSET MANAGEMENT; FORT               :
WASHINGTON INVESTMENT ADVISORS             :
INC.; FORTIS INVESTMENT MANAGEMENT         :
SA (LUXEMBOURG); GE ASSET                  :
MANAGEMENT; GOLDMAN SACHS ASSET            :
MANAGEMENT LP; GREENWICH STREET            :
ADVISORS; HENDERSON GLOBAL                 :
INVESTORS LIMITED; HSBC GLOBAL             :
ASSET MANAGEMENT (UK) LIMITED;             :
HUGHESON LIMITED; ING INVESTMENT           :
MANAGEMENT LLC; JONES HEWARD               :
INVESTMENT COUNSEL INC.; JP MORGAN         :
CLEARING CORP.; THE LAFAYETTE LIFE         :
INSURANCE CO.; LEGG MASON PARTNERS         :
FUND ADVISOR LLC; LIBERTY MUTUAL           :
INSURANCE CO.; LOOMIS, SAYLES & CO.,       :
LP; M&G INVESTMENT MANAGEMENT              :
LTD.; MEDIOLANUM ASSET MANAGEMENT          :
LIMITED; METZLER INVESTMENT GMBH;          :
MFC GLOBAL INVESTMENT MANAGEMENT           :
(US) LLC; THE MIDLAND CO.; MORGAN          :
STANLEY INVESTMENT MANAGEMENT              :
INC.; MUTUAL OF AMERICA CAPITAL            :
MANAGEMENT CORP.; MUTUAL OF OMAHA          :

INSURANCE CO.; NATIONWIDE INSURANCE :
CO. (OFFICE OF INVESTMENTS); NEW :
JERSEY DIVISION OF INVESTMENTS; NEW :
YORK LIFE INVESTMENT MANAGEMENT :
LLC; NOBO & RETAIL ACCOUNTS; NOMURA :
ASSET MANAGEMENT CO., LTD.; NOMURA :
CORPORATE RESEARCH & ASSET :
MANAGEMENT; NORTHERN TRUST :
INVESTMENTS NA; OHIO PERS; OHIO STRS; :
PIONEER INVESTMENT MANAGEMENT :
(IRELAND) LTD.; PIONEER INVESTMENT :
MANAGEMENT INC.; PPM AMERICA INC.; :
PROVIDENT INVESTMENT COUNSEL INC.; :
PRUDENTIAL INVESTMENT MANAGEMENT- :
FIXED INCOME; PYRAMIS GLOBAL :
ADVISORS LLC; SANKATY ADVISORS LLC; :
STANDISH MELLON ASSET MANAGEMENT :
CO., LLC; STATE STREET GLOBAL :
ADVISORS (SSGA); STICHTING :
PENSIOENFONDS ABP; STONE HARBOR :
INVESTMENT PARTNERS LP; STW FIXED :
INCOME MANAGEMENT; TEACHER :
RETIREMENT SYSTEM OF TEXAS; :
TEACHERS ADVISORS INC.; UBS AG; USAA :
INVESTMENT MANAGEMENT CO.; WELLS :
CAPITAL MANAGEMENT; WESTERN ASSET :
MANAGEMENT CO. (WAMCO); AND WHITE :
MOUNTAINS ADVISORS LLC; WILMINGTON :
TRUST COMPANY, AS TRUSTEE; AND :
UNKNOWN HOLDERS 1-500 OF $618,000,000 :
AND €500,000,000 OF 8-3/8% SENIOR NOTES :
DUE IN 2015 ISSUED BY LYONDELLBASELL :
INDUSTRIES AF S.C.A. AS SUCCESSOR TO :
NELL AF S.Á.R.L., :
                                                        :
                    Defendants.                         :
                                                        :
------------------------------------------------------------x

**MEMORANDUM OF LAW OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS IN SUPPORT OF DEBTORS' MOTION AND SUPPLEMENTAL
MOTION FOR (I) A PRELIMINARY INJUNCTION PURSUANT TO 11 U.S.C. § 105,
RULE 65 OF THE FEDERAL RULES OF CIVIL PROCEDURE, AND RULES
7001(7) AND 7065 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE, AND/OR (II) EXTENDING THE AUTOMATIC STAY
<u>PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE</u>**

