**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
                                  :

In re:                             :

                                  :       **Chapter 11**

LYONDELL CHEMICAL COMPANY, et al.,  :       **Case No. 09-10023 (REG)**

                                  :       **Jointly Administered**

                      **Debtors.**       :

--------------------------------------------------------------x
                                  :

LYONDELL CHEMICAL COMPANY, et al.  :

                      **Plaintiffs,**    :

                                  :

                  v.             :       **Adv. Proc. No. 09-01038 (REG)**

                                  :

CENTERPOINT ENERGY GAS SERVICES  :
INC., et al.,                         :

                     **Defendants.**   :

--------------------------------------------------------------x

<u>**SECOND SUPPLEMENTAL DECLARATION OF ALAN S. BIGMAN**
**IN SUPPORT OF DEBTORS' MOTION AND SUPPLEMENTAL MOTION FOR (I) A**
**PRELIMINARY INJUNCTION PURSUANT TO 11 U.S.C. § 105, RULE 65 OF THE**
**FEDERAL RULES OF CIVIL PROCEDURE, AND RULES 7001(7) AND 7065 OF THE**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND/OR (II) EXTENDING THE**
**AUTOMATIC STAY PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE**</u>

Pursuant to 28 U.S.C. § 1746, Alan S. Bigman declares as follows:

        1.        I am the Chief Financial Officer of LyondellBasell Industries AF S.C.A. ("<u>LBIAF</u>"), the non-debtor parent corporation of Lyondell Chemical Company ("<u>Lyondell Chemical</u>") and certain of its affiliated debtors (together with Lyondell Chemical, the "<u>Debtors</u>").

        2.        I submit this second supplemental declaration (the "<u>Second Supplemental Declaration</u>") in support of (a) the Debtors' Supplemental Motion For (I) a Preliminary

Injunction Pursuant to 11 U.S.C. § 105, Rule 65 of the Federal Rules of Civil Procedure, and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure, and/or (II) Extending the Automatic Stay Pursuant to Section 362 of the Bankruptcy Code [Docket No. 8] (the "Supplemental Motion"), and (b) the Debtors' Motion for (I) a Preliminary Injunction Pursuant to Section 105 of the Bankruptcy Code, Rule 65 Of The Federal Rules Of Civil Procedure, and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure, and/or (II) Extending the Automatic Stay Pursuant to Section 362 of the Bankruptcy Code [Docket No. 3] (the "Initial Motion" and, together with the Supplemental Motion, the "PI Motions"). This declaration supplements my declarations, dated February 6, 2009 and February 12, 2009 [Docket Nos. 5 and 43] (the "Initial Declarations") in support of the PI Motions.[1]

3.　　LBIAF does not have sufficient liquid assets to pay the 2015 Notes, totaling approximately $1.3 billion, and the potential Guaranty Claims, totaling approximately $130 million. To the extent LBIAF has liquid assets, those assets are pledged to the prepetition senior secured and bridge lenders, and are therefore not available to pay general claims. Exhibit A is a true and correct copy of LBIAF's draft unaudited balance sheet as of December 31, 2008. I do not believe that LBIAF's balance sheet has changed in any material amount through the present day, except as described below.

4.　　There are five types of assets listed on LBIAF's balance sheet. The first line shows €545,000,000 for "Shares in affiliated undertakings." This amount represents LBIAF's stock in subsidiaries. This stock is pledged to secure the prepetition senior secured and prepetition bridge loans under the Share Pledge Agreement dated December 20, 2007 between

---

[1] All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the PI Motions.

LBIAF, as Pledgor and Citibank, N.A. as Pledgee. A true and correct copy of this pledge agreement is attached as Exhibit B.

5. The second type of asset listed in the balance sheet is €939,819,871 for "Loans to affiliated undertakings." This amount represents the proceeds of the 2015 Notes which were raised by LBIAF and then in turn lent by LBIAF to its subsidiaries. These payables by the subsidiaries of LBIAF are pledged to secure senior secured and prepetition bridge loans under the U.S. Pledge Agreement, dated as of December 20, 2007 among the Grantors identified herein and Citibank, N.A., as Collateral Agent. A true and correct copy of this pledge agreement is attached as Exhibit C.

6. The third type of asset listed in the balance sheet is €56,485,070 for "Amounts owed by affiliated undertakings becoming due and payable within one year." This amount represents the intercompany payables to LBIAF from its subsidiaries that will become due and payable within one year. Of this amount, approximately €30 million represents the interest that the subsidiaries are accruing for payment to LBIAF with respect to the 2015 Notes. The remaining balance, approximately €26.5 million, is the amount currently owed to LBIAF by Basell Finance Company BV.

7. The fourth type of asset listed in the balance sheet is €122,694 for "Other debts becoming due and payable within one year." This amount represents an accrual for a Luxembourg value added tax receivable.

8. The fifth type of asset listed in the balance sheet is €1,381,820 for "Cash at bank and in hand." As shown on the February 19, 2009 "C/A Statement," attached as Exhibit D, this €1,380,000 was transferred after December 31, 2008 from LBIAF's account at ING to Basell Finance Company and is currently part of the amount owed to LBIAF by Basell Finance

Company BV. Any cash in the account at ING is also pledged to secure the Company's prepetition senior secured and prepetition bridge loans under the Bank Account Pledge Agreement dated December 20, 2007 among LBIAF, as Pledgor, Citibank, N.A., as Pledgee, and ING Luxembourg S.A., as account bank. A true and correct copy of this pledge agreement is attached as Exhibit E.

9.      As shown on Exhibit D, as of February 19, 2009, LBIAF had €26,421,359 held on account by Basell Finance Company. Of that amount, €11,737,284 will be used to pay an income tax obligation to the Luxembourg authorities. In addition, €9,194,002 is owed to a subsidiary as a recharge for auditing, accounting and related services. Accordingly, once those amounts are paid in the ordinary course, there will be approximately €5.5 million left as a receivable from Basell Finance Company BV. LBIAF's intent is to use this in the ordinary course of its business to pay for audit services and other professional fees necessary for its operation.

10.      In addition, the Debtors' DIP financing does not change the insufficiency of liquid assets of LBIAF to pay the Guaranty Claims and the 2015 Notes. Although the DIP financing provides some funds for Non-Debtor Affiliates in Europe, the amount is limited to €700 million and the funds may be used only as set forth in an operating budget agreed with the DIP lenders.

11.      Thus, LBIAF does not have liquid assets in any material amount with which to satisfy the 2015 Notes, the Guaranty Claims, or, importantly, any other guaranty claims that could be asserted against the Non-Debtor Affiliates that may not be subject to this Court's jurisdiction. The 2015 Noteholders and Guaranty Claimants will only recover after all of the

creditors of LBIAF's subsidiaries are satisfied, including the claims related to over $20 billion of debt that is secured by the pledge under Exhibit B.

12.     As indicated in a prior declaration, an interest payment on the 2015 Notes was due on February 15, 2009.  LBIAF did not make this payment because it could not do so without the approval of the prepetition senior secured and bridge lenders, approval which has not been granted.  While there is a 30-day grace period within which to make this interest payment, LBIAF has not yet determined whether it can make the payment.

13.     There has been an assertion by certain of the defendants that European creditors will be advantaged by the requested injunction.  This is not the case.  The Non-Debtor Affiliates have been paying their bills as they come due.  While LBIAF has issued a limited number of guarantees (approximately ten) similar to the ones at issue in this proceeding, LBIAF has not received any claims under those guarantees.  The Non-Debtor Affiliates intend to continue to pay their debts as they come due, and accordingly, there should be no guarantee claims asserted against LBIAF arising out of guarantees relating to the underlying obligations of the Non-Debtor Affiliates.

14.     Moreover, under the terms of the DIP financing, LBIAF is not permitted to dividend or otherwise transfer funds to the owner of its equity.

15.     Accordingly, no creditor that is not subject to this Court's jurisdiction will be advantaged if the preliminary injunction is granted.

16.     In addition, an insolvency proceeding against LBIAF triggers an automatic acceleration under the prepetition senior and bridge loans, and gives rise to direct remedies against the Non-Debtor Affiliates that are guarantors thereof, absent the forbearance agreements that are currently in place.  Those forbearance agreements were made possible only because of

the postpetition financing. In other words, the assertion by certain of the objectors to the injunction that the triggering of a default under the postpetition financing is a problem of the Company's own making misses the point. Had LBIAF filed a voluntary insolvency proceeding previously, the 2015 Notes and the Guaranty Claims would still be structurally subordinated to over $20 billion of secured debt pursuant to the terms of the Company's various loan and security agreements. In any event, the postpetition lenders have required that an involuntary filing against LBIAF be a default under the postpetition financing.

17.     LBIAF has little value absent a reorganization of the Company as a whole. The Non-Debtor Affiliates are currently solvent only because of funding afforded them under the Debtors' postpetition financing and the forbearance agreements with regard to the prepetition senior secured and bridge loans. If the non-debtor affiliates were forced to commence insolvency proceedings, a likely outcome would be the exercise of remedies by the prepetition senior secured and bridge lenders, leaving very little, if any, value for distribution to unsecured creditors, including the Guaranty Claimants and the 2015 Noteholders.

18.     Notwithstanding anything to the contrary contained in this declaration, nothing in this declaration is intended to be, or should be construed as, an admission with respect to (i) the liability for, the amount of, the enforceability of or the validity of any claim, or (ii) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim, or (iii) the proper characterization of any transaction or financing as a sale or financing. Each of LBIAF, the Debtors, and the Non-Debtor Affiliates specifically

reserve the right to challenge any claim or any transaction or any alleged security for any claim

on any and all bases.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      February 20, 2009

                           */s/ Alan S. Bigman*
                           Alan S. Bigman
                           Chief Financial Officer
                           LyondellBasell Industries AF S.C.A

EXHIBIT A

## LYONDELLBASELL INDUSTRIES AF S.C.A.

### Balance sheet - Draft and unaudited
### as at 31 December 2008
### (expressed in euro)

| | 31.12.2008 | 31.12.2007 |
|---|---|---|
| **ASSETS** | | |
| | | |
| **Fixed assets** | | |
| Shares in affiliated undertakings | 545,000,000 | 545,000,000 |
| Loans to affiliated undertakings | 939,819,781 | 917,969,281 |
| | 1,484,819,781 | 1,462,969,281 |
| | | |
| **Current assets** | | |
| Amounts owed by affiliated undertakings | 56,485,070 | 102,850,283 |
| becoming due and payable within one year | | |
| Other debtors | 122,694 | 1,498,446 |
| becoming due and payable within one year | | |
| Cash at bank and in hand | 1,381,820 | - |
| | 57,989,584 | 104,348,729 |
| | | |
| **TOTAL ASSETS** | **1,542,809,365** | **1,567,318,010** |
| | | |
| **LIABILITIES** | | |
| | | |
| **Capital and reserves** | | |
| Subscribed capital | 50,000,024 | 50,000,024 |
| Share premium account | 494,999,976 | 494,999,976 |
| Losses brought forward | (43,799,343) | (308,741) |
| Profit (loss) for the financial year | (380,858) | (43,490,602) |
| | 500,819,799 | 501,200,657 |
| | | |
| **Provisions for liabilities and charges** | | |
| Provisions for taxation | 11,737,284 | 40,094,722 |
| Other provisions | 51,343,715 | 52,036,626 |
| | 63,080,999 | 92,131,348 |
| | | |
| **Creditors** | | |
| Non-convertible bonds | | |
| becoming due and payable within one year | 29,734,854 | 29,043,528 |
| becoming due and payable after more than one year | 939,819,781 | 917,969,281 |
| Trade creditors | | |
| becoming due and payable within one year | 155,728 | 224,047 |
| Amounts due to aaffiliated undertakings | | |
| becoming due and payable within one year | 9,194,002 | - |
| becoming due and payable after more than one year | 4,202 | 26,749,149 |
| | 978,908,567 | 973,986,005 |
| | | |
| **TOTAL LIABILITIES** | **1,542,809,365** | **1,567,318,010** |
| | - | - |

**LYONDELLBASELL INDUSTRIES AF S.C.A.**

**Profit and loss account**
**for the year ended 31 December 2008**
**(expressed in euro)**

| | 2008 | 2007 |
|---|---|---|
| **CHARGES** | | |
| External charges | 30,571,701 | 100,217,580 |
| Other operating charges | - | 51,000,000 |
| Interest payable and similar charges other interests payable and charges | 79,566,250 | 79,505,221 |
| Tax on profit | - | 40,094,722 |
| | **110,137,951** | **270,817,523** |
| **INCOME** | | |
| Other operating income | - | 144,877,473 |
| Interest from loans forming part of the fixed assets derived from affiliated undertakings | 77,365,629 | 79,853,274 |
| Other interest receivable and similar income other interests receivable and similar income | 4,034,001 | 2,596,174 |
| Tax on profit | 28,357,463 | - |
| Loss for the year | 380,858 | 43,490,602 |
| | **110,137,951** | **270,817,523** |
| | - | - |

EXHIBIT B

**EXECUTION VERSION**

# SHARE PLEDGE AGREEMENT

## 20 DECEMBER 2007

### BETWEEN

**Basell AF S.C.A.**
**as Pledgor**

**and**

**Citibank, N.A.**
**as Pledgee**

in the presence of

**Basell Funding S.à r.l.**
**as Company**

relating to the Senior Credit Agreement and the Bridge Loan Agreement (each as defined below) dated on or about the date of this Pledge Agreement