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................1

II.   BACKGROUND .............................................................................................3

      A.    The Parent Company And Its Non-Debtor Affiliates ...........................................3

      B.    The Guaranty Agreements .................................................................4

      C.    The 2015 Notes ............................................................................5

      D.    Procedural Background ....................................................................6

III.  ARGUMENT ...................................................................................7

      A.    The Court Should Issue An Injunction Pursuant To Section 105(a) Of The
            Bankruptcy Code, Restraining Actions Against The LBIAF Non-Debtors............7

            i.    The Debtors' Have A Reasonable Likelihood Of A Successful
                  Reorganization .......................................................................10

            ii.   There Is A Danger Of Irreparable Harm To The Debtors' Estates And
                  The Debtors' Ability To Reorganize If A Preliminary Injunction Is Not
                  Issued ................................................................................11

            iii.  The Balance Of Harms Weighs Strongly In Favor Of The Issuance Of A
                  Preliminary Injunction ...........................................................13

            iv.   The Public Interest Militates In Favor Of A Preliminary Injunction ........14

      B.    The Automatic Stay Should Be Extended To Enjoin Actions Against The LBIAF
            Non-Debtors ...............................................................................15

IV.   CONCLUSION ...............................................................................17

## FEDERAL CASES

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ............................................................................15

*Barney's, Inc. v. Isetan Co. (In re Barney's, Inc.)*,
200 B.R. 527 (Bankr. S.D.N.Y. 1996) ...............................................................13

*Dore & Assocs. Contracting, Inc. v. American Druggists' Ins. Co.*,
54 B.R. 353 (Bankr. W.D. Wis. 1985) ...............................................................10

*Gucci, America, Inc. v. Duty Free Apparel, Ltd.*,
328 F. Supp. 2d 439 (S.D.N.Y. 2004) ................................................................15

*In re Adelphia Commc'ns Corp.*,
298 B.R. 49 (S.D.N.Y. 2003) ...............................................................................9

*In re Adelphia Commc'ns Corp.*,
345 B.R. 69 (Bankr. S.D.N.Y. 2006) ...............................................................8, 9

*In re Alert Holdings, Inc.*,
148 B.R. 194 (Bankr. S.D.N.Y. 1992) ................................................................11

*In re Calpine Corp.*,
354 B.R. 45 (Bankr. S.D.N.Y. 2006) ..........................................................8, 9, 11

*In re Calpine Corp.*,
365 B.R. 401 (S.D.N.Y. 2007) .......................................................................9, 12, 15

*In re Granite Partners, L.P.*,
194 B.R. 318 (Bankr. S.D.N.Y. 1996) ..................................................................8

*In re The 1031 Tax Group, LLC*,
397 B.R. 670 (Bankr. S.D.N.Y. 2008) .................................................8, 9, 12, 13

*In re United Health Case Org.*,
210 B.R. 228 (S.D.N.Y. 1997) ..............................................................8, 9, 12, 14

*In re WorldCom, Inc.*,
2003 WL 23861928 (Bankr. S.D.N.Y. 2003) ...............................................10, 14

*Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville)*,
26 B.R. 420 (Bankr. S.D.N.Y. 1983) ..................................................................13

*Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.),*
   801 F.2d 60 (2d Cir. 1986) ..........................................................................................8

*McCartney v. Integra Nat'l Bank North,*
   106 F.3d 506 (3d Cir. 1997) ................................................................................15, 16

*NRLB v. Bildisco & Bildisco,*
   465 U.S. 513 (1984) ...................................................................................................11

*Queenie Ltd. v. Nygard Int'l,*
   321 F.3d 282 (2d Cir. 2003) ................................................................................15, 16

*Steven P. Nelson, D.C., P.A. v. Gen. Elec. Capital Corp.,*
   140 B.R. 814 (Bankr. M.D. Fla. 1992)......................................................................10

## **FEDERAL STATUTES**

11 U.S.C. § 105(a) ................................................................................................................1

11 U.S.C. § 362(a) ................................................................................................................8

## **MISCELLANEOUS**

*European Cross Border Insolvency*, Jennifer Marshall, Sweet & Maxwell, July 2008 .................6

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in the chapter 11 cases of the above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), by and through its proposed counsel Brown Rudnick LLP, hereby submits this Memorandum of Law in support of *Debtors' Motion for (I) a Preliminary Injunction and a Temporary Restraining Order Pursuant to 11 U.S.C. § 105, Rule 65 of the Federal Rules of Civil Procedure, and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure, and/or (II) Extending the Automatic Stay Pursuant to Section 362 of the Bankruptcy Code* (the "<u>Original Motion</u>") and *Debtors' Supplemental Motion for (I) a Preliminary Injunction Pursuant to 11 U.S.C. § 105, Rule 65 of the Federal Rules of Civil Procedure, and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure, and/or (II) Extending the Automatic Stay Pursuant to Section 362 of the Bankruptcy Code* (the "<u>Supplemental Motion</u>" and, together with the Original Motion, the "<u>Motion</u>").[1]  In support thereof, the Committee respectfully represents as follows:

## I.       PRELIMINARY STATEMENT

1.       By the Motion, the Debtors are seeking a preliminary injunction against certain persons and entities, restraining them from pursuing remedies against the Debtors' non-debtor parent company and other affiliated non-debtors.  Such an injunction is essential in order to allow the Debtors sufficient breathing room to effectively and efficiently reorganize their businesses.  A failure to grant the requested relief could result in an abrupt and untimely end to the Debtors' cases – all to the severe detriment of the Debtors' creditors, employees, suppliers, and numerous other stakeholders.