# CONTENTS

**Clause**                                                                                                          **Page**

1.   Interpretation...................................................................................................................... 3
2.   Creation of the Pledge........................................................................................................ 6
3.   Perfection of the Pledge...................................................................................................... 6
4.   Preservation of the Pledge .................................................................................................. 6
5.   Representations, Warranties, Undertakings and Covenants ............................................... 8
6.   Right to Vote and Dividends ............................................................................................... 9
7.   Liability to Perform and Further Assurances..................................................................... 10
8.   Enforcement of the Pledge................................................................................................. 10
9.   Application of Proceeds and Release of the Pledge.......................................................... 11
10.  Liability and Indemnity ...................................................................................................... 11
11.  Delegation by the Pledgee ................................................................................................. 12
12.  Power of Attorney............................................................................................................... 12
13.  Waivers and Remedies Cumulative .................................................................................... 12
14.  Costs ................................................................................................................................... 12
15.  Notices ................................................................................................................................ 12
16.  Assignment ......................................................................................................................... 13
17.  Severability......................................................................................................................... 13
18.  Governing Law and Jurisdiction......................................................................................... 13
19.. Counterparts........................................................................................................................ 13

Signatories ....................................................................................................................................... 14

**THIS SHARE PLEDGE AGREEMENT** is dated 20 December 2007

**BETWEEN**

(1) **Basell AF S.C.A.**, a partnership limited by shares (*société en commandite par actions*) incorporated under the laws of the Grand Duchy of Luxembourg with its registered office at L-1420 Luxembourg, 15-17 avenue Gaston Diderich, having a share capital of EUR 50,000,024 and registered with the Luxembourg register of commerce and companies under number B 107.545 (the **Pledgor**); and

(2) **Citibank, N.A.**, a national association governed by the laws of the United States, having its registered address at 3900 Paradise Road, Las Vegas, NV 89169, with its principal place of business being 399 Park Avenue, New York, NY 10043, acting in its own name and on its own behalf as Collateral Agent (under the parallel debt clause provided for under clause 24.6 of the Intercreditor Agreement) (as defined below) (**the Pledgee**);

**IN THE PRESENCE OF**

(3) **Basell Funding S.à r.l.**, a private limited liability company (*société à responsabilité limitée*) incorporated under the laws of the Grand Duchy of Luxembourg with its registered office at L-1420 Luxembourg, 15-17 avenue Gaston Diderich, having a share capital of EUR 50,000,024 and registered with the Luxembourg register of commerce and companies under number B 107.544 (the **Company**).

**WHEREAS**

(A) Pursuant to the Senior Credit Agreement and the Second Lien Finance Documents (each as defined below), the Secured Parties (as defined below) have agreed to make available certain facilities and to purchase certain notes.

(B) The Pledgor is the sole owner of the shares (*parts sociales*) in the Company representing 100 *per cent.* of the shares issued by the Company.

(C) It is a condition to the Secured Parties making the facilities available or purchasing the notes that the Pledgor grants a pledge over the Shares (as defined below) to the Pledgee as security for the Secured Obligations (as defined below) subject to the terms of this share pledge agreement (the **Pledge Agreement**).

**IT IS AGREED** as follows:

**1.    INTERPRETATION**

**1.1    Recitals**

The recitals (A) to (C) above are an integral part of this Pledge Agreement.

## 1.2    Definitions

(a)    Terms defined in the Intercreditor Agreement shall, subject to clause 1.2(b) below, and unless the contrary intention appears or the context otherwise requires, have the same meaning in this Pledge Agreement.

(b)    In this Pledge Agreement, unless the contrary intention appears or the context otherwise requires:

**Bridge Loan Agreement** means the bridge loan agreement, dated on or about the date of this Pledge Agreement between, among others, the Pledgor as the Company, LyondellBasell Finance Company as the Borrower and the Pledgee.

**Business Day** means a day (other than a Saturday or a Sunday) on which the banks are open for general business in Luxembourg.

**Enforcement Event** means a Senior Facility Declared Default, an Interim Facility Declared Default or a Second Lien Notes Declared Default.

**Intercreditor Agreement** means the intercreditor agreement between, among others, Basell AF S.C.A., Citibank, N.A. (as senior agent and security agent), Merrill Lynch Capital Corporation (as interim facility agent), Citibank, N.A. (as ABL agent) and The Bank of New York (as high yield note trustee).

**Luxembourg** means the Grand Duchy of Luxembourg.

**Obligations** means all obligations for principal, premium, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any indebtedness including any "Obligations" as defined in the Senior Facility Agreement.

**Pledge** means the security interest (pledge - *gage*) over the Shares created and constituted by, and in accordance with, this Pledge Agreement.

**Secured Documents** means the Senior Finance Documents, the Hedging Documents, the Second Lien Finance Documents or the High Yield Notes (or all of them as the context requires).

**Secured Obligations** means all present and future Obligations (whether actual or contingent and whether owed jointly or severally or in any other capacity whatsoever) of the Pledgor to the Secured Parties (or any of them) under or in relation to any one or more of the Secured Documents to which it is a party.

**Secured Party** means a Senior Finance Party, an Interim Facility Finance Party, a Second Lien Notes Finance Party, a Second Lien Noteholder or a High Yield Noteholder.

**Security Period** means the period beginning on the date of this Agreement and ending on the date on which all Secured Obligations have been unconditionally and irrevocably paid and discharged in full and none of the Secured Parties has any actual or contingent obligation under the Secured Documents on the date on which all the security created by this Pledge Agreement is released in accordance with the Secured Documents.

**Senior Credit Agreement** means the senior credit agreement dated on or about the date of this Pledge Agreement between, among others, the Pledgor as the Company, BIL Acquisition Holdings Limited as the US Borrower and the Pledgee.

**Shares** means the 403,226 shares (*parts sociales*) with a par value of EUR 124 each in the Company representing the entire issued, fully paid-up and subscribed share capital of the Company as well as all securities acquired or offered in substitution or in addition to such shares including those which may be subscribed by the Pledgor in the case of an increase of the share capital of the Company, following exchange, merger, consolidation, division, issue of stock dividend, subscription for cash or otherwise and, generally, all such stock and shares in the capital of the Company now or at any time hereafter owned by the Pledgor and, except as otherwise provided in this Pledge Agreement, the dividends or interest thereon, redemption distribution, bonus, preference, option rights or otherwise to or in respect of any of the Shares.

## 1.3    Miscellaneous

(a)    Clause headings are inserted for convenience of reference only and shall be ignored in construing this Pledge Agreement.

(b)    The provisions of clause 1.2 of the Intercreditor Agreement apply to this Pledge Agreement as though they were set out in full in this Pledge Agreement except that references to Intercreditor Agreement are to be construed as references to this Pledge Agreement.

(c)    In the event of any ambiguity, conflict or inconsistency between the terms of this Pledge Agreement and the Intercreditor Agreement, then (to the extent permitted by law) the terms of the Intercreditor Agreement will prevail and compliance with the terms of the applicable provisions in the Intercreditor Agreement shall be deemed to be compliance with the ambiguous, conflicting or inconsistent term of this Pledge Agreement.

(d)    In the event of any ambiguity, conflict or inconsistency between the terms of this Pledge Agreement and the Senior Facility Agreement, Interim Facility Agreement or Second Lien Notes Indenture, then (to the extent permitted by law) the terms of the Senior Facility Agreement, Interim Facility Agreement or Second Lien Notes Indenture (as applicable) will prevail and compliance with the terms of the applicable provisions in the Senior Facility Agreement, Interim Facility Agreement or Second Lien Notes Indenture (as applicable) shall be deemed to be compliance with the ambiguous, conflicting or inconsistent term of this Pledge Agreement.

(e)    In the event of any ambiguity, conflict or inconsistency between the terms of this Pledge Agreement and any other Secured Document (other than the Intercreditor Agreement, Senior Facility Agreement, Interim Facility Agreement or Second Lien Notes Indenture), then (to the extent permitted by law) the terms of this Pledge Agreement will prevail and compliance with the terms of the applicable provisions in this Pledge Agreement shall be deemed to be compliance with the ambiguous, conflicting or inconsistent term of the relevant Secured Document.

(f)    A reference to a person in this Pledge Agreement includes its successors, transferees and assignees save that with respect to the Pledgor the terms of clause 16(b) of this Pledge Agreement shall apply.

(g)     The term **Secured Document** includes all amendments and supplements (however fundamental) including supplements providing for further advances and increases of the advances.

(h)     Words importing the singular shall include the plural and vice-versa.

## 2.     CREATION OF THE PLEDGE

As continuing first ranking security for the due and full payment, discharge and performance of the Secured Obligations, the Pledgor agrees to pledge and hereby pledges its claims, rights, title and interest in the Shares to, and in favour of, the Pledgee, who accepts the Pledge.

## 3.     PERFECTION OF THE PLEDGE

(a)     The Pledgor shall cause the Pledge constituted by this Pledge Agreement to be accepted by the Company on the date of execution of this Pledge Agreement and the Company by countersigning this Pledge Agreement accepts the Pledge, in accordance with article 5 of the act of 5 August 2005 on financial collateral contracts (the **Collateral Act 2005**).

(b)     The Pledgor shall procure the entry (*inscription*) of the Pledge in the register of the shareholder(s) (*registre des associés*) of the Company in the name of the Pledgee and provide to the Pledgee a certified copy of the register of the shareholder(s) of the Company evidencing such entry on the date of execution of this Pledge Agreement.

(c)     The Pledgor and the Pledgee hereby authorise any manager of the Company and any employee of Citadel Administration S.A., each acting individually, to proceed to the entry (*inscription*) of the Pledge in the register of the shareholder(s) (*registre des associés*) of the Company, as described under clause 3(b) above.

(d)     The Pledgor undertakes to reiterate the formalities referred to in sub-clause (b) above each time that the security constituted by this Pledge Agreement is extended to further shares or securities of the Company.

## 4.     PRESERVATION OF THE PLEDGE

(a)     The Pledge shall be a continuing security and shall not be considered as satisfied or discharged or prejudiced or waived or released by any intermediate payment, satisfaction or settlement of any part of the Secured Obligations and shall remain in full force and effect until it has been expressly released by the Pledgee in accordance with clause 9 below.

(b)     The Pledge shall be cumulative, in addition to and independent of every other security which the Pledgee may at any time hold as security for the Secured Obligations or any rights, powers and remedies provided by law and shall not operate so as in any way to prejudice or affect or be prejudiced or affected by any security interest or other right or remedy which the Pledgee may now or at any time in the future have in respect of the Secured Obligations.

(c)     The Pledge shall not be prejudiced by any time or indulgence granted to any person, or any abstention or delay by the Pledgee in perfecting or enforcing the Pledge or any security interest or rights or remedies that the Pledgee may now or at any time in the future have from or against the Pledgor or any other person.

(d)     No failure on the part of the Pledgee to exercise, or delay on its part in exercising, any of its rights under this Pledge Agreement shall operate as a waiver or release thereof, nor shall any single or partial exercise of any such right preclude any further or other exercise of that or any other rights.

(e)     Neither the obligations of the Pledgor contained in this Pledge Agreement nor the rights, powers and remedies conferred upon the Pledgee by this Pledge Agreement or by law nor the Pledge created hereby shall be discharged, impaired or otherwise affected by:

(i)     any amendment to, or any variation, waiver or release of, any obligation of the Obligors or any other person under the Senior Credit Agreement or any other Secured Document or this Pledge Agreement; or

(ii)    any failure to take, or to fully take, any security contemplated by any of the Secured Documents or otherwise agreed to be taken in respect of the Obligors' obligations under any of the Secured Documents; or

(iii)   any failure to realise or to fully realise the value of, or any release, discharge, exchange or substitution of, any security taken in respect of the Obligors' obligations under any of the Secured Documents; or

(iv)    any other act, event or omission which might operate to discharge, impair or otherwise affect any of the obligations of the Pledgor contained in this Pledge Agreement, the rights, powers and remedies conferred upon the Pledgee by this Pledge Agreement, the Pledge or by law.

(f)     The Pledgor hereby waives any rights (if any) arising for it under article 2037 of the Luxembourg civil code or any right it may have of first requiring the Pledgee to proceed against or claim payment from, or to divide any action between and against, any other persons or enforce any guarantee or security before enforcing this Pledge.

(g)     Until the end of the Security Period, the Pledgor shall not by virtue of any payment made, security realised or security interest enforced or moneys received hereunder:

(i)     be subrogated to any rights, security, security interests or moneys held, received or receivable by the Pledgee or be entitled to any right of contribution or indemnity, or

(ii)    claim, rank, prove or vote as a creditor of the Company or its estate in competition with the Pledgee.

(h)     The Pledgor hereby irrevocably waives any right of recourse that it may have, whether by way of subrogation or directly or of any other nature, against the Company and/or any subsidiaries of the Company, as a result of an enforcement of the Pledge by any means whatsoever. For the avoidance of doubt this waiver is final and will subsist after all Secured Obligations have been unconditionally and irrevocably paid and discharged in full.