---

[1]       Capitalized terms used hereunder and not defined herein shall have the meanings ascribed to them in the Motion or the TRO (as defined below), as applicable.

2. As the Debtors' parent company has limited personnel and no meaningful assets other than its equity interests in the Debtors and non-debtor affiliates (and an intercompany claim), the failure to issue an injunction would necessitate a substantial diversion of the Debtors' management's time and resources away from their reorganization efforts. Even more troubling, a denial of the Motion could prompt the acceleration of approximately $1.3 billion in senior notes issued by the parent company, the commencement of involuntary liquidation proceedings against the parent, and the appointment of a foreign liquidator who would control the parent going forward. Commencement of such proceedings would constitute a default under the Debtors' proposed debtor-in-possession financing (the "DIP Facility"), which in turn would constitute a default under the Debtors' forbearance agreements with its senior secured lenders, thereby imperil the DIP Facility and enabling the Debtors' lenders to exercise remedies against the non-debtor affiliates that pledged collateral and guaranteed the Debtors' secured indebtedness. This flood of defaults could force many of the non-debtor affiliates into liquidation proceedings – an outcome that would destroy the Debtors' synergies with their European brethren and potentially spell disaster for the Debtors' reorganization prospects.

3. Furthermore, in balancing the harms here, it is apparent that the parties sought to be enjoined will not be prejudiced by the issuance of the injunction nearly to the extent the Debtors may suffer harm. Their claims can be appropriately addressed in the context of the Debtors' chapter 11 proceedings. Moreover, as the parent company has no liquid assets which could be used to satisfy the Defendants' demands, it is unclear how expeditiously the claimants would actually be able to realize upon their claims by pursuing remedies against the parent company and its non-debtor subsidiaries. As the circumstances plainly establish that irreparable harm will result from a denial of an injunction, and as the balance of harms weighs

overwhelmingly in the Debtors' favor, this Court should enter a preliminary injunction under Section 105 of the Bankruptcy Code.

4.      In the alternative, this Court should extend Section 362's automatic stay to restrain actions against the Defendants because a failure to do so would have immediate adverse economic consequences for the Debtors' estates.  Given the potential avalanche of defaults and cross-defaults and commencement of European insolvency proceedings that could flow from a refusal to grant the requested relief, it cannot be doubted that grounds exist to extend the automatic stay under these circumstances.

## II.      BACKGROUND

### A.      The Parent Company And Its Non-Debtor Affiliates

5.      The Debtors are indirect subsidiaries of holding company LyondellBasell Industries AF S.C.A., a company existing under the laws of the Grand Duchy of Luxembourg (the "Parent Company" and, together with the Parent Company's non-debtor affiliates, the "LBIAF Non-Debtors").

6.      Neither the Parent Company, nor any of the Parent Company's European subsidiaries (other than the German company Basell Germany Holdings G.m.b.H.) is a Debtor in these proceedings.

7.      Other than the Parent Company's equity interest in its direct subsidiary (Basell Funding S.Á.R.L. ("Basell Funding")), an intercompany note from LyondellBasell Industries Holdings B.V. (the "Intercompany Note"), and potentially certain intercompany receivables from certain European entities, the Parent Company has no assets.  See Transcript of February 6, 2009 Hearing Before the Honorable Robert E. Gerber ("Transcript"), p. 8.

8.  According to the Debtors, each of the entities owned directly and indirectly by the Parent Company is "an important part of the integrated operations of the Debtors and non-debtors."  <u>See</u> Declaration of Alan S. Bigman in Support of a Motion for a Preliminary Injunction and a Temporary Restraining Order (the "<u>Bigman Declaration</u>"), ¶ 5.

**B.  <u>The Guaranty Agreements</u>**

9.  The Parent Company has entered into guaranty agreements (the "<u>Guaranty Agreements</u>"), guaranteeing obligations of certain of the Debtors.

10.  Certain of the Defendants are beneficiaries under the Guaranty Agreements and have made demands on the Parent Company for payment under the particular Guaranty Agreement to which each is a party.  Collectively, the claims asserted thus far total approximately $131 million.  The Debtors have indicated that they have a total exposure under the Guaranty Agreements in the amount of approximately $200 million.  <u>See</u> Transcript, at p. 11.