## 5. REPRESENTATIONS, WARRANTIES, UNDERTAKINGS AND COVENANTS

### 5.1 Representations, warranties and undertakings

The Pledgor hereby represents, warrants and undertakes that:

(a) the Shares represent, on the date of execution of this Pledge Agreement, 100 *per* cent. of the issued fully paid up and subscribed share capital of the Company;

(b) upon completion of the actions referred to in clause 3 of this Pledge Agreement, this Pledge is duly perfected and constitutes a legal, valid and binding first ranking pledge over the Shares in favour of the Pledgee not subject to any prior or *pari passu* encumbrance and this Pledge is not liable to be avoided or otherwise set aside on the liquidation or insolvency of the Pledgor or otherwise;

(c) the Shares are not (and none of the Shares is) subject to any options to purchase or to sell or warrants or similar rights of any person;

(d) it is and will remain the sole, registered and absolute legal owner of the Shares, and it has neither transferred, nor assigned, disposed of, sold, pledged or in any way encumbered the Shares (or any of them), other than pursuant to this Pledge Agreement, unless otherwise permitted by the Secured Documents;

(e) it will not sell, dispose of, pledge or otherwise encumber hereafter the whole or any part of the Shares (including any Shares which have been released pursuant to a partial release), unless otherwise permitted by the Secured Documents; .

(f) it will, and will cause the Company to, assist the Pledgee and generally make its best efforts, in order to obtain all necessary consents, approvals and authorisations from any relevant authorities in order to permit the exercise by the Pledgee of its rights and powers under this Pledge Agreement upon enforcement of the Pledge;

(g) this Pledge Agreement constitutes the legal, valid and binding obligations of the Pledgor, enforceable in accordance with its terms; and

(h) it will not do, or permit to be done, anything which could prejudice the Pledge in any material respect, other than as permitted by the Secured Documents or the Intercreditor Agreement.

### 5.2 Covenants

(a) The Pledgor covenants that during the Security Period until the Pledge shall be released by the Pledgee, it will immediately inform the Pledgee of any distress, attachment, execution or other legal process commenced in respect of the Shares.

(b) The Pledgor covenants and undertakes that until the Pledge shall be released by the Pledgee in full, in the case of a partial release of the Pledge, it will not transfer all or part of the released Shares to one or several third party(ies), unless the Pledgor and the third party(ies) transferee(s) expressly and specifically approve any transfer and transferee(s) upon enforcement of the Pledge by the Pledgee, whoever such transferee(s) may be (including the Pledgee) as new shareholder(s) of the Company, in accordance with article 189 of the Luxembourg act dated 10 August 1915 on

commercial companies, as amended, and undertakes not to transfer any of the released Shares unless the Pledgor and the proposed transferee(s) of the released Shares pass on the date the transfer occurs, the shareholders' resolutions required by article 189 of the Luxembourg act dated 10 August 1915 on commercial companies, as amended.

**5.3     Repetition of representations, warranties and undertakings**

The representations, warranties and undertakings set out in this clause 5 are made on the date of this Pledge Agreement and are deemed to be repeated each day, as they are deemed to be repeated under the Senior Credit Agreement or the Interim Facility Agreement, during the Security Period with reference to the facts and circumstances then exisiting.

**6.     RIGHT TO VOTE AND DIVIDENDS**

**6.1     Right to vote**

(a)     Subject to clause 8 below, the Pledgor shall remain the legal owner of the Shares and, accordingly, the right to take part in the general meetings of the shareholders of the Company and to vote therein shall remain vested in it. The Pledgor shall not, without the previous consent in writing of the Pledgee, exercise its voting powers in respect of the Shares in any manner which would adversely affect the security constituted by this Pledge Agreement (including, without limitation, in favour of any change in the terms of the Shares) or would be inconsistent with the terms of any of the Secured Documents.

(b)     The Pledgor shall in addition perform any and all the obligations imposed upon it in its capacity as shareholder of the Company so as to preserve all rights conferred by the Shares.

(c)     Upon the occurrence and during the continuance of an Enforcement Event, the Pledgee shall be entitled in relation to the Shares to exercise the voting rights in any manner it deems fit for the purpose of protecting and/or enforcing its rights under the Pledge Agreement. The Pledgor shall no longer exercise any voting rights in relation to the Shares. The Pledgor and the Company furthermore undertake to inform the Pledgee of any meeting of the shareholders of the Company, as well as of the agenda thereof. The Pledgee shall be entitled, following the occurrence of an Enforcement Event which is continuing, to request the Pledgee, which the Pledgor hereby expressly accepts and acknowledges, to issue a written confirmation that the Pledgee is entitled to act at one or more shareholders' meetings and to exercise the voting rights in any manner the Pledgee deems fit for the purpose of protecting and/or enforcing its rights under this Pledge Agreement. The Pledgor shall do whatever is necessary in order to ensure that the exercise of the voting rights in these circumstances is facilitated and becomes possible for the Pledgee, including the issuing of a written confirmation or a proxy in any form required under applicable law.

**6.2     Right to dividend**

(a)     Until the occurrence of an Enforcement Event which is continuing, the Pledgor shall be entitled to receive the dividends and other distributions paid or payable by the Company on all or any of the Shares, unless the payment of such dividends or other distributions is or becomes prohibited by any Secured Document.

(b) Upon the occurrence and during the continuance of an Enforcement Event, the Pledgee shall be entitled to receive dividends and other distributions paid or payable by the Company on all or any of the Shares and at its sole discretion either to apply any payments so received in and towards payment and discharge of the Secured Obligations, at the Pledgee's discretion, to hold any such payments received as continuing security for the Secured Obligations. To this effect, the Pledgor and the Pledgee agree that the Company is hereby directed (and the Company, by countersigning this Pledge Agreement, accepts), if and when an Enforcement Event occurs and is continuing and upon the service by the Pledgee of a default notice to the Company informing the Company of the occurrence of an Enforcement Event and the Pledgor to make direct payment of all such dividends and other distributions to the Pledgee.

## 7. LIABILITY TO PERFORM AND FURTHER ASSURANCES

(a) It is expressly agreed that, notwithstanding anything to the contrary contained in this Pledge Agreement, the Pledgor shall remain liable to observe and perform all of the conditions and obligations assumed by it in respect of the Shares and the Pledgee shall be under no obligation or liability by reason of or arising out of this Pledge Agreement. The Pledgee shall not be required in any manner to perform or fulfil any obligations of the Pledgor in respect of the Shares, or to make any payment, or to make any enquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or take any other action to collect or enforce the payment of any amount to which it may have been or to which it may be entitled hereunder at any time.

(b) The Pledgor shall at its own expense promptly and duly execute and do all such assurances, acts and things as the Pledgee may reasonably require as being necessary for perfecting or protecting all or any of the rights, powers, authorities and discretions which are for the time being exercisable by the Pledgee under this Pledge Agreement in relation to the Shares for facilitating the enforcement of any such rights or any part thereof and in the exercise of all powers, authorities and discretions vested in the Pledgee. To that effect, the Pledgor shall in particular execute all documents or instruments and give all notices, orders and directions and make all registrations which the Pledgee may reasonably think expedient.

## 8. ENFORCEMENT OF THE PLEDGE

(a) Upon the occurrence of an Enforcement Event which is continuing, the Pledgee shall be entitled to enforce the Pledge immediately, in its absolute discretion and exercise any right under (i) applicable law (including, without limitation, article 11 of the Collateral Act 2005), or (ii) this Pledge Agreement and to enforce all or any part of the Pledge in respect of the Shares in any manner it sees fit.

The Pledgee shall in particular be entitled to:

(i) cause the sale of all or any part of the Shares on a stock exchange determined by the Pledgee or by way of a public auction in a place and manner determined by the Pledgee; or

(ii) request the Luxembourg courts that title to the Shares be assigned to the Pledgee in payment of outstanding amounts under the Secured Obligations upon expert's determination; or

(iii) appropriate the Shares at a price equal to the book value of the Shares as determined on the basis of the last published annual accounts of the Company by an independent external auditor (*réviseur d'entreprises*) designated by the Pledgee; or

(iv) sell or cause the Shares to be sold in a private transaction at arm's length conditions (*conditions commerciales normales*); and

(v) act generally in relation to the Shares in such manner as the Pledgee acting reasonably shall determine, to the widest extent permitted by applicable law.

(b) The Pledgee shall have the right to request enforcement of all or part of the Shares in its discretion. No action, choice or absence of action in this respect, or partial enforcement, shall in any manner affect the Pledge as it then shall be (and in particular those Shares which have not been subject to enforcement). The Pledge shall continue to remain in full and valid existence until enforcement, discharge or termination hereof, as the case may be.

## 9. APPLICATION OF PROCEEDS AND RELEASE OF THE PLEDGE

(a) Any monies received by the Pledgee in respect of the Shares following the enforcement of the Pledge in accordance with clause 8 above and/or under the rights and powers hereby conferred shall be applied by the Pledgee, in or towards payment and discharge of the Secured Obligations, or at the discretion of the Pledgee, be held as continuing security for the Secured Obligations in each case in accordance with the Intercreditor Agreement.

(b) At the expiry of the Security Period, the Pledgee will at the written request (and at the cost of) the Pledgor, do whatever is necessary to release the Pledge. The Pledgee shall in particular inform the Company in writing of such release and instruct it to record the release of the Pledge in the Company's register of the shareholders.

(c) Notwithstanding clause 9(b) above, the security should only be released after the later to occur of (a) the Senior Facility Discharge Date, (b) the Interim Facility Discharge Date and (c) the Second Lien Notes Discharge Date.

## 10. LIABILITY AND INDEMNITY

(a) The Pledgee shall not be liable for any losses arising in connection with the exercise of any of its rights, powers and discretions hereunder save for liabilities and expenses arising from the gross negligence or misconduct (*négligence grossière ou faute lourde*) or wilful default (*faute intentionnelle*) of the Pledgee.

(b) The Pledgor will indemnify the Pledgee and every attorney which may be appointed, from time to time, in respect of all liabilities and reasonably documented expenses incurred by it, him, her or them in the execution of any rights, powers or discretions vested in it, him, her or them pursuant thereto save for liabilities and expenses arising from the gross negligence or wilful default or misconduct of the Pledgee or its attorney or both.

(c) The Pledgor shall indemnify and keep indemnified the Pledgee against any and all stamp, registration and similar taxes, charges and other duties which may be payable in connection with the entry into, performance or enforcement of this Pledge Agreement (including penalties for late payment).

## 11. DELEGATION BY THE PLEDGEE

(a) The Pledgee or any person appointed by the Pledgee may at any time and from time to time delegate by power of attorney or in any other manner to any properly qualified person or persons all or any of the powers, authorities and discretions which are for the time being exercisable by the Pledgee under this Pledge Agreement in relation to the Shares.

(b) Any such delegation may be made upon such terms (including a power of substitution) and subject to such regulations as the Pledgee or such person appointed by the Pledgee may think fit. The Pledgee shall as soon as practicable inform the Pledgor of the identity of the person appointed pursuant to this clause 11.

(c) The Pledgee or such person appointed by the Pledgee shall not be in any way liable or responsible to the Pledgor for any loss or damage arising from any act, default, omission or misconduct on the part of any such delegate or sub-delegate except in the case of gross negligence or wilful default or misconduct.

## 12. POWER OF ATTORNEY

(a) The Pledgor hereby, in order to fully secure the performance of its obligations hereunder, irrevocably appoints the Pledgee and every person appointed by the Pledgee hereunder to be its attorney (*mandataire*) acting severally, and on its behalf and in its name or otherwise, to execute and do all such acts and things which the Pledgor is required to do and fails to do under the covenants and provisions contained in this Pledge Agreement (including, without limitation, to make any demand upon or to give any notice or receipt to the Company or any other person).

(b) The Pledgor hereby agrees to ratify and confirm, if need be, whatever any such attorney (as referred to in clause 12(a) above) shall properly do or purport to do in the exercise or purported exercise of all or any of the powers, authorities and discretions referred to in such clause.

## 13. WAIVERS AND REMEDIES CUMULATIVE

No waiver of any of the terms hereof shall be effective unless in writing signed by the Pledgee. No delay in or non-exercise of any right by the Pledgee shall constitute a waiver. Any waiver may be on such terms as the Pledgee sees fit. The rights, powers and discretions of the Pledgee herein are additional to and not exclusive of those provided by law, by any agreement with or other security in favour of the Pledgee including the provisions set out in the Secured Documents.

## 14. COSTS

The Pledgor will reimburse the Pledgee upon first demand of all reasonable costs and expenses set out in section 10.04 (Attorney Costs and Expenses) of the Senior Credit Agreement and arising in relation to this Pledge Agreement.

## 15. NOTICES

All notices or other communications under this Pledge Agreement shall be sent in accordance with the provisions of clause 33 (Notices) of the Intercreditor Agreement.

## 16. ASSIGNMENT

(a) In the case of an assignment, transfer or novation by the Pledgee or any Secured Party to one or several transferees of all or any part of its rights and obligations under any of the Secured Documents, the Pledgee and the Pledgor hereby agree, that in such event, to the extent required under applicable law, the Pledgee shall preserve all of its rights under this Pledge Agreement as expressly permitted under article 1278 of the Luxembourg civil code, so that the security constituted by this Pledge Agreement shall automatically, and without any formality, benefit to any such transferees.