11.  It also appears to be the case that, on or about February 6, 2009, one of the Defendants party to a Guaranty Agreement with the Parent Company commenced a conservatorship proceeding in the Netherlands with respect to the Parent Company.  <u>See</u> Transcript, at pp. 11-13.  We understand that pursuant to these proceedings, leave was obtained by one of the Defendants party to a Guaranty Agreement with the Parent Company on an *ex parte* basis from a Dutch Court to make a precautionary attachment (in Dutch: "*conservatoir beslag*") of any Dutch assets of the Parent Company.  We further understand that within a certain period of time set by the Dutch Court (of 2 or 3 weeks), legal proceedings before a Dutch Court would have to be commenced by that Defendant against the Parent Company to obtain a judgment by the Dutch Court for payment by the Parent Company of the claim the Defendant alleges to have under the Guaranty Agreement with the Parent Company.

12.     Nell AF S.Á.R.L., the predecessor in interest to the Parent Company, issued €500 million and $615 million 8-3/8% Senior Notes due 2015 (the "2015 Notes" and the holders thereof, the "2015 Noteholders"), pursuant to an Indenture (the "2015 Notes Indenture") dated as of August 10, 2005.  The 2015 Notes are guaranteed (the "2015 Note Guarantees") by certain of the Parent Company's subsidiaries, including a number of the Debtors.  In addition, the 2015 Notes are secured by a pledge of the Parent Company's shares in Basell Funding and the Intercompany Note.

13.     The Debtors' bankruptcy filing triggered an event of default under the 2015 Notes Indenture.  See 2015 Notes Indenture, § 6.01(6).  As a consequence of such event of default and as long as such event of default is continuing, the indenture trustee or the holders of 25% in principal amount of outstanding 2015 Notes may declare the 2015 Notes due and payable.  See 2015 Notes Indenture, § 6.02(a).

14.     Upon information and belief, according to recent news articles, certain of the 2015 Noteholders also hold credit default swaps as a hedge on the 2015 Notes (the "CDS Holders") and have attempted to aggregate 25% of outstanding Notes in order to accelerate the 2015 Notes and create a termination event that would entitle them to a payment on the credit default swaps from their counterparties.  The Committee suggests that the Court need not go out of its way to help the CDS Holders cause a termination event.

15.     Pursuant to the Intercreditor Agreement (the "Intercreditor Agreement"), by and among the Parent Company, the indenture trustee for the 2015 Notes, and others, dated as of December 20, 2007, the 2015 Noteholders are prohibited from taking action to enforce their rights against their collateral or in respect of the 2015 Note Guarantees until after the senior debt

has been fully discharged or after the expiration of a 179-day standstill period.  See Intercreditor Agreement, §§ 18.3.2, 19.2.1(c).

16.    However, it is possible that, in light of the Parent Company's inability to satisfy all outstanding amounts of principal and interest that would be due upon acceleration, the trustee or the 2015 Noteholders may attempt to commence involuntary insolvency proceedings against the Parent Company in Luxembourg, the Netherlands, or some other jurisdiction.

17.    In the event that the 2015 Noteholders are able to commence involuntary insolvency proceedings against the Parent Company, a court-appointed judge (*juge-commissaire*) and court-appointed liquidator would take control of the Parent Company's operations.[2]  In addition, if the Parent Company has intercompany claims against any of the European non-debtor affiliates, it is possible that the liquidator will use these intercompany claims as a basis for commencing insolvency proceedings in respect of other European non-debtor entities in their respective jurisdictions.[3]

D.    **Procedural Background**

18.    On the morning of February 6, 2009, the Debtors submitted to the Court the Original Motion, a supporting memorandum of law, and the Bigman Declaration.

19.    On the afternoon of February 6, 2009, the Court held an *ex parte* hearing on the Original Motion.  The Committee, through its counsel, participated in the hearing telephonically. After hearing oral argument on the Original Motion, testimony from the Debtors' deputy general counsel Gerald A. O'Brien, and the Debtors' oral motion to extend the relief requested in the Original Motion to the 2015 Noteholders and certain related parties, the Court determined that

---

[2]    See *European Cross Border Insolvency*, Jennifer Marshall, Sweet & Maxwell, July 2008 at paragraph 18.012, sub-paragraph 7.2.
[3]    See *European Cross Border Insolvency*, Jennifer Marshall, Sweet & Maxwell, July 2008 at paragraph 18.015, sub-paragraph 8.7.

the Debtors had satisfied the requirements for a temporary restraining order with respect to all parties sought to be enjoined.