(b) The Pledgor may not assign any of its rights under this Pledge Agreement. The Pledgee may assign all or any part of its rights under this Pledge Agreement provided that such assignment will be effected together with a parallel assignment under the Secured Documents.

## 17. SEVERABILITY

If, at any time, any provision of this Pledge Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Pledge Agreement nor of such provisions under the law of any other jurisdiction shall in any way be affected or impaired thereby.

## 18. GOVERNING LAW AND JURISDICTION

(a) This Pledge Agreement is governed by, and shall be construed in accordance with, Luxembourg law.

(b) Any dispute arising in connection with this Pledge Agreement shall be submitted to the courts of the district of Luxembourg-City.

(c) Nothing in this clause 18 limits the right of the Pledgee to bring proceedings against the Pledgor in any other court of competent jurisdiction or concurrently in more than one jurisdiction.

## 19. COUNTERPARTS

This Pledge Agreement may be executed in any number of counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of the Pledge Agreement.

IN WITNESS THEREOF the parties hereto have executed this Pledge Agreement in three (3) copies on the day and year first above written.

**SIGNATORIES**

The Pledgor

Basell AF S.C.A.

by:

BRUCE DRESBACH

The Pledgee

Citibank, N.A.

by: _____

The Company acknowledges and accepts (i) the security interest constituted by this Pledge Agreement, (ii) the terms of clause 3. of this Pledge Agreement and (iii) the directions contained in clauses 6.1(c) and 6.2(b) of this Pledge Agreement. The Company confirms (i) that it will provide the required assistance in respect of the perfection of the Pledge and (ii) that it shall perform as directed and that nothing in the Company's articles of incorporation or otherwise prevents it from complying with the above obligations and directions.

The Company

Basell Funding S.à r.l.

by:

BRUCE DRESBACH

**SIGNATORIES**

The Pledgor

Basell AF S.C.A.

by: _____

The Pledgee

Citibank, N.A.

by: *[signature]*

Edward Crook
Vice President

The Company acknowledges and accepts (i) the security interest constituted by this Pledge Agreement, (ii) the terms of clause 3. of this Pledge Agreement and (iii) the directions contained in clauses 6.1(o) and 6.2(b) of this Pledge Agreement. The Company confirms (i) that it will provide the required assistance in respect of the perfection of the Pledge and (ii) that it shall perform as directed and that nothing in the Company's articles of incorporation or otherwise prevents it from complying with the above obligations and directions.

The Company

Basell Funding S.à r.l.

by: _____

EXHIBIT C

U.S. PLEDGE AGREEMENT

dated as of

December 20, 2007

among

THE GRANTORS IDENTIFIED HEREIN

and

CITIBANK, N.A.,
as Collateral Agent

# TABLE OF CONTENTS

## ARTICLE I

### Definitions

SECTION 1.01. Credit Agreement ........................................................................................... 1
SECTION 1.02. Other Defined Terms ..................................................................................... 1

## ARTICLE II

### Pledge of Securities

SECTION 2.01. Pledge ............................................................................................................ 2
SECTION 2.02. Delivery of the Collateral ............................................................................. 3
SECTION 2.03. Representations, Warranties and Covenants ................................................. 3
SECTION 2.04. Certification of Limited Liability Company and Limited
Partnership Interests ................................................................................... 4
SECTION 2.05. Registration in Nominee Name; Denominations ........................................... 4
SECTION 2.06. Voting Rights; Dividends and Interest .......................................................... 5

## ARTICLE III

### [Reserved]

## ARTICLE IV

### Remedies

SECTION 4.01. Remedies upon Default .................................................................................. 7
SECTION 4.02. Application of Proceeds ................................................................................. 8
SECTION 4.03. Securities Act, Etc ......................................................................................... 9

## ARTICLE V

### Subrogation and Subordination

SECTION 5.01. Subordination .............................................................................................. 10

## ARTICLE VI

### Miscellaneous

SECTION 6.01. Notices ............................................................................................... 10
SECTION 6.02. Waivers; Amendment ......................................................................... 10
SECTION 6.03. [Reserved] ........................................................................................... 11
SECTION 6.04. Successors and Assigns..................................................................... 11
SECTION 6.05. Survival of Agreement....................................................................... 11
SECTION 6.06. Counterparts; Effectiveness; Several Agreement; Limitation on
             Assignment ............................................................................................... 11
SECTION 6.07. Severability ........................................................................................ 11
SECTION 6.08. [Reserved] ........................................................................................... 11
SECTION 6.09. Governing Law; Jurisdiction; Consent to Service of Process......................... 12
SECTION 6.10. WAIVER OF JURY TRIAL............................................................... 12
SECTION 6.11. Headings ............................................................................................. 12
SECTION 6.12. Security Interest Absolute................................................................. 12
SECTION 6.13. Termination or Release ..................................................................... 13
SECTION 6.14. Collateral Agent Appointed Attorney-in-Fact ............................. 13
SECTION 6.15. General Authority of the Collateral Agent.................................... 14
SECTION 6.16. [Reserved] ........................................................................................... 15
SECTION 6.17. Intercreditor Agreement.................................................................... 15

*Schedules*

Schedule I     Pledged Equity; Pledged Debt

U.S. PLEDGE AGREEMENT dated as of December 20, 2007 among the Grantors identified herein and who become a party hereto from time to time, and CITIBANK, N.A., as Collateral Agent for the Secured Parties (as defined below) (the "**Collateral Agent**").

Reference is made to the Credit Agreement dated as of the date hereof (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among LyondellBasell Industries AF S.C.A. (the "**Company**"), a company existing under the laws of the Grand Duchy of Luxembourg, BIL Acquisition Holdings Limited (to be merged with and into Lyondell Chemical Company) (the "**U.S. Borrower**"), Basell Holdings B.V., a Dutch private limited liability company existing under the laws of the Netherlands, Basell Finance Company B.V., a Dutch private limited liability company existing under the laws of the Netherlands, and Basell Germany Holdings GmbH, a corporation organized under the laws of Germany, the Subsidiary Guarantors party thereto from time to time, the lenders party thereto from time to time, Citibank, N.A., as Administrative Agent and Collateral Agent and the other Agents party thereto. The Lenders have agreed to extend credit to the Borrowers subject to the terms and conditions set forth in the Credit Agreement. The obligations of the Lenders to extend such credit are conditioned upon, among other things, the execution and delivery of this Agreement. The Guarantors are affiliates of the Borrowers, will derive substantial benefits from the extension of credit to the Borrowers pursuant to the Credit Agreement and are willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit. Accordingly, the parties hereto agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01.  Credit Agreement.

(a)     Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Credit Agreement. All terms defined in the New York UCC (as defined herein) and not defined in this Agreement have the meanings specified therein; the term "instrument" shall have the meaning specified in Article 9 of the New York UCC.

(b)     The rules of construction specified in Article I of the Credit Agreement also apply to this Agreement.

SECTION 1.02.  Other Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"**Agreement**" means this Pledge Agreement.

"**Collateral**" has the meaning assigned to such term in Section 2.01.

"**Collateral Agent**" has the meaning assigned to such term in the preliminary statement to this Agreement.

"**Company**" has the meaning assigned to such term in the preliminary statement to this Agreement.

"**Credit Agreement**" has the meaning assigned to such term in the preliminary statement of this Agreement.

"**Grantor**" means each grantor named on the signature pages hereto or which becomes a party hereto after the date hereof.

"**New York UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"**Pledged Debt**" has the meaning assigned to such term in Section 2.01.

"**Pledged Equity**" has the meaning assigned to such term in Section 2.01.

"**Secured Obligations**" means the "Obligations" as defined in the Credit Agreement.

"**Secured Parties**" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, the Hedge Banks, the Supplemental Agents and each co-agent or sub-agent appointed by the Administrative Agent or the Collateral Agent from time to time pursuant to Section 9.02 of the Credit Agreement.

"**U.S. Borrower**" has the meaning assigned to such term in the preliminary statement of this Agreement.

## ARTICLE II

## Pledge of Securities

SECTION 2.01. Pledge.

As security for the payment and performance in full of the Secured Obligations, including the Guaranties, each Grantor hereby assigns and pledges to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in, all of such Grantor's right, title and interest in, to and under (i) (1) all Equity Interests held by it and listed on Schedule I, whether now owned or hereafter acquired, (2) any other Equity Interests of the issuers listed on Schedule I and (3) the certificates representing all such Equity Interests (all such Equity Interests and certificates collectively referred to as the "**Pledged Equity**") and (ii) (A) the debt securities owned by it and listed opposite the name of such Grantor on Schedule I and (B) the promissory notes and any other instruments evidencing such debt securities (collectively, the "**Pledged Debt**"); (iii) subject to Section 2.06, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other Proceeds

received in respect of, the securities referred to in clauses (i) and (ii) above; (iv) subject to Section 2.06, all rights and privileges of such Grantor with respect to the securities and other property referred to in clauses (i), (ii), and (iii) above; and (v) all Proceeds of any of the foregoing (the items referred to in clauses (i) through (v) above being collectively referred to as the "**Collateral**").

TO HAVE AND TO HOLD the Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, forever; *subject, however*, to the terms, covenants and conditions hereinafter set forth.

SECTION 2.02.  Delivery of the Collateral.

(a)     Each Grantor agrees promptly to deliver or cause to be delivered to the Collateral Agent, for the benefit of the Secured Parties, any and all Pledged Securities (other than any uncertificated securities, but only for so long as such securities remain uncertificated) to the extent such Pledged Securities, in the case of promissory notes or other instruments evidencing Indebtedness, have an aggregate principal amount in excess of $10,000,000.

(b)     Upon delivery to the Collateral Agent, (i) any Pledged Securities shall be accompanied by stock powers duly executed in blank or other instruments of transfer reasonably satisfactory to the Collateral Agent and (ii) all other property comprising part of the Collateral shall be accompanied by proper instruments of assignment duly executed by the applicable Grantor and such other instruments or documents as the Collateral Agent may reasonably request. Each Grantor hereby authorizes the Collateral Agent to Supplement Schedule I hereto by any additional Pledged Securities delivered to the Collateral Agent pursuant hereto.

(c)     In accordance with the terms of the Cash Flow Intercreditor Agreement, all Collateral delivered to the Collateral Agent shall also be held by the Collateral Agent as gratuitous bailee for the Interim Facility Finance Parties, (as such term is defined in the Cash Flow Intercreditor Agreement), solely for the purpose of perfecting the security interest therein granted under the Interim Facility Security Documents and (as such term is defined in the Cash Flow Intercreditor Agreement).

SECTION 2.03.  Representations, Warranties and Covenants. Each Grantor represents and warrants, as to itself and the other Grantors, to and with the Collateral Agent, for the benefit of the Secured Parties, that:

(a)     Schedule I correctly sets forth the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity and includes all Equity Interests, debt securities in excess of $10,000,000 and promissory notes in excess of $10,000,000 required to be pledged by the Grantors hereunder;

(b)     [Reserved];

(c)     [Reserved];

(d)     except for restrictions and limitations imposed by the Loan Documents or securities laws generally, the Collateral is and will continue to be freely transferable and assignable, and none of the Collateral is or will be subject to any option, right of first refusal, shareholders agreement, charter or by-law provisions or contractual restriction of any nature that might prohibit, materially impair, materially delay or otherwise affect in any manner material and adverse to the Secured Parties the pledge of such Collateral hereunder, the sale or disposition thereof pursuant hereto;

(e)     [Reserved];

(f)     [Reserved];

(g)     [Reserved];

(h)     [Reserved]; and

(i)     each Grantor that is an issuer of Pledged Equity, pledged hereunder agrees that after the occurrence and during the continuance of an Event of Default it shall comply with all instructions from the Collateral Agent with respect to such Pledged Equity without further consent of the Grantor pledging such Pledged Equity.

SECTION 2.04.  <u>Certification of Limited Liability Company and Limited Partnership Interests.</u>

(a)     Each interest in any Domestic Subsidiary that is a limited liability company or limited partnership controlled by any Grantor, pledged under Section 2.01 and represented by a certificate, shall be a "security" within the meaning of Article 8 of the New York UCC or any other applicable Uniform Commercial Code and shall be governed by Article 8 of the New York UCC or any other applicable Uniform Commercial Code, and each such interest shall at all times hereafter be represented by a certificate.

(b)     Each interest in any Domestic Subsidiary that is a limited liability company or limited partnership controlled by any Grantor, pledged under Section 2.01 and not represented by a certificate shall not be a "security" within the meaning of Article 8 of the New York UCC or any other applicable Uniform Commercial Code and shall not be governed by Article 8 of the New York UCC or any other applicable Uniform Commercial Code, and the Grantors shall at no time elect to treat any such interest as a "security" within the meaning of Article 8 of the New York UCC or any other applicable Uniform Commercial Code or issue any certificate representing such interest, unless the applicable Grantor provides prior written notification to the Administrative Agent of such election and promptly (and in any event within 30 days after such election) delivers any such certificate to the Administrative Agent pursuant to the terms hereof.