20.     The Court entered an order (the "<u>TRO</u>"), pursuant to sections 105(a) and 362(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules, staying, restraining and enjoining (i) the 2015 Noteholders and their agents, attorneys and all persons acting in concert or participation with them, directly and indirectly, and (ii) any creditor of the Debtors holding a guaranty executed by the Non-Debtor Affiliates, including the Guarantee Claimants, and their agents, attorneys and all persons in active concert or participation with them, directly and indirectly, from taking action against the Non-Debtor Affiliates.[4]

21.     The Court scheduled a hearing on the Debtors' request for a preliminary injunction for February 13, 2009.

22.     On February 9, the Debtors filed their *Complaint for Injunctive Relief* against the Defendants and the Supplemental Motion, supplementing the oral motion made at the February 6, 2009 hearing for injunctive relief as to the 2015 Notes.

## III.     <u>ARGUMENT</u>

### A.     <u>The Court Should Issue An Injunction Pursuant To Section 105(a) Of The Bankruptcy Code, Restraining Actions Against The LBIAF Non-Debtors</u>

---

[4]     Specifically, the TRO enjoined such persons and entities from "(a) taking any act or action to accelerate the maturity of or otherwise enforce any rights in respect of the 2015 Notes or any Guaranty Claims against any Non-Debtor Affiliates, obtain possession of or to exercise control over property, or the proceeds of property, of Non-Debtor Affiliates; (b) taking any act or action to create, perfect or enforce any lien against Non-Debtors Affiliates or their property, or the proceeds of such property; (c) commencing or continuing any action or legal proceeding (including, without limitation, any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever), including by way of counterclaim, against Non Debtor Affiliates, or any of their property, or the proceeds of such property, including, without limitation, the commencement of insolvency or similar proceedings against Non-Debtor Affiliates in any jurisdiction whatsoever; and (d) enforcing any judicial, quasi-judicial, administrative or regulatory judgment, assessment or order against Non-Debtor Affiliates, and commencing or continuing any act or action or other legal proceeding (including, without limitation, any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever) or any counterclaim to create, perfect or enforce any lien, attachment, garnishment, setoff or other claim against Non-Debtor Affiliates or their property, or the proceeds of such property, or any action to commence insolvency or similar proceedings against Non-Debtor Affiliates in any jurisdiction whatsoever."

23.     Section 105(a) of the Bankruptcy Code authorizes bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." See 11 U.S.C. § 105(a).  Courts have regularly invoked Section 105's power to enjoin actions against non-debtors where such actions threaten the debtor's estate and its efforts to reorganize.  See, e.g., In re The 1031 Tax Group, LLC, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008); In re Granite Partners, L.P., 194 B.R. 318, 337 (Bankr. S.D.N.Y. 1996) (bankruptcy courts "can and should enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts"); In re Adelphia Commc'ns Corp., 345 B.R. 69, 85 (Bankr. S.D.N.Y. 2006) ("A bankruptcy court may enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it.  As the Second Circuit has observed, section 105(a) powers may be exercised where there is a basis for concluding that rehabilitation, the very purpose for the bankruptcy proceedings, might be undone by the other action.") (citing Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 64 (2d Cir. 1986)); In re Calpine Corp., 354 B.R. 45, 49 (Bankr. S.D.N.Y. 2006) ("Section 105 injunctions are granted . . . because one of the overriding purposes of the Bankruptcy Code is to provide debtors with breathing room from their creditors to increase the chances of a successful reorganization. Because non-debtors do not fall within the protection of automatic stay, at times section 105 must be invoked on their behalf to prevent creditors from frustrating an otherwise-viable reorganization effort by pursuing actions against them.  In other words, Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code.") (internal quotations omitted); In re United Health Case Org., 210 B.R. 228, 232

(S.D.N.Y. 1997) (Section 105 permits courts to enjoin actions against non debtors if doing so "contributes to the debtor's efforts to achieve rehabilitation").

24.     In determining whether to grant a Section 105 injunction, courts have examined "(1) whether there is a likelihood of successful reorganization; (2) whether there is an imminent irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harms tips in favor or the moving party; and (4) whether the public interest weighs in favor of an injunction."  See In re Calpine Corp., 365 B.R. 401, 409 (S.D.N.Y. 2007).[5]  In assessing these factors, courts take a flexible approach and no one factor is determinative.  See id.  Notably, courts construe Section 105 "liberally to enjoin suits that might impede the reorganization process" and have "embraced the use of § 105(a) without proof of all four factors normally required for injunctions."  See In re Adelphia Commc'ns Corp., 298 B.R. 49, 54 (S.D.N.Y. 2003) (citing MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 93 (2d Cir. 1988)); see also In re Adelphia Commc'ns Corp., 345 B.R. 69, 84 (Bankr. S.D.N.Y. 2006) ("Though it may not matter, since the standards for issuance of an injunction set forth above have been satisfied, the Court notes that it has been repeatedly held in this district that the usual grounds for injunctive relief, such as irreparable injury, need not be shown in a proceeding for an injunction under section 105(a).").