SECTION 2.05.  <u>Registration in Nominee Name; Denominations.</u>  If an Event of Default shall occur and be continuing and the Collateral Agent shall give the U.S. Borrower no-

tice of its intent to exercise such rights, (a) the Collateral Agent, on behalf of the Secured Parties, shall have the right (in its sole and absolute discretion) to hold the Pledged Securities in its own name as pledgee, the name of its nominee (as pledgee or as sub-agent) or the name of the applicable Grantor, endorsed or assigned in blank or in favor of the Collateral Agent and each Grantor will promptly give to the Collateral Agent copies of any notices or other communications received by it with respect to Pledged Securities registered in the name of such Grantor and (b) the Collateral Agent shall have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any purpose consistent with this Agreement.

SECTION 2.06. <u>Voting Rights; Dividends and Interest</u>.

(a)     Unless and until (1) an Event of Default shall have occurred and be continuing and (2) the Collateral Agent shall have notified the U.S. Borrower that the rights of the Grantors under this Section 2.06 are being suspended:

(i)     Each Grantor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities or any part thereof for any purpose consistent with the terms of this Agreement, the Credit Agreement and the other Loan Documents.

(ii)     The Collateral Agent shall promptly execute and deliver to each Grantor, or cause to be executed and delivered to such Grantor, all such proxies, powers of attorney and other instruments as such Grantor may reasonably request for the purpose of enabling such Grantor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above.

(iii)     Each Grantor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Securities to the extent and only to the extent that such dividends, interest, principal and other distributions are permitted by, and otherwise paid or distributed in accordance with, the terms and conditions of the Credit Agreement, the other Loan Documents and applicable Laws; *provided* that any noncash dividends, interest, principal or other distributions that would constitute Pledged Equity or Pledged Debt, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Collateral, and shall if certificated be held in trust for the benefit of the Collateral Agent and the Secured Parties and shall be forthwith delivered to the Collateral Agent in the same form as so received (with any necessary endorsement reasonably requested by the Collateral Agent).

(b)     If (A) an Event of Default has occurred and is continuing and (B) the Collateral Agent shall have notified the U.S. Borrower of the suspension of the rights of the Grantors under paragraph (a)(iii) of this Section 2.06, then all rights of any Grantor to dividends, interest,

principal or other distributions that such Grantor is authorized to receive with respect to such Collateral pursuant to paragraph (a)(iii) of this Section 2.06 shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions, subject to the terms of the Credit Agreement and Intercreditor Agreement. All dividends, interest, principal or other distributions received by any Grantor contrary to the provisions of this Section 2.06 shall be held in trust for the benefit of the Collateral Agent, shall be segregated from other property or funds of such Grantor and shall be forthwith delivered to the Collateral Agent upon demand in the same form as so received (with any necessary endorsement reasonably requested by the Collateral Agent). Any and all money and other property paid over to or received by the Collateral Agent pursuant to the provisions of this paragraph (b) shall be retained by the Collateral Agent in an account to be established by the Collateral Agent upon receipt of such money or other property and shall be applied in accordance with the provisions of Section 4.02. After all Events of Default have been cured or waived, the Collateral Agent shall promptly repay to each Grantor (without interest) all dividends, interest, principal or other distributions that such Grantor would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) of this Section 2.06 and that remain in such account.

(c)     If (A) an Event of Default has occurred and is continuing and (B) the Collateral Agent shall have notified the U.S. Borrower of the suspension of the rights of the Grantors under paragraph (a)(iii) of this Section 2.06, then all rights of any Grantor to exercise the voting and consensual rights and powers it is entitled to exercise with respect to such Collateral pursuant to paragraph (a)(i) of this Section 2.06, and the obligations of the Collateral Agent under paragraph (a)(ii) of this Section 2.06, shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers, subject to the terms of the Credit Agreement and the Intercreditor Agreement; *provided* that, unless otherwise directed by the Required Lenders, the Collateral Agent shall have the right from time to time following and during the continuance of an Event of Default to permit the Grantors to exercise such rights. After all Events of Default have been cured or waived, each Grantor shall have the exclusive right to exercise the voting and/or consensual rights and powers that such Grantor would otherwise be entitled to exercise pursuant to the terms of paragraph (a)(i) above.

(d)     Any notice given by the Collateral Agent to the U.S. Borrower suspending the rights of the Grantors under paragraph (a) of this Section 2.06 (i) shall be given in writing, (ii) may be given with respect to one or more of the Grantors at the same or different times and (iii) may suspend the rights of the Grantors under paragraph (a)(i) or paragraph (a)(iii) in part without suspending all such rights (as specified by the Collateral Agent in its sole and absolute discretion) and without waiving or otherwise affecting the Collateral Agent's rights to give additional notices from time to time suspending other rights so long as an Event of Default has occurred and is continuing.

## ARTICLE III

### [Reserved]

## ARTICLE IV

### Remedies

SECTION 4.01. <u>Remedies upon Default</u>. Upon the occurrence and during the continuance of an Event of Default, it is agreed that the Collateral Agent shall have the right to exercise any and all rights afforded to a secured party with respect to the Secured Obligations under the Uniform Commercial Code or other applicable law and also may (i) exercise any and all rights and remedies of any of the Grantors under or in connection with the Collateral, or otherwise in respect of the Collateral, and (ii) subject to the mandatory requirements of applicable law and the notice requirements described below, sell or otherwise dispose of all or any part of the Collateral securing the Secured Obligations at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate. The Collateral Agent shall be authorized at any such sale of securities (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any sale of Collateral shall hold the property sold absolutely, free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by law) all rights of redemption, stay and appraisal which such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

The Collateral Agent shall give the applicable Grantors 10 days' written notice (which each Grantor agrees is reasonable notice within the meaning of Section 9-611 of the New York UCC or its equivalent in other jurisdictions) of the Collateral Agent's intention to make any sale of Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice (if any) of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine. The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future deliv-

ery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all said rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Collateral Agent shall be free to carry out such sale pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full. As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this Section 4.01, to the fullest extent permitted by applicable law, shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the New York UCC or its equivalent in other jurisdictions.

Any remedies provided in this Section 4.01 shall be subject to each Intercreditor Agreement.

SECTION 4.02. Application of Proceeds.

(a)     The Collateral Agent shall apply the proceeds of any collection or sale of Collateral in accordance with the applicable clause of Section 20 of the Cash Flow Intercreditor Agreement, and if the Cash Flow Intercreditor Agreement is no longer outstanding, in accordance with the Credit Agreement.

Subject to the terms of the Cash Flow Intercreditor Agreement, the Collateral Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof.

(b)     In making the determination and allocations required by this Section 4.02, the Collateral Agent may conclusively rely upon information supplied by the Administrative

Agent as to the amounts of unpaid principal and interest and other amounts outstanding with respect to the Secured Obligations, and the Collateral Agent shall have no liability to any of the Secured Parties for actions taken in reliance on such information, *provided* that nothing in this sentence shall prevent any Grantor from contesting any amounts claimed by any Secured Party in any information so supplied. All distributions made by the Collateral Agent pursuant to this Section 4.02 shall be (subject to any decree of any court of competent jurisdiction) final (absent manifest error), and the Collateral Agent shall have no duty to inquire as to the application by the Administrative Agent of any amounts distributed to it.

        SECTION 4.03. <u>Securities Act, Etc.</u> In view of the position of the Grantors in relation to the Collateral, or because of other current or future circumstances, a question may arise under the U.S. Securities Act of 1933, as now or hereafter in effect, or any similar statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being called the "**Federal Securities Laws**") with respect to any disposition of the Collateral permitted hereunder. Each Grantor understands that compliance with the Federal Securities Laws might very strictly limit the course of conduct of the Collateral Agent if the Collateral Agent were to attempt to dispose of all or any part of the Collateral, and might also limit the extent to which or the manner in which any subsequent transferee of any Collateral could dispose of the same. Similarly, there may be other legal restrictions or limitations affecting the Collateral Agent in any attempt to dispose of all or part of the Collateral under applicable "blue sky" or other state securities laws or similar laws analogous in purpose or effect. Each Grantor recognizes that in light of such restrictions and limitations the Collateral Agent may, with respect to any sale of the Collateral, limit the purchasers to those who will agree, among other things, to acquire such Collateral for their own account, for investment, and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that in light of such restrictions and limitations, the Collateral Agent, in its sole and absolute discretion and to the extent permitted under applicable law, (a) may proceed to make such a sale whether or not a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under the Federal Securities Laws and (b) may approach and negotiate with a limited number of potential purchasers (including a single potential purchaser) to effect such sale. Each Grantor acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions. In the event of any such sale, the Collateral Agent shall, to the extent permitted under applicable law, incur no responsibility or liability for selling all or any part of the Collateral at a price that the Collateral Agent may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after registration as aforesaid or if more than a limited number of purchasers (or a single purchaser) were approached. The provisions of this Section 4.03 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices may exceed substantially the price at which the Collateral Agent sells.

# ARTICLE V

## Subrogation and Subordination

SECTION 5.01. <u>Subordination</u>.

(a)     Notwithstanding any provision of this Agreement to the contrary, all rights of the Grantors of indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the indefeasible payment in full in cash of the Secured Obligations. No failure on the part of any Loan Party to make any payments required under applicable law or otherwise shall in any respect limit the obligations and liabilities of any Grantor with respect to its obligations hereunder, and each Grantor shall remain liable for the full amount of the obligations of such Grantor hereunder.

(b)     Each Grantor hereby agrees that upon the occurrence and during the continuance of an Event of Default and after notice from the Collateral Agent all Indebtedness owed to it by any Subsidiary shall be fully subordinated to the indefeasible payment in full in cash of the Secured Obligations.

# ARTICLE VI

## Miscellaneous

SECTION 6.01. <u>Notices</u>. All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 10.02 of the Credit Agreement. All communications and notices hereunder to any Grantor shall be given to it in care of the Borrower's Agent as provided in Section 10.02 of the Credit Agreement.

SECTION 6.02. <u>Waivers; Amendment</u>.

(a)     No failure or delay by any Secured Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by applicable Law. No waiver of any provision of this Agreement or consent to any departure by any Grantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 6.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether any Secured Party may have had notice or knowledge of such Default at the time. No notice or demand on any Grantor in any case shall entitle any Grantor to any other or further notice or demand in similar or other circumstances.

(b)     Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantor or Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 10.01 of the Credit Agreement.

SECTION 6.03.  [Reserved].

SECTION 6.04.  Successors and Assigns.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

SECTION 6.05.  Survival of Agreement.  Such representations and warranties have been or will be relied upon by each Secured Party, regardless of any investigation made by any Secured Party or on their behalf and notwithstanding that any Secured Party may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as of the time made as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

SECTION 6.06.  Counterparts; Effectiveness; Several Agreement; Limitation on Assignment.  This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract.  Delivery by telecopier of an executed counterpart of a signature page to this Agreement shall be as effective as delivery of an original executed counterpart of this Agreement.  This Agreement shall become effective as to any Grantor when a counterpart hereof executed on behalf of such Grantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon such Grantor and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of such Grantor, the Collateral Agent and the other Secured Parties and their respective successors and assigns, except that no Grantor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Collateral (and any such assignment or transfer shall be void) except as permitted by this Agreement or the Credit Agreement.  This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, modified, supplemented, waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

SECTION 6.07.  Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 6.08.  [Reserved].

SECTION 6.09.  Governing Law; Jurisdiction; Consent to Service of Process.

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(a)     ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WHETHER NOW EXISTING OR HERE-AFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREE-MENT, EACH GRANTOR AND THE COLLATERAL AGENT CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.  EACH GRANTOR AND THE COLLATERAL AGENT IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PRO-CEEDING IN SUCH JURISDICTION IN RESPECT OF THIS AGREEMENT OR OTHER DOCUMENT RELATED HERETO.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN TELECOPIER) IN SECTION 10.02 OF THE CREDIT AGREEMENT. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

SECTION 6.10.  WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTA-TIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EX-PRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) AC-KNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 6.11.  Headings.  Article and Section headings and the Table of Con-tents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 6.12.  Security Interest Absolute.  All rights of the Collateral Agent hereunder, the grant of a security interest in the Collateral and all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforce-ability of the Credit Agreement, any other Loan Document, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing,

(b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Secured Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Secured Obligations or this Agreement.

SECTION 6.13.  Termination or Release.

(a)     This Agreement and all other security interests granted hereby shall terminate with respect to all Secured Obligations when all the outstanding Secured Obligations (other than contingent indemnification obligations not then due) have been paid in full in cash, the Lenders have no further commitment to lend under the Credit Agreement, the L/C Obligations have been reduced to zero and the L/C Issuers have no further obligations to issue Letters of Credit under the Credit Agreement.

(b)     A Grantor shall automatically be released from its obligations hereunder and the Security Interest in the Collateral of such Grantor shall be automatically released upon the consummation of any transaction permitted by the Credit Agreement as a result of which such Grantor ceases to be a Subsidiary of the Company or is otherwise no longer required to be a Grantor hereunder; *provided* that the Required Lenders shall have consented to such transaction (to the extent required by the Credit Agreement) and the terms of such consent did not provide otherwise.

(c)     Upon any sale or other transfer by any Grantor of any Collateral (other than any transfer of Collateral to another Grantor) that is permitted under the Credit Agreement, or upon the effectiveness of any written consent to the release of the security interest granted hereby in any Collateral pursuant to Section 10.01 of the Credit Agreement, the Security Interest in such Collateral shall be automatically released.