---

[5]     See also United Health, 210 B.R. at 233 (adopting test for issuance of a Section 105 injunction: "The first requirement is that there be danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize. Second, there must be a reasonable likelihood of a successful reorganization.  Third, the court must balance the relative harm as between the debtor and the creditor who would be restrained.  Fourth, the court must consider the public interest; this requires a balancing of the public interest in successful bankruptcy reorganizations with competing societal interests.") (citing 2 Collier on Bankruptcy, ¶ 105.02[2] at 105-13 (15th ed. 1997)).  Other courts in this Circuit have applied a slightly different test for determining whether a preliminary injunction should issue. See, e.g., Calpine, 354 B.R. at 48 ("To obtain a preliminary injunction in a bankruptcy proceeding, the moving party must demonstrate both irreparable harm and either a likelihood of success on the merits or a sufficiently serious question regarding the merits to make it a fair ground for litigation, with the balance of hardships tipping decidedly in the movant's favor.").  Regardless of which test is applied here, the Debtors have more than met their burden of demonstrating entitlement to a preliminary injunction.

25.     Here, the injunction sought by the Debtors falls squarely within the case law interpreting Section 105, as it is unquestionably necessary to prevent actions that would threaten the Debtors' estates and their efforts to reorganize.  See, e.g., 1031 Tax Group, 397 B.R. at 684. In addition, as described below, each of the preliminary injunction factors weighs heavily in favor of the requested relief.  Accordingly, the Court should grant the Motion.

### i.     The Debtors' Have A Reasonable Likelihood Of A Successful Reorganization

26.     The Debtors have a reasonable likelihood of a successful reorganization.  The Debtors commenced their cases just over one month ago, and already the process of stabilizing and restructuring their business is well underway.  Given the nascent stage of these proceedings, it is imperative that the Debtors be permitted to move forward with their efforts.  See Dore & Assocs. Contracting, Inc. v. American Druggists' Ins. Co., 54 B.R. 353, 359-60 (Bankr. W.D. Wis. 1985) ("In the early stages of bankruptcy when it is uncertain if reorganization is feasible or not the bankruptcy court must have broader latitude in determining whether to grant injunctive relief.  It is particularly appropriate that all uncertainties should be resolved in the debtor's favor during the period when the debtor is entitled to file a plan of reorganization."); see also Steven P. Nelson, D.C., P.A. v. Gen. Elec. Capital Corp., 140 B.R. 814, 816-17 (Bankr. M.D. Fla. 1992) (finding likelihood of successful reorganization; "[t]his Chapter 11 case is still in an embryonic stage and it is clearly unreasonable to require the Debtor at this early stage of the case to make detailed projections of the terms or anticipated feasibility of its plan of reorganization").

27.     To deny the Debtors such an opportunity would vitiate any progress that has been made so far and wholly undermine the Bankruptcy Code's objective of reorganizing financially troubled entities.  See, e.g., In re WorldCom, Inc., 2003 WL 23861928, at *51 (Bankr. S.D.N.Y. 2003) ("The primary goal of chapter 11 is to promote the rehabilitation of the debtor.  Congress

has recognized that the continuation of the operation of a debtor's business as a viable entity benefits the national economy through the preservation of jobs and continued production of goods and services. The Supreme Court similarly has recognized that '[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.'" (quoting NRLB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)).

> ### ii. There Is A Danger Of Irreparable Harm To The Debtors' Estates And The Debtors' Ability To Reorganize If A Preliminary Injunction Is Not Issued

28.     Courts in the Second Circuit have recognized "a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process or which would impair the court's jurisdiction with respect to the case before it." See In re Alert Holdings, Inc., 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992). Thus, where the movant shows "that the action sought to be enjoined would burden, delay or otherwise impede the reorganization proceedings or if the stay is necessary to preserve or protect the debtor's estate or reorganization prospects, the Bankruptcy Court may issue injunctive relief." See id.; see also Calpine, 354 B.R. at 48 (recognizing irreparable harm exception).

29.     Here, it is manifest that the actions sought to be enjoined by the Motion severely threaten the Debtors' reorganization process and their estates. For example, in the absence of a preliminary injunction, the 2015 Noteholders could accelerate the 2015 Notes and attempt to commence involuntary insolvency proceedings against the Parent Company – an event that would have far-reaching consequences. First, a foreign liquidator likely would be appointed to take control over the Parent Company, thereby wresting control from current management. Second, the commencement of an involuntary insolvency proceeding against the Parent

Company would constitute a default under the DIP Financing, which financing is essential for the Debtors' continued operations. Third, the default under the DIP Financing would precipitate a default under the forbearance agreements among the Debtors and their prepetition senior secured and bridge lenders. This in turn would permit such secured lenders to exercise remedies against certain of the Debtors' non-debtor affiliates. Indeed, it is entirely probable that the foregoing parade of horribles would eventually prompt a rash of filings among the European non-debtor affiliates, which would result in the liquidation – rather than reorganization – of such entities.