(d)     Upon the occurrence of any event or circumstance set forth in Section 2.01(b) hereunder, the Security Interest in such Collateral shall be automatically released.

(e)     In the event that any Security Interest granted hereunder is in violation of the Credit Agreement or the Agreed Security Principles, the Security Interests in such Collateral shall be automatically released.

(f)     In connection with any termination or release pursuant to paragraph (a) through (e), the Collateral Agent shall execute and deliver to any Grantor, at such Grantor's expense, all documents that such Grantor shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section 6.13 shall be without recourse to or warranty by the Collateral Agent.

SECTION 6.14.  Collateral Agent Appointed Attorney-in-Fact.

(a)    Each Grantor hereby appoints the Collateral Agent the attorney-in-fact of such Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof at any time after and during the continuance of an Event of Default, which appointment is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, the Collateral Agent shall have the right, upon the occurrence and during the continuance of an Event of Default and notice by the Collateral Agent to the Borrower's Agent of its intent to exercise such rights, with full power of substitution either in the Collateral Agent's name or in the name of such Grantor (a) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (d) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; and (e) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; *provided* that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence, bad faith or willful misconduct or that of any of their Affiliates, directors, officers, employees, counsel, agents or attorneys-in-fact.

(b)    Each Grantor hereby irrevocably authorizes the Collateral Agent for the benefit of the Secured Parties at any time and from time to time to file in any relevant jurisdiction any financing statements (including fixture filings) with respect to the Collateral or any part thereof and amendments thereto that (i) indicate the Collateral as all assets of such Grantor or words of similar effect as being of an equal or lesser scope or with greater detail, and (ii) contain the information required by Article 9 of the Uniform Commercial Code or the analogous legislation of each applicable jurisdiction for the filing of any financing statement or amendment, including whether the Grantor is an organization, the type of organization and any organizational identification number issued to the Grantor. The Grantor agrees to provide such information to the Collateral Agent promptly upon request.

SECTION 6.15.  General Authority of the Collateral Agent. By acceptance of the benefits of this Agreement and any other Collateral Documents, each Secured Party (whether or not a signatory hereto) shall be deemed irrevocably (a) to consent to the appointment of the Collateral Agent as its agent hereunder and under such other Collateral Documents, (b) to con-

firm that the Collateral Agent shall have the authority to act as the exclusive agent of such Secured Party for the enforcement of any provisions of this Agreement and such other Collateral Documents against any Grantor, the exercise of remedies hereunder or thereunder and the giving or withholding of any consent or approval hereunder or thereunder relating to any Collateral or any Grantor's obligations with respect thereto, (c) to agree that it shall not take any action to enforce any provisions of this Agreement or any other Collateral Document against any Grantor, to exercise any remedy hereunder or thereunder or to give any consents or approvals hereunder or thereunder except as expressly provided in this Agreement or any other Collateral Document and (d) to agree to be bound by the terms of this Agreement and any other Collateral Documents.

SECTION 6.16.  [Reserved].

SECTION 6.17.  Intercreditor Agreement.  Notwithstanding anything herein to the contrary, the liens and security interests granted to the Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent hereunder, in each case, with respect to the Collateral are subject to the limitations and provisions of each Intercreditor Agreement. In the event of any conflict between the terms of any Intercreditor Agreement and the terms of this Agreement with respect to the Collateral (other than with respect to Section 2.01), the terms of such Intercreditor Agreement shall govern and control.

*(Remainder of page intentionally left blank)*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

BASELL HOLDINGS B.V.,
as Grantor

By: _____
Name:
Title:

BASELL INTERNATIONAL HOLDINGS B.V.
as Grantor

By: _____
Name:
Title:

BASELL FUNDING S.A.R.L.
as Grantor

By: _____
Name:
Title:

LYONDELLBASELL INDUSTRIES AF S.C.A.
as Grantor

By: _____
Name:
Title:

CITIBANK, N.A.,
as Collateral Agent

by

Name: Edward Crook
Title:  Vice President

SCHEDULE I

## EQUITY INTERESTS

| Grantor | Issuer | Number of Certifi-cate | Registered Owner | Number and Class of Equity Interests | Percentage of Equity Interests |
|---------|--------|------------------------|------------------|--------------------------------------|--------------------------------|
| Basell Holdings B.V. | Basell Canada Inc. | 13 | Basell Holdings B.V. | 20,000 Common Shares | 100% |
| Basell International Holdings B.V. | Basell Australia Holdings Pty Ltd[1] | | Basell Interna-tional Holdings B.V. | | 100% |
| Basell Funding S.a.r.l. | LyondellBasell Finance Company | | LyondellBasell Finance Company | | 100% |

## DEBT SECURITIES

| Grantor | Issuer | Principal Amount | Date of Note | Maturity Date |
|---------|--------|------------------|--------------|---------------|
| Basell AF S.C.A. | Basell Funding S.a.r.l.[2] | $615,000,000 | August 10, 2005 | None. |

---

[1] To be turned over to the Collateral Agent post-closing.

[2] To be turned over to the Collateral Agent post-closing.

SCHEDULE I

EQUITY INTERESTS

| Grantor | Issuer | Number of Certificate | Registered Owner | Number and Class of Equity Interests | Percentage of Equity Interests |
|---------|--------|----------------------|------------------|--------------------------------------|-------------------------------|
| Basell Holdings B.V. | Basell Canada Inc. | 13 | Basell Holdings B.V. | 20,000 Common Shares | 100% |
| Basell International Holdings B.V. | Basell Australia Holdings Pty Ltd[1] | | Basell International Holdings B.V. | | 100% |
| Basell Funding S.a.r.l. | LyondellBasell Finance Company | 1 | Basell Funding S.a.r.l | 1,000 Common Shares | 100% |

DEBT SECURITIES

| Grantor | Issuer | Principal Amount | Date of Note | Maturity Date |
|---------|--------|------------------|--------------|---------------|
| Basell AF S.C.A. | Basell Funding S.a.r.l.[2] | $615,000,000 | August 10, 2005 | None. |

---

[1] To be turned over to the Collateral Agent post-closing.

[2] To be turned over to the Collateral Agent post-closing.

EXHIBIT D

# C/A Statement

From 01-Feb-2009 to 19-Feb-2009
As at 19-Feb-2009

**Run Date:** 19-Feb-2009 02:33 pm
**Print Date:** 19/02/2009

| Date | Deal No | T/T | Counterparty | Instrument | Amount | Balance | Comments |
|------|---------|-----|--------------|------------|--------|---------|----------|
| **Ccy:** | | | **EUR** | | | | |
| **Bank :** | | | Basell Finance Company | | | | |
| **Account Number :** | | | [REDACTED] | **Currency :** | EUR | | |
| | | | | **Account Name :** | C/A LYONDELLBASELL IND AF SCA (EUR) | | |
| 01/02/2009 | 43986 | A1 | [REDACTED] | NONE | -55,256.19 | -55,256.19 | |
| 01/02/2009 | | OB | Opening Balance | | -25,046,190.35 | -25,101,446.54 | |
| 02/02/2009 | 43763 | AT | | Bank Account Transfer | 60,087.50 | -25,041,359.04 | [REDACTED] BASELL PO COBVBA EXBCC |
| 13/02/2009 | 44434 | AT | | Bank Account Transfer | -1,380,000.00 | -26,421,359.04 | Cash deposit LBI AF SCA: transfer from ING |
| | | | **Closing balance :** | | -26,421,359.04 | | |
| **Ccy:** | | | **USD** | | | | |
| **Bank :** | | | Basell Finance Company | | | | |
| **Account Number :** | | | [REDACTED] | **Currency :** | USD | | |
| | | | | **Account Name :** | C/A LYONDELLBASELL IND AF SCA (USD) | | |
| 01/02/2009 | 43987 | A1 | [REDACTED] | NONE | 22.44 | 22.44 | |
| 01/02/2009 | | OB | Opening Balance | | 7,122.67 | 7,145.11 | |
| | | | **Closing balance :** | | 7,145.11 | | |

End of Report

EXHIBIT E

EXECUTION VERSION

# ACCOUNT PLEDGE AGREEMENT

20 DECEMBER 2007

BETWEEN

Basell AF S.C.A.
as Pledgor

and

Citibank, N.A.
as Pledgee

relating to the Senior Credit Agreement and the Bridge Loan Agreement (each as defined below)
dated on or about the date of this Pledge Agreement

## ALLEN & OVERY
### LUXEMBOURG

# CONTENTS

**Clause**          **Page**

1. Interpretation ................................................................................................................. 1
2. Creation of the pledge ...................................................................................................... 3
3. Perfection of the pledge .................................................................................................... 3
4. Effectiveness of the pledge ................................................................................................ 4
5. Representations, warranties and covenants ........................................................................ 5
6. Further assurances ............................................................................................................ 6
7. Enforcement of the pledge ................................................................................................ 6
8. Release of the pledge ........................................................................................................ 6
9. Liability and indemnity ..................................................................................................... 7
10. Delegation by the pledgee ................................................................................................. 7
11. Power of attorney ............................................................................................................. 7
12. Waivers and Remedies Cumulative .................................................................................... 8
13. Costs ............................................................................................................................... 8
14. Notices ............................................................................................................................ 8
15. Assignment ...................................................................................................................... 8
16. Severability ...................................................................................................................... 8
17. Governing law and jurisdiction ........................................................................................... 8
18. Counterparts .................................................................................................................... 9

Signatories ................................................................................................................................ 10

**Schedule**

1. Reference to the Account .................................................................................................. 11
2. Notice of Pledge .............................................................................................................. 12
3. Form of Acknowledgement ................................................................................................ 14
4. Blocking Notice ............................................................................................................... 17
5. Confirmation ................................................................................................................... 18

**THIS PLEDGE AGREEMENT** is dated 10 December 2007

**BETWEEN**

(1)    **Basell AF S.C.A.**, a partnership limited by shares (société en commandite par actions) incorporated under the laws of the Grand Duchy of Luxembourg with its registered office at L-1420 Luxembourg, 15-17 avenue Gaston Diderich, having a share capital of EUR 50,000,024 and registered with the Luxembourg register of trade and commerce under number B 107.545 (**the Pledgor**); and

(2)    **Citibank, N.A.**, a national association governed by the laws of the United States, having its registered address at 3900 Paradise Road, Las Vegas, NV 89169, with its principal place of business being 399 Park Avenue, New York, NY 10043, acting in its own name and on its own behalf as Collateral Agent (under the parallel debt clause provided for under clause 24.6 of the Intercreditor Agreement) (as defined below) (**the Pledgee**);

**WHEREAS**

(A)    Pursuant to the Senior Credit Agreement and the Second Lien Finance Documents (each as defined below), the Secured Parties (as defined below) have agreed to make available certain facilities and to purchase certain notes.

(B)    The Pledgor is the sole holder of the Account.

(C)    It is a condition to the Secured Parties making the facilities available or purchasing the notes that the Pledgor grants a pledge over the Account (as defined below) to the Pledgee as security for the Secured Obligations (as defined below) subject to the terms of this pledge agreement (the **Pledge Agreement**).

**IT IS AGREED** as follows:

**1.    INTERPRETATION**

**1.1    Recitals**

The recitals (A) to (C) above are an integral part of this Pledge Agreement.

**1.2    Definitions**

(a)    Terms defined in the Intercreditor Agreement shall, subject to clause 1.2(b) below and unless the contrary intention appears or the context otherwise requires, have the same meaning in this Pledge Agreement.

(b)    In this Pledge Agreement, unless the contrary intention appears or the context otherwise requires:

**Account** means the bank account opened in the name of, and held by, the Pledgor with the Account Bank (as specified in Schedule 1 to this Pledge Agreement).

**Account Bank** means a bank listed in Schedule 1.

**Bridge Loan Agreement** means the bridge loan agreement, dated on or about the date of this Pledge Agreement between, among others, the Pledgor as the Company, LyondellBasell Finance Company as the Borrower and the Pledgee.

**Business Day** means a day (other than a Saturday or a Sunday) on which the banks are open for general business in Luxembourg.

**Enforcement Event** means a Senior Facility Declared Default, an Interim Facility Declared Default or a Second Lien Notes Declared Default.

**Intercreditor Agreement** means the intercreditor agreement between, among others, Basell AF S.C.A., Citibank, N.A. (as senior agent and security agent), Merrill Lynch Capital Corporation (as interim facility agent), Citibank, N.A. (as ABL agent) and The Bank of New York (as high yield note trustee).

**Luxembourg** means the Grand Duchy of Luxembourg.

**Obligations** means all obligations for principal, premium, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any indebtedness including any "Obligations" as defined in the Senior Facility Agreement.

**Pledge** means the security interest (pledge – *gage*) over the Account created and constituted by, and in accordance with, this Pledge Agreement.

**Security Assets** means all the monies, claims, rights, title, interest and other assets standing, now and in the future, to the credit of the Account, including any interest or revenue accrued thereon.

**Secured Documents** means the Senior Finance Documents, the Hedging Documents, the Second Lien Finance Documents or the High Yield Notes (or all of them as the context requires).

**Secured Obligations** means all present and future Obligations (whether actual or contingent and whether owed jointly or severally or in any other capacity whatsoever) of the Pledgor to the Secured Parties (or any of them) under or in relation to any one or more of the Secured Documents to which it is a party.