30. Moreover, above and beyond the significant threat to the Debtors' reorganization efforts posed by a failure to issue a preliminary injunction, there are a myriad of other indicia of irreparable harm. First, as the Parent Company has no liquid assets, it is certain that a failure to issue an injunction will compel the Debtors' expenditure of funds for the Parent Company's defense costs.[6] In addition, as the Parent Company has limited personnel, a denial of the Motion would result in a substantial diversion of time away from the Debtors' restructuring efforts to the side-show that would be created by an involuntary insolvency proceeding against the Parent Company. Such a misallocation of the Debtors' scarce resources, particularly at such a critical juncture in these cases, would be wasteful and potentially dangerous to the Debtors' prospects for reorganization. See, e.g., Calpine, 365 B.R. at 410 (fact that failure to stay litigation against non-debtor would cause a significant burden and distraction of key employees from the debtor's restructuring efforts was sufficient to demonstrate irreparable harm); United Health, 210 B.R. at 232 (actions against non-debtors may be stayed where the action to be enjoined "would consume time and energy of the non-debtor that would otherwise be devoted to a reorganization effort.");

---

[6] The Parent Company's only source of potential source of liquidity (e.g., to pay interest on the 2015 Notes) would require it to borrow under the DIP Facility at an all-in rate of approximately 20%.

1031 Tax Group, 397 B.R. at 684 (court should consider whether the action to be enjoined would "burden and distract the debtor's management by diverting manpower from reorganization to defending litigation").

31.     Furthermore, a failure to enjoin actions against the LBIAF Non-Debtors could result in judgments adverse to the Debtors' interests which the Debtors' could be estopped from re-litigating.  Courts have held that Section 105 may be used to enjoin actions against non-debtors where "an adverse judgment in that litigation will collaterally estop the debtor in subsequent litigation."  See Barney's, Inc. v. Isetan Co. (In re Barney's, Inc.), 200 B.R. 527, 531 (Bankr. S.D.N.Y. 1996); Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville), 26 B.R. 420, 429 (Bankr. S.D.N.Y. 1983); see also 1031 Tax Group, 397 B.R. at 684 (court should consider whether the action to be enjoined would "expose the debtor to risks of collateral estoppel or res judicata").  As the Defendants' claims under the Guaranty Agreements are contingent upon a determination of the Debtors' underlying liability, the Debtors face a substantial risk of adverse findings if such claims are allowed to proceed against the LBIAF Non-Debtors.

32.     Finally, Defendants' successful prosecution of the claims arising under the Guaranty Agreements could give rise to indemnification and/or contribution claims by the Parent Company against the Debtors, thereby irreparably harming the Debtors' estates.  See, e.g., Johns-Manville, 26 B.R. at 429 (enjoining action where adverse judgment could trigger indemnification rights against the debtor); 1031 Tax Group, 397 B.R. at 684 (court should consider whether the action to be enjoined would "increase the debtor's indemnification liability").

### iii.     The Balance Of Harms Weighs Strongly In Favor Of The Issuance Of A Preliminary Injunction

33.     As described above, a denial of a preliminary injunction portends incalculable disaster for the Debtors' efforts toward a successful reorganization.  If creditors are allowed to commence insolvency proceedings against the Parent Company, the result could be a freefall of subsequent involuntary insolvency proceedings for the Debtors' European affiliates.  By stark contrast, the issuance of a preliminary injunction would cause little, if any, harm to the parties sought to be enjoined.  The only effect the preliminary injunction will have is to force the Defendants to temporarily delay the exercise of their remedies (many of which may already be restricted by the standstill in the Intercreditor Agreement).  Their claims will be addressed, as appropriate, in the context of the Debtors' bankruptcy proceedings.  Moreover, as the Parent Company does not have any liquid assets, the Defendants would not, in any event, be able to swiftly convert any remedies they may have into a recovery on their claims.  Against the backdrop of an all-but-assured failure of the Debtors' reorganization efforts in the absence of a preliminary injunction, it is clear that the balance of harms weighs heavily in favor of the requested relief.