**Secured Party** means a Senior Finance Party, an Interim Facility Finance Party, a Second Lien Notes Finance Party, a Second Lien Noteholder or a High Yield Noteholder.

**Security Period** means the period beginning on the date of this Agreement and ending on the date on which all Secured Obligations have been unconditionally and irrevocably paid and discharged in full and none of the Secured Parties has any actual or contingent obligation under the Secured Documents on the date on which all the security created by this Pledge Agreement is released in accordance with the Secured Documents.

**Senior Credit Agreement** means the senior credit agreement dated on or about the date of this Pledge Agreement between, among others, the Pledgor as the Company, BIL Acquisition Holdings Limited as the US Borrower and the Pledgee.

### 1.3  Miscellaneous

(a)    Clause headings are inserted for convenience of reference only and shall be ignored in construing this Pledge Agreement.

(b) The provisions of clause 1.2 of the Intercreditor Agreement apply to this Pledge Agreement as though they were set out in full in this Pledge Agreement except that references to the Intercreditor Agreement are to be construed as references to this Pledge Agreement.

(c) In the event of any ambiguity, conflict or inconsistency between the terms of this Pledge Agreement and the Intercreditor Agreement, then (to the extent permitted by law) the terms of the Intercreditor Agreement will prevail and compliance with the terms of the applicable provisions in the Intercreditor Agreement shall be deemed to be compliance with the ambiguous, conflicting or inconsistent term of this Pledge Agreement.

(d) In the event of any ambiguity, conflict or inconsistency between the terms of this Pledge Agreement and the Senior Facility Agreement, Interim Facility Agreement or Second Lien Notes Indenture, then (to the extent permitted by law) the terms of the Senior Facility Agreement, Interim Facility Agreement or Second Lien Notes Indenture (as applicable) will prevail and compliance with the terms of the applicable provisions in the Senior Facility Agreement, Interim Facility Agreement or Second Lien Notes Indenture (as applicable) shall be deemed to be compliance with the ambiguous, conflicting or inconsistent term of this Pledge Agreement.

(e) In the event of any ambiguity, conflict or inconsistency between the terms of this Pledge Agreement and any other Secured Document (other than the Intercreditor Agreement, Senior Facility Agreement, Interim Facility Agreement or Second Lien Notes Indenture), then (to the extent permitted by law) the terms of this Pledge Agreement will prevail and compliance with the terms of the applicable provisions in this Pledge Agreement shall be deemed to be compliance with the ambiguous, conflicting or inconsistent term of the relevant Secured Document.

(f) A reference to a person in this Pledge Agreement includes its successors, transferees and assignees save that with respect to the Pledgor the terms of clause 15(b) of this Pledge Agreement shall apply.

(d) The term **Secured Document** includes all amendments and supplements (however fundamental) including supplements providing for further advances and increases of the advances.

(e) Words importing the singular shall include the plural and vice-versa.

## 2. CREATION OF THE PLEDGE

As continuing first ranking security for the due and full payment, discharge and performance of the Secured Obligations, the Pledgor, as sole holder of the Account, agrees to pledge and hereby pledges all the Security Assets held, or deposited in, or standing to the credit of, currently and in the future, the Account to, and in favour of, the Pledgee, who accepts the Pledge. Until the occurrence of an Enforcement Event, the Pledgor is free to dispose of the Security Assets in accordance with this Pledge Agreement (subject to any limitations provided for in the Secured Documents which the Account Bank is not obliged to verify). Upon occurrence of an Enforcement Event, the Pledgee will be entitled to notify the Account Bank that the Pledgor can no longer dispose of the Security Assets.

## 3. PERFECTION OF THE PLEDGE

The Pledgor shall cause the Pledge constituted by this Pledge Agreement to be notified to the Account Bank, within twenty days, in accordance with article 5(3) of the act of 5 August 2005 on financial collateral contracts (the **Collateral Act 2005**) by a duly executed notice substantially in the form of the notice contained in Schedule 2 and undertakes on a best efforts basis, to obtain from the

Account Bank, within ten Business Days, a duly executed acknowledgement and waiver in the form set out in Schedule 3.

## 4. EFFECTIVENESS OF THE PLEDGE

(a) The Pledge shall be a continuing security and shall not be considered as satisfied or discharged or prejudiced or waived or released by any intermediate payment, satisfaction or settlement of any part of the Secured Obligations and shall remain in full force and effect until it has been expressly released by the Pledgee in accordance with clause 8 below.

(b) The Pledge shall be cumulative, in addition to and independent of every other security which the Pledgee may at any time hold as security for the Secured Obligations or any rights, powers and remedies provided by law and shall not operate so as in any way to prejudice or affect or be prejudiced or affected by any security interest or other right or remedy which the Pledgee may now or at any time in the future have in respect of the Secured Obligations.

(c) The Pledge shall not be prejudiced by any time or indulgence granted to any person, or any abstention or delay by the Pledgee in perfecting or enforcing the Pledge or any security interest or rights or remedies that the Pledgee may now or at any time in the future have from or against the Pledgor or any other person.

(d) No failure on the part of the Pledgee to exercise, or delay on its part in exercising, any of its rights under this Pledge Agreement shall operate as a waiver or release thereof, nor shall any single or partial exercise of any such right preclude any further or other exercise of that or any other rights.

(e) If, at any time, any provision of this Pledge Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Pledge Agreement nor of such provisions under the law of any other jurisdiction shall in any way be affected or impaired thereby.

(f) Neither the obligations of the Pledgor contained in this Pledge Agreement nor the rights, powers and remedies conferred upon the Pledgee by this Pledge Agreement or by law nor the Pledge created hereby shall be discharged, impaired or otherwise affected by:

    (i) any amendment to, or any variation, waiver or release of, any obligation of the Obligors or any other person under the Senior Credit Agreement or any other Secured Document or this Pledge Agreement; or

    (ii) any failure to take, or to fully take, any security contemplated by any of the Secured Documents or otherwise agreed to be taken in respect of the Obligors' obligations under any of the Secured Documents; or

    (iii) any failure to realise or to fully realise the value of, or any release, discharge, exchange or substitution of, any security taken in respect of the Obligors' obligations under any of the Secured Documents; or

    (iv) any other act, event or omission which might operate to discharge, impair or otherwise affect any of the obligations of the Pledgor contained in this Pledge Agreement, the rights, powers and remedies conferred upon the Pledgee by this Pledge Agreement, the Pledge or by law.

(g) The Pledgor hereby waives any rights (if any) arising for it under article 2037 of the Luxembourg civil code or any right it may have of first requiring the Pledgee to proceed against or claim payment from, or to divide any action between and against, any other persons or enforce any guarantee or security before enforcing this Pledge.

(h) Neither the Pledgee nor any of its agents shall be liable by reason of (i) taking any action permitted by this Pledge Agreement or (ii) the realisation of the Pledge, except in the case of gross negligence or wilful default or misconduct upon its part.

(i) Until the end of the Security Period, the Pledgor shall not by virtue of any payment made, security realised or security interest enforced or moneys received hereunder:

(i) be subrogated to any rights, security, security interests or moneys held, received or receivable by the Pledgee or be entitled to any right of contribution or indemnity, or

(ii) claim, rank, prove or vote as a creditor of the Account Bank or its estate in competition with the Pledgee.

## 5. REPRESENTATIONS, WARRANTIES AND COVENANTS

### 5.1 Representations and warranties

The Pledgor hereby represents, warrants and undertakes that:

(a) it is the sole holder of the Account;

(b) it is the sole owner of any and all Security Assets;

(c) upon completion of the actions referred to in clause 3 of this Pledge Agreement, this Pledge is duly perfected and constitutes a legal, valid and binding first ranking pledge over the Account in favour of the Pledgee not subject to any prior or *pari passu* encumbrance and this Pledge is not liable to be avoided or otherwise set aside on the liquidation of the Pledgor or otherwise; until the Pledge shall be released by the Pledgee, it will not grant any additional (more junior ranking) pledge over the Account;

(d) it will, and will cause the Account Bank to, assist the Pledgee and generally make its best efforts, in order to obtain all necessary consents, approvals and authorisations from any relevant authorities in order to permit the exercise by the Pledgee of its rights and powers under this Pledge Agreement upon enforcement of the Pledge;

(e) it will not sell, dispose of, pledge or otherwise encumber hereafter the whole or any part of the Security Assets, unless otherwise permitted by the Secured Documents;

(f) this Pledge Agreement constitutes the legal, valid and binding obligations of the Pledgor, enforceable in accordance with its terms;

(g) it has full power, legal right and lawful authority to execute this Pledge Agreement and to pledge, assign and transfer the Security Assets in the manner and form hereof.

(h) it will not do, or permit to be done, anything which could prejudice the Pledge in any material respect, other than as permitted by the Secured Documents or the Intercreditor Agreement.

**5.2    Covenants**

    (a)    The Pledgor covenants that during the Security Period, it will immediately inform the Pledgee of any distress, attachment, execution or other legal process commenced in respect of the Account or all or part of the Security Assets.

    (b)    The Pledgor covenants and undertakes that until the Pledge shall be released by the Pledgee in full, in the case of a partial release of the Pledge, not to transfer all the Account or all or part of the Security Assets to one or several third party(ies), unless the Pledgor and the third party(ies) transferee(s) expressly and specifically approve any transfer and transferee(s) upon enforcement of the Pledge by the Pledgee.

**5.3    Repetition of representations, warranties and undertakings**

The representations, warranties and undertakings set out in this clause 5 are made on the date of this Pledge Agreement and are deemed to be repeated each day, as they are deemed to be repeated under the Senior Credit Agreement or the Interim Facility Agreement, to the Pledgor during the Security Period with reference to the facts and circumstances then existing.

**6.    FURTHER ASSURANCES**

The Pledgor shall at its own expense promptly and duly execute and do all such assurances, acts and things as the Pledgee may reasonably require as being necessary for perfecting or protecting all or any of the rights, powers, authorities and discretions which are for the time being exercisable by the Pledgee under this Pledge Agreement in relation to the Security Assets or any part thereof or the Account for facilitating the enforcement of any such rights or any part thereof and in the exercise of all powers, authorities and discretions vested in the Pledgee. To that effect, the Pledgor shall in particular execute all documents or instruments and give all notices, orders and directions and make all registrations which the Pledgee may reasonably think expedient.

**7.    ENFORCEMENT OF THE PLEDGE**

    (a)    Upon the occurrence of an Enforcement Event which is outstanding, the Pledgee shall be entitled to request the closure of account (*clôture de compte*) by notice to the Account Bank (in the form set out in Schedule 4) and to enforce the Pledge immediately, in its absolute discretion and exercise any right under (i) applicable law (including, without limitation, article 11 of the Collateral Act 2005), and/or (ii) this Pledge Agreement and to enforce all or any part of the Pledge in respect of the Account in any manner it sees fit.

    (b)    Any monies received by the Pledgee in respect of the Account following the enforcement of the Pledge in accordance with paragraph (a) above and/or under the rights and powers hereby conferred shall be applied by the Pledgee in or towards payment and discharge of the Secured Obligations or, at the discretion of the Pledgee, be held as a continuing security for the Secured Obligations.

**8.    RELEASE OF THE PLEDGE**

    (a)    At the expiry of the Security Period, the Pledge shall be discharged by the express release thereof granted by the Pledgee which the Pledgee shall be obliged to grant (and in which respect it shall take all necessary action) at the written request (and at the cost) of the Pledgor, after the Secured Obligations have been unconditionally and irrevocably paid and discharged in full.

(b)     Notwithstanding clause 8(a) above, the security should only be released after the later to occur of (a) the Senior Facility Discharge Date, (b) the Interim Facility Discharge Date and (c) the Second Lien Notes Discharge Date.

## 9.     LIABILITY AND INDEMNITY

(a)     The Pledgee shall not be liable for any losses arising in connection with the exercise of any of its rights, powers and discretions hereunder save for liabilities and expenses arising from the gross negligence or misconduct (négligence grossière ou faute lourde) or wilful default (faute intentionnelle) of the Pledgee.

(b)     The Pledgor will indemnify the Pledgee and every attorney which may be appointed, from time to time, in respect of all liabilities and reasonably documented expenses incurred by it, him, her or them in the execution of any rights, powers or discretions vested in it, him, her or them pursuant thereto save for liabilities and expenses arising from the gross negligence or misconduct (négligence grossière ou faute lourde) or wilful default (faute intentionnelle) of the Pledgee or its attorney or both.

## 10.    DELEGATION BY THE PLEDGEE

(a)     The Pledgee or any person appointed by the Pledgee may at any time and from time to time delegate by power of attorney or in any other manner to any properly qualified person or persons all or any of the powers, authorities and discretions which are for the time being exercisable by the Pledgee under this Pledge Agreement in relation to the Security Assets or any part thereof or the Account.

(b)     Any such delegation may be made upon such terms (including a power of substitution) and subject to such regulations as the Pledgee or such person appointed by the Pledgee may think fit. The Pledgee shall as soon as practicable inform the Pledgor and the Account Bank of the identity of the person appointed pursuant to this clause 10.

(c)     The Pledgee or such person appointed by the Pledgee shall not be in any way liable or responsible to the Pledgor for any loss or damage arising from any act, default, omission or misconduct on the part of any such delegate or sub-delegate except in the case of gross negligence or wilful default or misconduct.