### iv.     The Public Interest Militates In Favor Of A Preliminary Injunction

34.     It is beyond cavil that the public interest would be served by promoting a successful reorganization of the Debtors' estates.  The Debtors' creditors, employees, vendors and other stakeholders, as well as the global economy itself, have a substantial interest in seeing the restructuring of the Debtors' businesses and the confirmation of a viable chapter 11 plan. See WorldCom, 2003 WL 23861928, at *51 ("Congress has recognized that the continuation of the operation of a debtor's business as a viable entity benefits the national economy through the preservation of jobs and continued production of goods and services.").  Although this Court must balance the public interest in successful reorganizations against any "competing societal

interests" (see United Health, 210 B.R. at 233), the Committee is unable to conceive of any countervailing societal interest that would outweigh the interests that would be served by a successful reorganization of the Debtors' business.

### B.  The Automatic Stay Should Be Extended To Enjoin Actions Against The LBIAF Non-Debtors

35.     Even if the Court determines that the standard for issuance of a preliminary injunction has not been met, grounds exist to extend Section 362's automatic stay to enjoin actions against the LBIAF Non-Debtors.  Although Section 362 does not, by its terms, apply to non-debtors, courts have extended the stay to enjoin actions against non-debtors where the action would have "an immediate adverse economic consequence for the debtor's estate."  See Calpine, 365 B.R. at 408; Queenie Ltd. v. Nygard Int'l, 321 F.3d 282, 287 (2d Cir. 2003).

36.     For example, courts have enjoined actions against non-debtors where there was such identity between the debtor and the non-debtor that the debtor may be said to be the real party defendant and that a judgment against the non-debtor "will in effect be a judgment against the debtor."  See Calpine, 365 B.R. at 408; Queenie, 321 F.3d at 288 (quoting A.H. Robins Co. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986)); see also Gucci, America, Inc. v. Duty Free Apparel, Ltd., 328 F. Supp. 2d 439, 441 (S.D.N.Y. 2004) ("[A] § 362(a) stay may be imposed against a non-bankrupt party when such an identity of interest exists between the debtor and third party non-debtor that a judgment against the third party will directly affect the debtor.").

37.     In addition, courts have extended the automatic stay to non-debtors where the action sought to be enjoined relates to an obligation for which the debtor is a guarantor.  See Queenie, 321 F.3d at 287; see also McCartney v. Integra Nat'l Bank North, 106 F.3d 506, 510-11 (3d Cir. 1997) (extending automatic stay to foreclosure action against non-debtor corporation

where the bankrupt principal had guaranteed the corporation's obligation; because the plaintiff could not bring the action without involving the debtor in the process and impacting the debtor's estate, grounds existed to extend the stay).

38.     Here, a refusal to enjoin actions against the LBIAF Non-Debtors would have "an immediate adverse economic consequence for the debtor's estate."   As described above, commencement of an involuntary insolvency proceeding against the Parent Company would both wrest control of the Parent Company from existing management and put the entity's fate in the hands of an unfamiliar foreign liquidator.   In addition, an involuntary proceeding would produce a domino-effect of defaults – causing defaults under, inter alia, the DIP Facility and the forbearance agreements.  This could send many of the Debtors' non-debtor foreign affiliates into liquidation proceedings, thereby dissipating substantial value.

39.     Moreover, the interwoven guarantee relationships among the Debtors and non-debtors create a substantial identity of interest between them such that actions against the Parent Company and the other LBIAF Non-Debtors will directly affect the Debtors.  See Queenie, 321 F.3d at 288.  As the Parent Company has no liquid assets, a judgment against it will, in effect, be a judgment against the Debtors.   Significantly, the defense of any proceedings commenced against it will necessarily be borne by the Debtors.   Further, the Debtors' assets would be called upon to satisfy the claims arising under the Guaranty Agreements and could give rise to claims by the Parent Company against the Debtors.  Similarly, actions by the 2015 Noteholders would, as a result of guarantees of such obligations by certain of the Debtors, necessarily involve the Debtors in the process and impact the Debtors' estates.  See McCartney, 106 F.3d at 511 (extending automatic stay to action against non-debtor where debtor had guaranteed the non-

debtor's obligation). Actions with such a direct and adverse impact on the Debtors' estates and reorganization efforts should not be permitted to continue.

40. As a denial of the Motion would give rise to "an immediate adverse economic consequence" for the Debtors' estates, grounds exist to extend Section 362's automatic stay to enjoin actions against the LBIAF Non-Debtors. Accordingly, the Court should grant the Motion.

## IV.  **CONCLUSION**

The Committee respectfully requests that this Court (a) grant the Motion, (b) override any objections thereto, and (c) grant to the Committee and the Debtors such other and further relief as this Court deems appropriate.

Dated:  February 12, 2009

Respectfully submitted,

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS


By: /s/ Edward S. Weisfelner
Edward S. Weisfelner (EW-5581)
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

Steven D. Pohl
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

Proposed Counsel for the Official
Committee of Unsecured Creditors

# 1633301 v2