## 11.    POWER OF ATTORNEY

(a)     The Pledgor hereby, in order to fully secure the performance of its obligations hereunder, irrevocably appoints the Pledgee and every person appointed by the Pledgee hereunder to be its attorney (*mandataire*) acting severally, and on its behalf and in its name or otherwise, to execute and do all such acts and things which the Pledgor is required to do and fails to do under the covenants and provisions contained in this Pledge Agreement (including, without limitation, to make any demand upon or to give any notice or receipt to the Account Bank or any other person).

(b)     The Pledgor hereby agrees to ratify and confirm, if need be, whatever any such attorney (as referred to in clause 11(a) above) shall properly do or purport to do in the exercise or purported exercise of all or any of the powers, authorities and discretions referred to in such clause.

12. **WAIVERS AND REMEDIES CUMULATIVE**

No waiver of any of the terms hereof shall be effective unless in writing signed by the Pledgee. No delay in or non-exercise of any right by the Pledgee shall constitute a waiver. Any waiver may be on such terms as the Pledgee sees fit. The rights, powers and discretions of the Pledgee herein are additional to and not exclusive of those provided by law, by any agreement with or other security in favour of the Pledgee including the provisions set out in the Secured Documents.

13. **COSTS**

The Pledgor will reimburse the Pledgee upon first demand of all reasonable costs and expenses set out in section 10.04 (Attorney Costs and Expenses) of the Senior Credit Agreement and arising in relation to this Pledge Agreement.

14. **NOTICES**

All notices or other communications under this Pledge Agreement shall be sent in accordance with the provisions of clause 33 (Notices) of the Intercreditor Agreement.

15. **ASSIGNMENT**

(a)     In the case of an assignment, transfer or novation by the Pledgee or any Secured Party to one or several transferees of all or any part of its rights and obligations under any of the Secured Documents, the Pledgee and the Pledgor hereby agree, that in such event, to the extent required under applicable law, the Pledgee shall preserve all of its rights under this Pledge Agreement as expressly permitted under article 1278 of the Luxembourg civil code, so that the security constituted by this Pledge Agreement shall automatically, and without any formality, benefit to any such transferees.

(b)     The Pledgor may not assign any of its rights under this Pledge Agreement. The Pledgee may assign all or any part of its rights under this Pledge Agreement provided that such assignment will be effected together with a parallel assignment under the Secured Documents.

16. **SEVERABILITY**

If, at any time, any provision of this Pledge Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Pledge Agreement nor of such provisions under the law of any other jurisdiction shall in any way be affected or impaired thereby.

17. **GOVERNING LAW AND JURISDICTION**

(a)     This Pledge Agreement is governed by, and shall be construed in accordance with, Luxembourg law.

(b)     Any dispute arising in connection with this Pledge Agreement shall be submitted to the courts of the district of Luxembourg-City.

(c)     Nothing in this clause 17 limits the right of the Pledgee to bring proceedings against the Pledgor in any other court of competent jurisdiction or concurrently in more than one jurisdiction.

## 18. COUNTERPARTS

This Pledge Agreement may be executed in any number of counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of the Pledge Agreement.

**IN WITNESS THEREOF** the parties hereto have executed this Pledge Agreement in two (2) original copies on the day and year first above written.

**SIGNATORIES**

The Pledgor

**BASELL AF S.C.A.**

by: _____


The Pledgee

**CITIBANK, N.A.**

by: _____

## SCHEDULE 1

### REFERENCE TO THE ACCOUNT

**Account numbers:**

[REDACTED]

**Account Banks**

**ING Luxembourg S.A. - Luxembourg**

## NOTICE OF PLEDGE

**Basell AF S.C.A.**
(To be renamed **LyondellBasell Industries AF S.C.A.**)
*Société en commandite par actions*
Registered office: 15-17 avenue Gaston Diderich, L-1420 Luxembourg
R.C.S. Luxembourg: B 107.545

Date [•]

To:

    ING Luxembourg S.A.
    52, Route d'Esch
    L-2965 LUXEMBOURG

Copy to:

    Citibank, N.A.
    388 Greenwich St
    20th Floor
    New York 10013
    Fax +1 212 816 2613

**BY REGISTERED MAIL AND FAX**

Dear Sirs,

This is to give you notice that, pursuant to an Account Pledge Agreement dated December [], 2007, Basell AF S.C.A., as Pledgor, has pledged to Citibank, N.A., as Pledgee (the "**Pledgee**"), all amounts and assets which presently or in the future are held in or stand to the credit of account [REDACTED]

    held with you (the **Account**), in whatever currency, including any and all property which may at any time or from time to time hereafter be deposited in or which may accrue to the Account and the debts represented by any balance standing to the credit of the Account.

We hereby give you notice, for the purpose of Article 5(3) of the Luxembourg law of 5 August 2005 on financial collateral arrangements, as well as any other applicable laws, if any, of a pledge granted by ourselves in favour of the Pledgee over any claim to the credit balance of the Account, as well as any other claim we may have against your bank in relation to such Account.

Within the limits as provided in the acknowledgment form attached hereto, we further request you to waive any right of pledge, right of set-off, lien, right of retention, right of combination of accounts or any similar right you may have against us or the Bank Account, whether arising by way of contract, general terms and conditions or law.

We kindly ask you to return the attached acknowledgement form, duly executed, to our above address, with copy to the Pledgee.

Yours sincerely,

**Basell AF S.C.A.**

_____

By:
Title:

## SCHEDULE 3

## FORM OF ACKNOWLEDGEMENT
### (ON THE LETTERHEAD OF THE ACCOUNT BANK)

Date [•]

To:

Basell AF S.C.A.
15-17 avenue Gaston Diderich
L-1420 Luxembourg

Copy to:
Citibank, N.A.
388 Greenwich St
20th Floor
New York 10013
Fax +1 212 816 2613

Dear Sirs,

**Notice of Pledge over Bank Account**

We refer to the notice of pledge dated December [ ], 2007 and regarding an Account Plegde Agreement entered into between Citibank, N.A., as Pledgee (the "**Pledgee**") and Basell AF S.C.A., as Pledgor (the "**Pledgor**") for the purpose of creating a pledge over any claim the Pledgor may have to the credit balance of the account [REDACTED] (the "**Account**") opened in the name of the Pledgor with our bank, as well as any other claim the Pledgor may have against our bank in relation to such account.

Within the limits as provided hereunder, we acknowledge receipt of this notice of pledge as well as the security interest created by the Account Pledge Agreement.

Any security interest over the Account that may exist in our favour such as, in particular, any pledge or similar security arrangement pursuant to the general terms and conditions governing the Account shall be released hereby within the limits as provided hereunder.

Within the limits as provided hereunder, we expressly waive any right of pledge, right of set-off, lien, right of retention, right of combination of accounts or any similar right we may have against you or the Account, whether arising by way of contract, general terms and conditions or law.

However, as we did not receive any copy of the Finance Documents and, therefore for the avoidance of any doubt concerning the limits of our obligations thereof and under the Account Pledge Agreement, we confirm you that our acknowledgement as provided herein is conditional upon your agreement on the fact that our liability under the Account Pledge Agreement shall be strictly limited to the following:

(a) Upon the occurrence of an Enforcement Event, the Pledgee shall be entitled to send a written notice (the "**Blocking Notice**") by telefax to us and shall confirm us the sending of the telefax by a telephone call, during the normal Business Hours (from

8.30 to 12.30 and 13.30 to 17.30 Luxembourg time on any day - other than Saturday or Sunday - on which banks are generally open for business in Luxembourg), to the Head of the Corporate and Institutional Banking Department of the Account Bank (Fax number +352 45 92 97, telephone number : +352 44 99 1480).

Upon receipt of the Blocking Notice and the telephone call, we undertake to immediately send a confirmation (the "**Confirmation**") to the Pledgee of the receipt of the telefaxed version of the Blocking Notice.2

We shall use our best efforts to block the Account referred to in the Blocking Notice as soon as possible upon receipt of the Blocking Notice it being understood that such blocking shall not occur later than 8 consecutive Business Hours after the sending of the Confirmation confirming the receipt by the Bank of the telefaxed version of the Blocking Notice. Once the account has been blocked, we shall notify the Pledgor and the Pledgee as soon as reasonable feasible that the Account has been blocked.

(b)   Until the blocking of the Account as provided hereunder, the Pledgor may manage and operate the Account in accordance with Clause 2 of the Account Pledge Agreement, without any liability from our Bank, except gross negligence or wilful misconduct, nor any duty of control, monitoring, blocking or information of any kind vis-à-vis the Pledgor.

(c)   If at any time a blocking of the Account is done as provided herein, we shall not execute anymore the instructions given by the Pledgor except with the express prior written confirmation of the Pledgee;

(d)   The Pledgor formally authorises us to promptly provide to the Pledgee, upon the latter's request therefore from time to time, any information with regard to the Account and the transactions realised thereon during the Security Period. The Pledgor releases therefore us from our professional secrecy obligation for any information transmitted to the Pledgee in accordance with the Account Pledge Agreement and more generally, from any liability with regard to any damages whatsoever which it may incur owing to the transmission of such information.

(e)   Moreover it is understood that:

Our obligations and liabilities are strictly limited to those expressly set forth in writing herein and in our standard account documentation and terms and conditions as in effect from time to time (all of which shall apply to the Account to the extent not inconsistent with the terms of the present acknowledgement) and, for the avoidance of doubt, we have thus no obligation of any kind of information, control, monitoring, blocking vis-à-vis de Pledgee and the beneficiaries of the Pledge before the blocking of the Account as provided herein nor to check if a Default under the Account Pledge Agreement has occurred and/or is continuing.

The acceptance of this Notice of Pledge by us does not imply any obligation for us to guarantee any commitments of the Pledgor towards the Pledgee. Any realisation or transfer of the security assets which we could be required to effect hereunder in favour of or for the account of the Pledgee will be limited to the value of the security assets as of the day of their realisation or transfer, as the case may be.

All reasonable costs and expenses (including, without limitation, legal fees) incurred by our Account Bank in the lawful exercise of the powers and rights hereby conferred shall be payable by the Pledgor.

We shall not be liable for any losses arising in connection with the exercise of any of its rights, powers and discretion hereunder save for liabilities and expenses arising from the gross negligence or wilful default or misconduct of our Account Bank.

The Pledgor will indemnify us in respect of all liabilities and reasonably documented expenses incurred by it, him, her or them in the execution of any rights, powers or discretion vested in it, him, her or them pursuant hereto save for liabilities and expenses arising from our gross negligence or wilful default or misconduct.

Any such payment due by the Pledgor to us shall constitute a personal commitment of the Pledgor and we shall not be entitled to any right of set-off or other right in respect of the Secured Rights during the Security Period (except if by the effect of the law and except that the Account Bank may set off (i) all reasonable amounts due to us in respect of its customary fees and expenses for the routine maintenance and operation of the Account including transactions fees, and (ii) the face amount of any checks or other items which have been credited to any of the Accounts but are subsequently returned unpaid because of uncollected or insufficient funds).

For the avoidance of any doubts, to be opposable to us, the pledge on any future account(s) to be opened with our Bank shall have to be subject to (i) a similar Notice of Pledge from the Pledgor specifying expressly the account number concerned and a similar Acknowledgement letter from us.

This letter is governed by the laws of the Grand Duchy of Luxembourg.

The courts of Luxembourg City have exclusive jurisdiction to settle any dispute arising out of or in connection with this letter.


Yours sincerely,

ING Luxembourg S.A.

## SCHEDULE 4

### BLOCKING NOTICE
(ON THE LETTERHEAD OF THE PLEDGEE)

From:

Citibank, N.A.
388 Greenwich St
20th Floor
New York 10013
Fax +1 212 816 2613

To:

ING Luxembourg S.A.
Attn : Head of Corporate and Institutional Banking Department
52, route d'Esch
L-2965 Luxembourg
Fax Number : +352 45 92 97

**[TO BE SENT BY TELEFAX AND IMMEDIATELY CONFIRMED BY PHONE]**

[Please insert date]

Dear Sir,

We refer to the notice of pledge dated [•] and regarding an Account Pledge Agreement entered into between Citibank, N.A. as Pledgee and Basell AF S.C.A. as Pledgor for the purpose of creating a pledge over any claim the Pledgor may have to the credit balance of the account as listed hereunder (the "**Account**") opened in the name of the Pledgor with our bank, as well as any other claim the Pledgor may have against our bank in relation to such account.

We hereby kindly request you to block the account set out below in accordance with Clause 7 of the Account Pledge Agreement and request that, upon the receipt of this notice and a phone call from us confirming the sending of this notice, you:

- immediately confirm us by return of fax the receipt of this Notice of Blocking, and

- block the Account        [REDACTED]        and do not to execute any instructions whatsoever given by the Pledgor and/or the other persons empowered to operate such Account.

[PLEDGEE]

## SIGNATORIES

The Pledgor

**BASELL AF S.C.A.**

by: _____
BRUCE DRESBACH

The Pledgee

**CITIBANK, N.A.**

by: _____

**SIGNATORIES**

The Pledgor

**BASELL AF S.C.A.**

by: _____

The Pledgee

**CITIBANK, N.A.**

by: _~signature~_

Edward Crook
Vice President