UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LYONDELL CHEMICAL COMPANY, *et al.*, | ) | |
| | ) | Case No. 09-10023 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ——————————————————————— | ) | |
| | ) | |
| LYONDELL CHEMICAL COMPANY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| *against* | ) | Adversary Proceeding |
| | ) | |
| CENTERPOINT ENERGY GAS SERVICES | ) | No. 09-01038 (REG) |
| INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————————— | ) | |

BENCH DECISION[1] ON MOTIONS FOR
PRELIMINARY INJUNCTIONS

---

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion.  Because they often start as scripts for decisions to be dictated in open court, they typically have less in the way of citations and footnotes, and have a more conversational tone.

Subject to cite checking, technical corrections, and, if circumstances require or permit, supplementation.

APPEARANCES:

SUSMAN GODFREY, LLP
Proposed Counsel for Debtors
1000 Louisiana Street 5100
Houston, TX 77002
By:     Vineet Bhatia, Esq. (argued)
        David Peterson, Esq.

CADWALADER, WICKERSHAM & TAFT, LLP
Proposed Counsel for Debtors
One World Financial Center
New York, NY 10281
By:     George A. Davis, Esq.
        Israel Dahan, Esq.

BROWN RUDNICK, LLP
Proposed Counsel for Official Committee
  of Unsecured Creditors
Seven Times Square
New York, NY 10036
By:     Edward S. Weisfelner, Esq.

One Financial Center
Boston, MA 02111
By:     Steven D. Pohl, Esq. (argued)

STROOCK & STROOCK & LAVAN, LLP
Counsel for Morgan Stanley Capital Group, Inc.,
  Hess Corporation, Hess Energy Services Company, LLC,
  and Hess Energy Trading Company, LLC
180 Maiden Lane
New York, NY 10038
By:     Melvin A. Brosterman, Esq. (argued)
        Mark A. Speiser, Esq.
        Harold A. Olsen, Esq.

LOCKE LORDE BISSELL & LIDDELL, LLP
Co-Counsel for Targa Liquids Marketing and Trade, Targa
  Midstream Services Limited Partnership, and ConocoPhillips Co.
3400 JPMorgan Chase Tower
600 Travis Street
Houston, TX 77002
By:     Patricia Williams Prewitt, Esq.

885 Third Avenue
Twenty-Sixth Floor
New York, NY 10022
By:    Allen C. Wasserman, Esq. (argued)

601 Poydras Street, Suite 2660
New Orleans, LA 70130
By:    Omer F. Kuebel, III, Esq.

KLEE, TUCHIN, BOGDANOFF & STERN, LLP
Counsel for ConocoPhillips Company
1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, CA 90067
By:    Kenneth N. Klee, Esq.

MEYER, SUOZZI, ENGLISH & KLEIN, PC
Co-Counsel for Targa Liquids Marketing and Trade
  and Targa Midstream Services Limited Partnership
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, NY 11530
By:    Alan E. Marder, Esq.
       Jil Mazer-Marino, Esq.

ORRICK, HERRINGTON & SUTCLIFFE, LLP
Counsel for Koch Supply & Trading, LP,
  Koch Supply & Trading, sarl,
  Deutsche Bank AG, London Branch,
  and Deutsche Asset Management
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005
By:    Jonathan P. Guy, Esq. (argued)

666 Fifth Avenue
New York, NY 10103
By:    Alyssa D. Englund, Esq.
       Courtney M. Rogers, Esq.

SAUL EWING, LLP
Counsel for GATX Corporation
245 Park Avenue, 24th Floor
New York, NY 10167
By:    John J. Jerome, Esq.

HALPERIN BATTAGLIA RAICHT, LLP
Counsel for Marathon Petroleum Company, LLC
555 Madison Avenue, 9th Floor
New York, NY 10022
By:    Alan D. Halperin, Esq.
       Neil W. Cohen, Esq.

MORGAN, LEWIS & BOCKIUS, LLP
Counsel for Wachovia Bank, National Association
101 Park Avenue
New York, NY 10178
By:    Richard S. Toder, Esq.
       Andrew D. Gottfried, Esq. (argued)
       Matthew W. Olsen, Esq.

JONES DAY
Counsel for CenterPoint Energy Services, Inc.
  and Cokinos Natural Gas Company
222 East 41st Street
New York, NY 10017
By:    Steven C. Bennett, Esq.
       Erica M. Ryland, Esq.
       Ross S. Barr, Esq.

COKINOS, BOSIEN & YOUNG, PC
Counsel for CenterPoint Energy Services, Inc.
  and Cokinos Natural Gas Company
Four Houston Center
1221 Lamar, 16th Floor
Houston, TX 77010
By:    Gregory M. Cokinos, Esq.

SONNENSCHEIN NATH & ROSENTHAL, LLP
Counsel for Anadarko Energy Services Company
  and Houston Pipe Line Company, LP
1221 Avenue of the Americas
New York, NY, 10020
By:    Oscar N. Pinkas, Esq.

PORTER & HEDGES, LLP
Counsel for Anadarko Energy Services Company
  and Houston Pipe Line Company, LP
1000 Main Street, 36th Floor
Houston, TX 77002
By:    John F. Higgins, Esq.
       James Matthew Vaughn, Esq.

WHITEFORD TAYLOR & PRESTON, LLP
Counsel for CITGO Petroleum Corporation
Seven Saint Paul Street
Baltimore, MD 21202
By:    Brent C. Strickland, Esq.

WILMER CUTLER PICKERING HALE & DORR, LLP
Counsel for Aspen Technology, Inc.
399 Park Avenue
New York, NY 10022
By:    Phillip D. Anker, Esq.
       Mitchel Appelbaum, Esq.

BINGHAM McCUTCHEN LLP
Counsel for The Liverpool Limited Partnership
  and Elliott International, LP
399 Park Avenue
New York, NY 10022
By:    Jeffrey S. Sabin, Esq.
       Steven Wilamowsky, Esq. (argued)
       Jared R. Clark, Esq.
       Stephanie Mai, Esq.

UNGARETTI & HARRIS LLP
Counsel for Nalco Company
3500 Three First National Plaza
Chicago, IL 60602
By:    R. Scott Alsterda, Esq.
       Theodore E. Harman, Esq.

DUANE MORRIS LLP
Counsel for Utility Center Massvlakte Leftbank B.V.
1540 Broadway
New York, NY 10036
By:    William H. Schrag, Esq.
       William C. Heuer, Esq.

ANDREWS KURTH LLP
Counsel to Columbus Hill Overseas, Ltd. and Columbus Hill
Partners, LP
450 Lexington Avenue, 15th Floor
New York, NY 10017
By:    Lynne M. Fischman Uniman, Esq. (argued)
        Paul N. Silverstein, Esq. (argued)

SEWARD & KISSEL LLP
Counsel for Wilmington Trust Company as Successor Indenture
Trustee for the 2015 Notes
One Battery Park Plaza
New York, NY 10004
By:    John R. Ashmead, Esq. (argued)
        Dale C. Christensen, Jr., Esq.


BEFORE:    ROBERT E. GERBER
            UNITED STATES BANKRUPTCY JUDGE

In this adversary proceeding under the umbrella of the chapter 11 cases of

Lyondell Chemical Co. ("Lyondell") and its affiliates, the Debtors seek preliminary

injunctions, of two types:

> (1) enjoining creditors of the Debtors in this case, until
>
> confirmation, from pursuing remedies—including, and perhaps especially,
>
> the commencement of involuntary insolvency proceedings in foreign
>
> countries—against the Debtor's nondebtor parent LyondellBasell
>
> Industries AF S.C.A. ("**LBIAF**") arising from guaranties of debt incurred
>
> by various of the Debtors in their dealings with those creditors; and

> (2) enjoining creditors of LBIAF, once more until confirmation,
>
> from doing such by reason of covenant and payment defaults on notes
>
> issued by LBIAF's predecessor in the principal amount of €500 million
>
> and US $615 million, due in 2015, which have been referred to as the
>
> "**2015 Notes.**"

The two motions are granted, but for a period of 60 days only, and subject to

some carveouts and conditions that I will require.

Some, but not all, of the damage the Debtors fear is a matter of serious concern.

But injunctions of the breadth and duration that the Debtors request raise material public

interest concerns, potentially prejudicing some creditors vis-à-vis other creditors and

impairing the value of guaranties in major commercial transactions—with the result that

an injunction of the breadth and duration requested here would represent an excessive

exercise of the power that I undoubtedly have to interfere with creditors' rights against

nondebtor parties.  An injunction for 60 days should be sufficient to permit the filing of

1

voluntary insolvency proceedings in the U.S. or abroad, to protect the Debtors from the disruption of their integrated European operations and a default on their DIP financing facility—each of which is a very major concern, and would otherwise be serious risks if I failed to act. At the same time, an injunction of 60-day duration, with the added safeguards I will impose, will result in little, if any, material prejudice to the enjoined parties.

The following are my Findings of Fact, Conclusions of Law, and bases for the exercise of my discretion in connection with these determinations.

<u>Facts</u>

After an evidentiary hearing, I find the facts to be as follows:

*1. Corporate Structure*

The Debtors' corporate family is a complex one, but the corporate relationships relevant here can be more briefly stated. The Debtors, all but one of which do business in the United States, are indirect subsidiaries of a holding company, LBIAF. LBIAF is organized under the laws of Luxembourg, and has its principal place of business in the Netherlands.

LBIAF has a single subsidiary, Basell Funding S.a.r.l. ("**Basell Funding**"), which has many direct and indirect subsidiaries, all or most of which are in Europe. Of those, only one of them—a German company called Basell Germany Holdings G.m.b.H. (the "**German Company**")—is a debtor in the chapter 11 cases here. All of LBIAF's other subsidiaries, direct and non-direct, are nondebtors in this case, and so far as the record reflects, are not debtors anywhere else. There are no ongoing foreign insolvency proceedings in progress elsewhere in the world to which to grant comity or to consider doing so.

2

From time to time, I'll refer to LBIAF, Basell Funding, and their other nondebtor affiliates as the "**LBIAF Nondebtors**."

   2.  *LBIAF's Obligations*

      a.  *The Guaranties*

Various of the Debtors in this case—including at least Debtors Lyondell, Equistar Chemicals, LP ("**Equistar**"), Houston Refining, LP ("**Houston Refining**"), and Basell USA, Inc. ("**Basell USA**") entered into commercial transactions with contract counterparties, and failed to pay the counterparties all that was due. Thus the unpaid counterparties have claims (for the most part, unsecured) against those Debtors in these chapter 11 cases. Additionally, however—and critical to the issues here—those counterparties (the "**Guaranty Creditors**") sought and obtained, prior to the filing of the Debtors' chapter 11 cases, guaranties of those Debtors' obligations by LBIAF.[2]

The Guaranty Creditors have satisfied me for the purposes of this decision (especially given the absence of any proof to the contrary) that the guaranties from LBIAF that the Guaranty Creditors sought and obtained were material to their decisions to extend credit to their Debtor obligors. Similarly, the Guaranty Creditors have satisfied me that they relied upon the LBIAF guaranties when extending credit to the various Debtors. Whether they *reasonably* relied on those guaranties, given what they knew or should have known about LBIAF's corporate structure and debt, is more debatable, but it ultimately is not critical to the determinations I make here.

---

[2]    It also appears that at least some of the underlying agreements covered by LBIAF guaranties were with European nondebtor affiliates. *See* Bigman Decl. of Feb. 6, 2009 ("**Bigman Decl. #1**") at ¶ 17 (describing guaranty of petroleum purchase contracts between Morgan Stanley and, among others, Basell Finance BV, Basell Finance & Trading Co. BV, Lyondell Chemie Nederland BV, Lyondell Chimie France SAS, and Compagnie de Distribution des Hydrocarbures).

Collectively, the guaranty claims against LBIAF now total approximately $131 million, and may total $200 million.

One of the Guaranty Creditors, ConocoPhillips Co. ("**ConocoPhillips**") commenced proceedings in Luxembourg and the Netherlands in the nature of a request for an attachment under U.S. law. With some simplification, the procedures in each country called for securing an order of attachment from the foreign court, and then taking further steps in the foreign jurisdiction (*e.g.* serving it on various parties, and engaging in further proceedings in the foreign court), with the latter steps necessary to complete the perfection of the resulting lien and rights.

ConocoPhillips secured the initial orders from the Luxembourg and Netherlands courts that were necessary to initiate the process, but when ConocoPhillips learned of the TRO I entered at the outset of this controversy (described below), ConocoPhillips refrained from completing the further steps. ConocoPhillips argues that I should not grant the requested preliminary injunction, but that if I do, I should nevertheless allow it to complete the steps necessary to perfect its attachment lien.

### b. The 2015 Notes

In August 2005, LBIAF's predecessor issued the 2015 Notes.[3] LBIAF is now the principal obligor on the 2015 Notes, though the Notes are guarantied by certain of LBIAF's subsidiaries (in both Europe and the United States), including a number of the Debtors. The 2015 Notes are secured by a pledge of the shares of Basell Funding (which, as noted above, is LBIAF's only direct subsidiary), and certain other collateral.

---

[3]     Bigman Decl. dated Feb. 12, 2009 (**Bigman Decl. #2**) ¶ 4.

The Debtors' bankruptcy filings triggered an event of default under the indenture under which the 2015 Notes were issued (the "**2015 Notes Indenture**").  As a consequence, the 2015 Notes' indenture trustee (the **"Indenture Trustee")** or the holders of 25% in principal amount of the outstanding 2015 Notes may declare the 2015 Notes due.  To date, there has been no such declaration, and such a declaration was one of the things prohibited under the TRO.

Many of the objecting parties in this adversary proceeding are holders of the 2015 Notes ("**2015 Noteholders**"), though some are also parties to credit default swaps that protect such holders from the risk of nonpayment—and whose interests are materially different from those who simply hold the 2015 Notes.  Expressing a concern that is increasingly common in the large chapter 11 cases in this Court, some of the 2015 Noteholders argue that they would be affected much more dramatically by an inability to recover on the 2015 Notes than a 2015 Noteholder with a credit default swap would.

And apart from the covenant default under the 2015 Notes Indenture that resulted from the Debtors' chapter 11 filings, there has now also been a payment default under the 2015 Notes Indenture, although it is potentially subject to cure.  On February 17, 2009 (after the TRO was issued and the hearing on this preliminary injunction motion began, but before the preliminary injunction hearing was completed), LBIAF failed to make the interest payment that was due on the 2015 Notes at that time.  There is a 30 day grace period for such payment, but in the absence of cure that would be an additional, and more significant, default.

5

Under an intercreditor agreement to which the Indenture Trustee is a party,[4] the 2015 Noteholders are prohibited from taking action to enforce their rights against their collateral or the LBIAF subsidiary guaranties until after the senior secured debt has been fully discharged—or, more significantly as a practical matter, after the expiration of a 179-day standstill period.

However—and this is a matter of major concern—in light of LBIAF's inability to pay the principal and interest that would be due under the 2015 Notes upon acceleration, the Indenture Trustee or 2015 Noteholders could attempt to commence involuntary insolvency proceedings against LBIAF in Luxembourg, the Netherlands, or (less likely) elsewhere.

    *3. LBIAF's Assets*

LBIAF has assets of five types, three of which are material to this matter. LBIAF's balance sheet as of December 31, 2008 shows €545 million for shares in "affiliated undertakings," which represents LBIAF's stock in its subsidiaries.[5]  (As noted above, LBIAF has one direct subsidiary, Basell Funding).  The Basell Funding stock is pledged to secure the prepetition senior secured and prepetition bridge loans.

The second type of asset listed in the balance sheet of that date is approximately €939 million for "loans to affiliated undertakings."  This amount represents the proceeds of the 2015 Notes which were raised by LBIAF and then in turn lent by LBIAF to its subsidiaries.  When the funds were lent to the subsidiaries, that created intercompany obligations—payables from the subsidiaries' perspective and receivables from LBIAF's

---

[4]    At the time, the Indenture Trustee was a predecessor institution.  Now the Indenture Trustee is Wilmington Trust Co. ("**Wilmington Trust**"), which is a defendant in this adversary proceeding, protecting the interests of 2015 Noteholders.

[5]    Decl. of Alan Bigman, dated Feb. 20, 2009 (ECF #64) ("**Bigman Decl. #3**") at ¶ 4-9.

point of view—running from the subsidiaries to LBIAF.  However, these receivable too are pledged to the prepetition senior secured and bridge loan lenders.

The third type of asset listed in LBIAF's balance sheet of that date is approximately €56 million for "amounts owed by affiliated undertakings due and payable within a year."  Of this, approximately €30 million represents interest that has accrued on the subsidiaries' obligations to LBIAF with respect to their receipt of the proceeds of the 2015 Notes.  The remainder, approximately €27 million, is the amount currently owed to LBIAF by Basell Finance Company BV ("**Basell Finance B.V.**"), an indirect subsidiary of LBIAF and Basell Funding.

The fourth type of asset listed in the balance sheet as of that date is approximately €123 thousand for "Other debts becoming due and payable within one year," representing an accrual for a Luxembourg value added tax receivable.  I don't consider it material for purposes of this analysis.

The fifth type of asset listed in the balance sheet as of that date is approximately €1.4 million, for "Cash at bank and in hand."  It too is pledged to secure the prepetition senior secured and bridge loans.  The cash on hand changed after the end of the year. The €1.4 million was transferred after December 31 to Basell Finance B.V., with a corresponding receivable from Basell Finance B.V. owing to LBIAF.  As of February 19, LBIAF had approximately €26 million held on account by Basell Finance B.V., of which approximately €12 million will be used to pay an income tax obligation to the Luxembourg authorities and €9 million is owed to a subsidiary for auditing, accounting and related services.  After those amounts (which LBIAF's CFO describes as ordinary course payments) are paid, there will be approximately €5.5 million left as a receivable

7

from Basell Finance B.V.  LBIAF intends to use this in the ordinary course of its business
to pay for audit services and other professional fees.  That €5.5 is plainly insufficient to
pay any significant portion of the Guaranty claims (much less the 2015 Note obligations),
but the payments described in this paragraph may be regarded as having had a *de facto*
priority over payment on the Guaranty Claims and obligations on the 2015 Notes.

Similarly, LBIAF lacks the liquid assets to defend itself against any Guaranty
Claims.  Because of that, and because the claims against LBIAF arise from transactions
as to which the underlying Debtors, rather than LBIAF, would have the relevant
knowledge, I agree with the Debtors' assertion that the burden of any defense of claims
against LBIAF on the guaranties would fall on the Debtors.  However, other than
contesting the exact amount due, I now see little that LBIAF could say in the way of any
substantive defense to the Guaranty Claims, and little in the way of costs or burdens
associated with that defense.

4.   *Risks and Consequences of Involuntary Proceedings in Europe*

If the 2015 Noteholders were able to commence involuntary insolvency
proceedings against LBIAF, a court-appointed judge and court-appointed liquidator
would take control of LBIAF's operations.  It is also reasonable to infer that if any of the
Guaranty Creditors commenced involuntary insolvency proceedings against LBIAF, like
consequences would follow.  Additionally (and as a matter of greater concern), if LBIAF
has intercompany claims (as a creditor) against any of the European *nondebtor*
subsidiaries (which LBIAF at least seemingly does, by reason of the downstreaming of
the proceeds of the 2015 Notes, with corresponding intercompany payables on the part of
the European subsidiaries with respect to sums received), these intercompany claims

could be used as a basis for commencing insolvency proceedings against other European

nondebtor entities in their respective jurisdictions.

In that connection, the Debtors sought to introduce evidence at the preliminary

injunction hearing, through LBIAF CFO Alan Bigman, that Guaranty Creditor Wachovia

had threatened the filing of an involuntary insolvency proceeding in Europe (the

**"Wachovia Threat"**).  Counsel for Wachovia objected on hearsay grounds, and it turned

out that Mr. Bigman heard of the Wachovia Threat not directly from Wachovia, but from

another Lyondell officer.  While testimony of that substance would have been admissible,

for several purposes, if presented by the other officer (who did not testify), it was double-

hearsay as presented by Mr. Bigman.  Thus I sustained Wachovia's objection, and

excluded evidence of the Wachovia Threat to the extent it was offered for the truth of the

matter asserted—*i.e.*, that the threat was actually made; that it came from Wachovia; and

that Wachovia intended to act in accordance with its alleged threat.  However, I allowed

the evidence, and now consider it, for purposes other than the truth of the matter asserted,

and find that the Debtors' belief that they need to protect themselves from the risk of an

involuntary filing is very reasonable.

The Debtors have submitted a declaration of Marc Mehlen, their Luxembourg

counsel, stating that it is "entirely possible," under Luxembourg law, that as a result of

the attachment order obtained by ConocoPhillips in the Netherlands, and various

guaranty claims asserted against LBIAF, insolvency proceedings against LBIAF could be

opened in Luxembourg (unless a court determines that LBIAF's center of main interests

(**"COMI"**) is elsewhere), either as a result of an involuntary proceeding commenced by

an LBIAF creditor or as a result of a filing made by the general manager of LBIAF—

which the manager is obligated to do, no later than 30 days after the date on which

LBIAF is in cessation of payments.[6]  Under those circumstances, LBIAF's management

would be divested of all powers to represent LBIAF and a bankruptcy receiver would be

appointed, who would be in control of all assets of LBIAF—subject to certain exceptions,

notably those assets subject to perfected security interests.[7]  I take those statements as

true.

Similarly, the Debtors have submitted a declaration of their Dutch counsel, Jelle

Hofland, stating that as a result of the attachment order ConocoPhillips obtained in the

Netherlands, an involuntary proceeding against LBIAF could shortly be commenced in

the Netherlands.[8]  While the Netherlands has an insolvency regime called "suspension of

payments," under which a debtor can manage and dispose of its assets only with the

cooperation or authorization of a court appointed administrator, it is available only at the

request of a debtor.  The Netherlands' alternative regime, "bankruptcy," which results in

liquidation, can be made by one or more creditors of the debtor.[9]  The main effect of a

bankruptcy proceeding in the Netherlands is that LBIAF's management would be

divested of all powers to manage and dispose of LBIAF's assets and a bankruptcy

receiver would be appointed, who would be the only person entitled to take any acts

regarding the assets of LBIAF (other than certain assets subject to perfected security

interests).  I take those statements as true as well.

---

[6]      Mehlen Decl. ¶ 5.

[7]      Mehlen Decl. ¶ 7.

[8]      Hofland Decl. ¶ 5.

[9]      Hofland Decl. ¶ 9.

Wachovia submitted a declaration by Luxembourg avocat Alain Rukavina, purporting to advise me whether the laws of Luxembourg provide a procedure for reorganization or restructuring, as distinguished from liquidation.  Though the declaration's English is a bit awkward, it seems to suggest that there is some kind of mechanism or regime ("regime de la gestion contrôlée") by which a company unable either to raise credit or to perform its commitments can "file a request to the court" to act under supervision of the court with the purpose either to reorganize or to secure a better sale of its assets.[10]  But while the declaration reveals the possibility of a *voluntary* proceeding for reorganization, the declaration is silent on whether reorganization is available in an *involuntary* proceeding.  The declaration provides no basis for a conclusion on the latter question.

But the declaration of John Houghton, an English solicitor with expertise as to European insolvency matters, submitted by defendant Columbus Hill Partners, one of the 2015 Noteholders, is instructive.  Mr. Houghton acknowledges differences between the insolvency laws of Luxembourg and the Netherlands and chapter 11 as implemented in the U.S.  And he notes, in that connection, that "these differences include," among others:

> the possibility of mandatory duties to file upon insolvency, the displacement of some or all of management's powers following the opening of an insolvency case and the appointment of an external administrator or liquidator.[11]

Mr. Houghton notes further that "[t]hese differences are by no means unique to Luxembourg or the Netherlands among the insolvency laws of the various European

---

[10]     Rukavina Decl. ¶¶ 3,4.

[11]     Houghton Decl. ¶ 5.

states."[12]   And he goes on to say that, as a result, "the challenges presented by the legal

framework in many Europeans countries means that European restructuring tends to be

practiced very differently than in the United States" and that "[l]arge and complex

financial restructurings tend to be conducted almost exclusively out of court by a

consensual process of negotiation among the debtor and each class of creditors."[13]   I take

these statements as true as well.

        Mr. Houghton's observations are significant in at least two respects.  They

validate the Debtors' fears with respect to the consequences of an uncontrolled filing of

an involuntary petition in Europe, and suggest the desirability of limiting any injunction

that I might issue to permit consensual processes of negotiation to take place.

   5.   *Prejudice and Injury to the Debtors*

        Though under the facts presented here, I don't regard matters related to the

defense of the Guaranty claims (either by reason of cost or risks of *res judicata* or

collateral estoppel) to constitute serious or irreparable injury, for the reasons discussed

above and below, I find that there would be serious and irreparable injury to the Debtors

if some relief, for some period of time, weren't granted here.  Satisfactory showings have

been made to me that:

                        (a) If the Guaranty Creditors were allowed to assert claims on the

                Guaranties, LBIAF could be forced into involuntary insolvency

                proceedings in Luxembourg, the Netherlands, or (though less likely)

                elsewhere;

---

[12]        *Id.* at ¶ 6.

[13]        *Id.* at ¶ 8.

(b) A European involuntary insolvency proceeding would be unlikely to involve a process of reorganization or restructuring as in the United States, and could cause a fast liquidation of LBIAF;

(c) That, in turn, could have the effect of triggering fiduciary (or other legal) obligations of directors of nondebtor affiliates of the Debtors and LBIAF located in Europe, which, in turn, could force all the European debtors into their own liquidation proceedings in as many as 8 countries;

(d) It would not be possible to coordinate each of those disparate proceedings.[14]

Additionally, a satisfactory showing has been made to me, and I so find, that each of the entities owned directly and indirectly by LBIAF (with the exception of certain legacy entities that have no ongoing operations) is an important part of the *integrated operations* of the Debtors and nondebtors.  The Debtors and their nondebtor affiliates operate as an integrated enterprise through the worldwide coordination of their businesses and their operation as a vertically integrated group of companies.[15]  These entities' operations—and the Debtors' restructuring and reorganization efforts—benefit substantially from maintaining coordinated control and management over all of the worldwide operations.[16]  Operating together, the U.S. and European entities achieve substantial synergies (estimated at the time of the merger between Lyondell Chemical

---

[14]   It is also the case that in material respects, the Debtors and their European affiliates have overlapping management.  On other requests for similar relief, I've normally regarded management distraction as something worthy of consideration, but permitting (and requiring) reconsideration after the passage of time.  If there ever were an involuntary filing here, placing control of the Debtors' European affiliates in the hands of a foreign trustee, I believe that the level of management distraction in this case would greatly exceed any distraction that I had ever considered in any other case on my watch before.

[15]   Bigman Decl. #1 at ¶ 23.

[16]   Bigman Decl. #1 at ¶5.

13

Company and Basell Polyolefins to increase EBITDA by approximately $420 million

through 2010); benefit from access to credit (which is very important in the present

economic environment); and by their coordinated operations receive other benefits, such

as operational improvement.[17]  Because the Debtors and their European affiliates operate

as an integrated global enterprise, the cessation of European operations would require the

Debtors to expend substantial resources in order to replace the goods, services, and

systems formerly provided by the European nondebtors.[18]

I believe that a *voluntary*, properly planned and organized, *restructuring* of the

affairs of LBIAF would not result in irreparable injury or at least that an insufficient

showing has been made to me that irreparable injury in that event would result.[19]  But I

believe than an *involuntary* proceeding against any of the European nondebtor entities

would be a disaster, and the resulting injury would indeed be irreparable.  I'm satisfied

that the synergies associated with the coordinated operations of the entities, in both the

U.S. and Europe, that form the integrated whole in the worldwide enterprise are real.

And the recoveries of the creditors in the chapter 11 cases before me—particularly those

in the unsecured creditor community, who are of course junior to secured debt, but whose

needs and concerns I very much care about—depend upon maximizing the value of the

Debtors here.  It also is reasonable to assume, at least for now, that the interests of all

creditors in this case, secured and unsecured, would be well served by finding as many

---

[17]    Other stated benefits ("value chain integration"; "customer and market focus"; and "technological leadership"), Bigman Decl. #1 at ¶ 5, were not by themselves comprehensible to me and were stated too vaguely for me to place material reliance on them.

[18]    Bigman Decl. #1 at ¶ 23.

[19]    Originally, not just an involuntary bankruptcy against LBIAF, but even a "voluntary pre-emptive bankruptcy" filed by LBIAF to forestall an involuntary liquidation, would result in a default under the Debtors' DIP financing.  *See* Bigman Decl. ¶ 21 n.1.  But the documentation for the final DIP facility no longer has a provision making a voluntary insolvency filing by LBIAF an event of default.

14

ways as possible for the *secured* creditors in these chapter 11 cases to look to value to realize upon their claims—being mindful that a significant component of the secured creditors' collateral is in Europe, and that the value of this collateral could be materially impaired if financial affairs in Europe turn into a freefall.

Additionally, for either those reasons or others (including an understandable reluctance to put control of the chapter 11 cases here in the hands of a European liquidator), an involuntary filing against LBIAF would be an event of default under the Debtors' DIP. I can find no assurance, either way, that the Debtors' DIP lenders would or would not waive the resulting default. It is clear, however, that if the Debtors' DIP lenders exercised their rights upon a default, the Debtors would have a resulting loss of liquidity that would force them to liquidate their business, lay off thousands of employees, and shut down their facilities.[20] The DIP financing provides the Debtors and European nondebtor affiliates with funding that is essential to survival, and ultimately, the Debtors' ability to successfully reorganize. Loss of the DIP financing would doom their reorganization, resulting in the loss of billions of dollars of value essential to satisfying creditor claims and a loss of thousands of rank and file employee jobs.[21]

Moreover, a default under the DIP would in turn trigger a default under the forbearance agreement currently in place that prohibits the parties to the Debtors' prepetition senior secured and interim credit facilities from pursuing remedies against

---

[20]     Bigman Decl. #1 at ¶ 21.

[21]     While it has been argued by many of the defendants here, in words or substance, that this was a problem "of the Debtors' own making," I cannot agree. The evidence here does not support a finding that the Debtors requested such a provision. Indeed, a similar provision was in the prepetition senior secured borrowing facility. Where, as is normally the case (and so far as the Debtor's record reflects, is the case here), change-of-control provisions are requested in a DIP financing by the lender and not the borrower, and are not a subterfuge for incumbent protection or other improper purpose, they have frequently been regarded as understandable and acceptable.

European nondebtors that were guarantors under those credit facilities. A default under the forbearance agreement would allow those secured parties to assert remedies against the assets of many of the nondebtors—including insolvency proceedings and liquidation under applicable European law.[22] Thus, while in such event the damage (described above) would be done by *secured*, rather than unsecured, creditors of the European nondebtors, the resulting injury, which I find to be irreparable, would be the same.

All of those matters, in my view, would constitute irreparable injury, to the extent a finding of such is required, and equally plainly are relevant to any balancing of relative hardships.

6. *Prejudice and Injury to the Guaranty Creditors and 2015 Noteholders*

By reason of the foregoing, LBIAF does not have sufficient liquid assets to pay the 2015 Notes (approximately $1.3 billion), and the Guaranty Claims (approximately $130 million). Also, to the extent LBIAF has liquid assets, they are pledged to the prepetition senior secured and bridge lenders, and are therefore unavailable to pay more junior claims.

Thus the 2015 Noteholders and Guaranty Creditors could recover only after all of the creditors of LBIAF's subsidiaries were satisfied, including claims related to over $20 billion of debt owed to the Senior Secured Lenders. Allowing the 2015 Noteholders and Guaranty Creditors to proceed against LBIAF would as a practical matter get them very little, other than an opportunity to complicate the Debtors' affairs (and thus to exercise leverage) and perhaps get a possible leg up against other LBIAF junior creditors

---

[22]     Bigman Decl. ¶ 22.

in the ultimate event of an LBIAF insolvency in which secured lenders have been paid in full.

To the extent Guaranty Creditors have valid claims against LBIAF (and I assume, for purposes of this analysis, that they do, subject only to fine tuning of the exact amounts owed), they also have valid claims against one or another of the Debtors. Yet by bringing claims against LBIAF, they risk damaging the very Debtors against whom they have their claims and diminishing the value of their own claims as well as those of all of the other creditors of those entities.[23]

Moreover, because LBIAF has virtually no liquid assets to satisfy the Guaranty Claims and its only meaningful assets are indirect equity interests in, and receivables from, European subsidiaries, Guaranty Creditors will only recover after all of the creditors of LBIAF's subsidiaries are satisfied, and are thus very unlikely to have their Guaranty Claims satisfied in any event.

The situation of the 2015 Noteholders is slightly different in detail, but ultimately with the same result. Under their intercreditor agreement with senior secured creditors, the 2015 Noteholders are subject to certain limitations on receiving payment of the 2015 Notes and enforcing remedies against collateral of the guarantors of the 2015 Notes, though not against LBIAF.[24] But importantly, the 2015 Noteholders would gain very little from pursuing such claims. Under the terms of the 2015 Notes Indenture and the intercreditor agreement, the claims of the 2015 Noteholders are expressly subordinated to the Debtors' senior debt. Upon notification of a default under the 2015 Notes, the 2015

---

[23] It is for that reason, I believe, that the Creditors' Committee supports the Debtors on this preliminary injunction motion, even though the Guaranty Creditors are unsecured creditors that are members of the Creditors' Committee's constituency.

[24] Bigman Decl. #2 ¶ 7.

Noteholders and their Indenture Trustee may take enforcement action against the 2015
Guarantors or any collateral supporting their claims (those being their only realistic
sources of repayment) only after the passage of 179 days.[25] Moreover, any payments
they would receive would be subject to turnover for the benefit of the senior lenders;
except where we shortcut the process to prevent money from going in a circle (as we
often do to deal with sub debt issues in plans), that's what subordination means. And
once more, because LBIAF has no meaningful assets other than its Basell Funding stock
and intercompany receivables, the 2015 Noteholders will only recover after all of the
creditors of LBIAF's subsidiaries are satisfied. Accordingly (with only one exception,
which I do not regard as my duty to facilitate),[26] accelerating and filing an involuntary
bankruptcy case will not, in any reasonably foreseeable way, afford the 2015 Noteholders
any meaningful recovery.

---

[25]    Bigman Decl. #2 ¶ 12.

[26]    A January 15, 2009 article in Debt Wire (a trade periodical for investors in distressed debt)
reported that certain holders of credit default swaps have attempted to aggregate 25% of the 2015
Notes in order to accelerate them and create a "termination event" that would entitle them to
payment on the credit default swaps from their swap counterparties. Bigman Decl. #2 ¶ 6. I'm
not in a position to make a factual finding as to the truth of this report; newspaper articles are
hearsay, and the parties' (and the Court's) inability to know all of the facts as to this is one of the
many manifestations of the opacity of the use of derivatives in bankruptcy cases.

Assuming that the report is true, any 2015 Noteholders who were also the beneficiary of credit
default swaps might benefit from an acceleration (though of course at the expense of their swap
counterparties). The injunction that I'm asked to issue would impair the efforts of such credit
default swap holders to effect an early acceleration by that means, and to thereby recover more
quickly on their swaps.

But, that's not legally cognizable prejudice. Except where distressed debt investors' conduct
comes at the expense of other creditors in the case, the practice of bankruptcy courts is generally
not to involve themselves in distressed debt investors' efforts to profit from bankruptcies or
investments in distressed debt—including by trading in claims or bonds, or recovering on credit
default swap transactions. While trading and investment strategies of that character are generally
permissible, bankruptcy courts need not run their cases to advance those ends. Rather, on
discretionary matters, bankruptcy courts will act in accordance with their principal objectives—to
maximize the chances for a successful reorganization, and to maximize creditors' ability to
recover on their *claims* in the cases on the bankruptcy courts' watch.

Thus, once more, 2015 Noteholders can do nothing for their genuine economic benefit anyway.

However, both Guaranty Creditors and 2015 Noteholders would have one potential source of recovery not subject to senior creditor claims, if an insolvency proceeding for LBIAF were filed, at least under U.S. law.  On cross examination of Alan S. Bigman, the CFO of certain Debtor entities and LBIAF, it was established that LBIAF made a number of payments in 2007 and 2008 to its shareholder in amounts aggregating over $500 million.  These payments were of a character that (depending on facts not now before me, including, *inter alia*, solvency, the nature of any consideration, and the payments' purpose and effect)[27] might be subject to recovery in an avoidance action if an LBIAF chapter 11 case were filed in the U.S., or an LBIAF insolvency proceeding were commenced in Europe.  Mr. Bigman denied that reducing the potential for recovery of these sums was a factor in the Debtors' decision to seek section 105(a) relief as contrasted to LBIAF's simply filing a chapter 11 case here, and I take him at his word. But I do note that the need to protect creditors of LBIAF from the forfeiture of the rights, if any, that they or LBIAF might have in connection with the payments is a matter of significant "Public Interest" concern.

*7.  Procedural History*

On February 6, the Debtors came before me seeking a TRO with respect to a stay of enforcement proceedings by the Guaranty Creditors.  They sought it on an *ex parte* basis, for all practical purposes (with notice only to the Creditors' Committee), asserting

---

[27]     For that reason, and because the shareholder has had no opportunity to be heard, I've made no determination whatever concerning the strengths or weaknesses of any such potential claims.

that notice would vitiate the purpose of the request—as involuntary proceedings might be initiated if notice were given before the TRO was put into effect.

The Debtors' request was then supplemented, initially orally (and with testimony) and then by supplemental papers, to additionally seek to enjoin the enforcement of remedies with respect to the 2015 Notes.  Pending further consideration at a preliminary injunction hearing, I granted a TRO in each of the respects for which preliminary injunctions are now sought.  That TRO provided, in substance, that the Guaranty Creditors and the 2015 Noteholders were enjoined from taking action against the Nondebtor affiliates.

As the TRO would expire, unless extended, on the 10th day after issuance (and the 10th day was a Monday holiday), the preliminary injunction hearing was set for the prior Friday—a time that would give defendants a very modest time to respond on a matter of this complexity. Nevertheless, extensive opposing papers were filed, though some defendants—especially the  Indenture Trustee—advocated proceeding at a slower pace.  It soon became apparent, after the first several hours of hearing on the preliminary injunction, that the preliminary injunction hearing could not be completed on that day in any event, and the TRO was then extended for another 10 days, for cause.

The 10-day extension provided better notice, and I find that it resolved any "due process" concerns as to issuance of any preliminary injunction.  The preliminary injunction hearing then continued, after the passage of the 10 days (and the completion of discovery and supplemental briefing during that time), and this decision presents my determination upon the conclusion of that hearing.

Discussion

I.

Jurisdiction

Some of the defendants question my jurisdiction to issue the relief requested here.

While the *propriety* of exercising my jurisdiction here might legitimately be debated,

subject matter jurisdiction and personal jurisdiction cannot be.  The relevant subject

matter jurisdiction statute, Judicial Code section 1334(b), provides, in relevant part:

> Except as provided in subsection (e)(2), and
> notwithstanding any Act of Congress that confers
> exclusive jurisdiction on a court or courts other than
> the district courts, the district courts shall have
> original but not exclusive jurisdiction of all civil
> proceedings arising under title 11, or arising in or
> related to cases under title 11.[28]

Here the Debtors assert claims under Bankruptcy Code section 105(a) (thereby

invoking my "arising under" jurisdiction), to protect their ability to reorganize in their

existing chapter 11 cases (thereby invoking my "arising in" jurisdiction).  Moreover, the

Debtors have easily shown by declaration how the actions sought to be enjoined would

also affect their ability to reorganize, and the value of their estates.  The Second Circuit,

though hardly alone in this regard, follows the Third Circuit's "*Pacor*" test.[29]  As the

Circuit stated in *Cuyahoga Equipment*:

> [T]he test for determining whether litigation has a
> significant connection with a pending bankruptcy
> proceeding is whether its outcome would have any
> "conceivable effect" on the bankrupt estate. If that
> question is answered affirmatively, the litigation

---

[28]    28 U.S.C. § 1334.

[29]    *See Publicker Indus., Inc. v. United States (In re Cuyahoga Equip. Corp.),* 980 F.2d 110, 114 (2d Cir. 1992) ("*Cuyahoga Equipment*"), *citing Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984).

21

falls within the "related to" jurisdiction of the
bankruptcy court.[30]

As the issues here plainly pass muster under that standard, I have "related to" jurisdiction

as well.

Nor, to the extent it matters, do I have any doubt that that the matters here present

a core matter, in which I as an Article I judge can issue final orders without sending the

matter up to a district judge.[31]  This is not an action under which the estate is asserting

contract claims under state law.  It is, rather, an effort to invoke rights under the

Bankruptcy Code, section 105(a) and (to a lesser extent) section 362, to protect existing

property of the estate, and to protect the estate's ability to reorganize.  It is a core matter,

including under the nonexclusive subsection 157(b)(2)(A).

Nor, to the extent a lack of personal jurisdiction has been argued, do I have any

doubts as to my ability to enforce my jurisdiction against anyone with notice of the

proposed injunction, including anyone abroad.  The Guaranty Creditors entered into

contracts here in the United States, and the 2015 Indenture provided for submission for

jurisdiction in the United States.  Moreover, to the extent I grant relief, it will be to

protect property of the estate here in the United States, and to protect an ongoing

reorganization here in the United States.  To the extent anyone, even abroad, takes steps

abroad to cause injury here to the reorganization before me, it is analytically no different

than shooting a bullet across a state line.

---

[30]       *Cuyahoga Equipment*, 980 F.2d at 114.

[31]       *See* Judicial Code section 157, 28 U.S.C. § 157.

## II.

## Standards for Issuance of a Section 105(a) Injunction

Section 105 of the Code provides that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." No one considering this matter objectively disputes the power of a bankruptcy court, under section 105(a) of the Code, to enjoin acts against third parties when they impair a debtor's ability to reorganize in a chapter 11 case—even though such acts are not proscribed by the automatic stay of section 362 of the Code.[32] The issue, once more, is the appropriate exercise of the court's power.

Thus I look to the standards for invocation of section 105(a) in instances where parties seek to protect their reorganizations by enjoining acts against nondebtor entities that are not entitled to section 362 protection.[33]

---

[32]  *See Calpine Corp. v. Nevada Power Co. (In re Calpine Corp.)*, 354 B.R. 45 (Bankr. S.D.N.Y. 2006) (Lifland, C.J.) ("*Calpine-Bankruptcy*"), *aff'd* 365 B.R. 401 (S.D.N.Y. 2007) (Scheindlin, J.) ("*Calpine-District*").

[33]  While, like the court in *Calpine-District, see* 365 B.R. at 409 n.20, I'm sensitive to the various pronouncements that section 105(a) can't be used to create substantive rights that are otherwise unavailable under applicable law (or, of course, to trump other provisions of the Code), I agree with observations in *Calpine-District* that nothing in the Second Circuit's decisions in this regard "affects the longstanding practice of courts utilizing section 105 to stay (as opposed to release) nondebtor litigation," *id.,* and hence that use of section 105(a) for this purpose is authorized. As the Circuit held in *Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litigation)*, 765 F.2d 343 (2d Cir. 1985):

> [T]he Bankruptcy Court has authority under section 105
> broader than the automatic stay provisions of section 362 and
> may use its equitable powers to assure the orderly conduct of
> the reorganization proceedings.

*Id.* at 348. *See also* Chief Judge Bernstein's observations in *Goldin v. Primavera Familienstiftung, Tag Assoc., Ltd. (In re Granite Partners, L.P.)*, 194 B.R. 318, 337 (Bankr. S.D.N.Y. 1994) ("Under Section 105, the bankruptcy court can issue an injunction to restrain activities that threaten the reorganization process or impair the court's jurisdiction with respect to a case before it"; "[T]he court can and should enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts."), and my observations, several years ago, in *Adelphia Communications Corp. v. The America Channel (In re Adelphia Communications Corp.)*, 345 B.R. 69, 85 (Bankr. S.D.N.Y. 2006) (Gerber, J.) ("*Adelphia-America Channel*") ("Section 105(a) provides broad equitable power for a Bankruptcy Court to maintain its

The applicable law relating to the exercise of the 105(a) power was restated in the recent *Calpine* decisions,[34] which understandably are cited, and analyzed, by parties on all sides in this case.[35]  As noted in *Calpine-District*, courts have applied the "traditional preliminary injunction standard as modified to fit the bankruptcy context."[36]  The *Calpine-District* court engaged in its analysis using the following factors:

> (1) whether there is a likelihood of successful reorganization;

> (2) whether there is an imminent irreparable harm to the estate in the absence of an injunction;[37]

---

own jurisdiction and to facilitate the reorganization process.  A bankruptcy court may enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it.  As the Second Circuit has observed, section 105(a) powers may be exercised "where there is a basis for concluding that rehabilitation, the very purpose for the bankruptcy proceedings, might be undone by the other action.").

Thus while use of the 105(a) power in this area is subject, of course, to thoughtful application of the applicable criteria, there can no longer be any question that it is authorized.

[34]  *See* n.32 above.

[35]  While the Debtors here, as others similarly situated normally do, have asked me to extend the automatic stay that exists under section 362, and alternatively to issue an injunction under section 105(a), my personal preference is to extend section 362 protection principally in cases where a claim against the nondebtor is in economic effect equivalent to a claim against the debtor, and otherwise not to extend section 362 in situations involving guarantors or sureties.  *See Calpine-District*, 365 B.R. at 408-409 & n.19, fleshing out the underlying concerns in greater detail.  Limitations on the extension of section 362 in such cases are not hard-and-fast, and here extension under section 362 might also pass muster under the approach I just described.  But there's no need for me to consider section 362 doctrine in light of the greater relevance of section 105(a) and the caselaw applying section 105(a) to protect reorganizations—which as noted in *Calpine-District,* grants broader authority than section 362.  *Id.* at 409 & n.20.

[36]  365 B.R. at 409 & n.25, *citing Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp., Inc. (In re Calpine Corp.),* 2006 WL 3755175 (S.D.N.Y. 2006) (Castel, J.) ("*Hawaii Structural*").

[37]  However, it has been repeatedly held in this district that the usual grounds for injunctive relief, such as irreparable injury, need not be shown in a proceeding for an injunction under section 105(a).  *See LTV Steel Co., Inc. v. Board of Educ. (In re Chateaugay Corp.),* 93 B.R. 26, 29 (S.D.N.Y. 1988) (Leval, J., then a District Judge) ("*LTV*"); *Garrity v. Leffler (In re Neuman),* 71 B.R. 567, 571 (S.D.N.Y. 1987) (Sweet, J.) ("*Neuman*"); *C & J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.),* 92 B.R. 87, 92 (Bankr. S.D.N.Y. 1988) (Brozman, C.J.); *Adelphia-America Channel,* 345 B.R. at 85.  In this case, irreparable injury to the Debtors' ability to reorganize plainly is threatened anyway, as discussed above and below, so I don't need to address any possible inconsistencies between *Calpine-District* and these cases.

24

(3) whether the balance of harms tips in favor of the moving party;

and

(4) whether the public interest weighs in favor of an injunction.[38]

I consider those in turn.

III.

Application of Those Standards

A. *Likelihood of Successful Reorganization*

Parties in this case have differed over whether there needs to be a "likelihood" of a successful reorganization, or a "reasonable likelihood" of such (since the addition of "reasonable" materially changes the clause's meaning), and even whether I need to find prospects for a 100% distribution on unsecured creditor claims. They also differ over the extent to which the Debtors need be denied relief because a determination of this type requires, in material part, a prediction as to matters that are largely unknowable in the early days of practically every large chapter 11 case, and as to which there can be little assurance, on the part of either side.

The *Calpine-District* court, in applying the "likelihood of successful reorganization" factor, did not articulate the standards that would be applicable if people were in disagreement as to its application. The *Calpine-District* court simply referred to a finding in *Calpine-Bankruptcy* that it was there undisputed that there was a "strong likelihood" that the Debtors could successfully reorganize,[39] and found it sufficient to rely on a factual finding in this regard in Judge Castel's earlier *Hawaii Structural*

---

[38]     *Id.* at 409.

[39]     365 B.R. at 410.

25

decision, on an appeal from a similar order in another adversary proceeding in the

*Calpine* cases.

But in considering this factor, Judge Castel in *Hawaii Structural* articulated the

requirement as a "*reasonable* likelihood of a successful reorganization,[40] and he was

plainly right in that respect. Other authority supports his approach.[41] Especially since

emergency requests to protect an estate's ability to reorganize often come up in a chapter

11 case's earliest stages, there is no way to predict what will ultimately happen in a large

chapter 11 case as new issues arise.

It was also argued to me, somewhat surprisingly, that the "probability of success"

requirement would require the Debtors to show a probability of confirming a plan that

would provide for a *100% repayment* to unsecured creditors. In support of that notion,

they cited *In re Larmar Estates, Inc.*,[42] a brief decision in an early case under the then-

new Bankruptcy Code, issued about a year after the Code's enactment, involving an

effort to enjoin the enforcement of a principal's guaranty of the debtor's mortgage in a

single asset real estate case. The *Larmar Estates* court denied relief for a number of

reasons, one of which was the fact that the debtors had been in chapter 11 for over four

months, and the court had received no indications that the debtors were "close to having

their reorganization plans, if any have been proposed, confirmed."[43] While the *Larmar

Estates* court did indeed evaluate the request for protection on the guaranty by looking to

---

[40]    2006 WL 3755175 at *4 (emphasis added).

[41]    *See In re United Health Care Organization*, 210 B.R. 228, 233 (S.D.N.Y. 228) (Scheindlin, J.)
(describing factor as a "*reasonable* likelihood of a successful reorganization") (emphasis added);
*In re Monroe Well Service, Inc.*, 67 B.R. 746, 752 (Fox, J.) (same); 2 *Collier on Bankruptcy* ¶
105.02[2] at 105-13 (15th ed. Rev.) (same).

[42]    *In re Larmar Estates, Inc.,* 5 B.R. 328 (E.D.N.Y. 1980) (Hall, J.) ("*Larmar Estates*").

[43]    *Id.* at 331.

see whether the need to proceed on the guaranty could be obviated by a 100% plan, there

is no indication that I can discern that *Larmar Estates* has ever been relied upon to

impose a 100% distributions requirement in any large, complex commercial case—

especially one with billions of debt and thousands of employees, in its earliest weeks.

Whatever the propriety of the *Larmar Estates* approach may be in cases involving efforts

to protect principals in single asset real estate cases, the considerations are quite different

when analyzing the effect on reorganization in cases involving larger commercial

enterprises.

Here the Debtors have so far been successful in doing everything they've needed

to do to date.  Whether they will be able to address later issues cannot be determined in

the earliest weeks of a case, and it would be silly for a court to impose any standard other

than the one Judge Castel articulated.  That is especially so where thousands of jobs are

on the line, which would otherwise be jeopardized by an arbitrary and restrictive

placement of burdens on the debtor to meet standards that require proof of the uncertain.

Application of a higher standard would make it essentially impossible to protect the

debtors' ability to reorganize in all but the simplest or most predictable chapter 11 cases.

Here I can say with great comfort, and find, that the Debtors are proceeding on

track, and there is no reason to believe or suspect that their reorganization will fail—

unless, of course, the acts sought to be enjoined *cause* it to fail.

While if there are reasons to conclude that the debtor(s) *could not* reorganize, that

plainly should affect debtors' ability to invoke this factor, where debtors are proceeding

"on track" and have met the challenges they have faced so far, that is sufficient.[44]  The

"Likelihood of Successful Reorganization" factor has been satisfied here.

## B.  Irreparable Harm

Courts in the Second Circuit have recognized a limited exception to the

irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy

context where the action to be enjoined is one that threatens the reorganization process or

which would impair the court's jurisdiction with respect to the case before it.[45]  Thus,

where the movant shows "that the action sought to be enjoined would burden, delay or

otherwise impede the reorganization proceedings or if the stay is necessary to preserve or

protect the debtor's estate or reorganization prospects, the Bankruptcy Court may issue

injunctive relief."[46]  Additionally, as I've noted above,[47] (though I needn't rely on this

here, since the damage to the estate resulting from involuntary insolvency proceedings

against LBIAF or the European subsidiaries would be so clear, severe, and irreparable), I

and other courts have repeatedly noted that when a court is considering an application

under section 105(a) to protect the Debtor's reorganization, irreparable injury need not be

shown.

---

[44]    *See Dore & Assocs. Contracting, Inc. v. American Druggists' Ins. Co.,* 54 B.R. 353, 359-360 (Bankr. W.D. Wisc. 1985) (Martin, J.) ("In the early stages of bankruptcy when it is uncertain if reorganization is feasible or not the bankruptcy court must have broader latitude in determining whether to grant injunctive relief."); *Steven P. Nelson, D.C., P.A. v. G.E. Capital Corp.*, 140 B.R. 814, 816-817 (Bankr. M.D. Fla. 1992) (Paskay, J.) ("This Chapter 11 case is still in an embryonic stage and it is clearly unreasonable to require the Debtor at this early stage of the case to make detailed projections of the terms or anticipated feasibility of its plan of reorganization. … In this connection, it should be noted that there is nothing in the record to indicate that the Debtor will not be able to successfully reorganize.").

[45]    *Alert Holdings, Inc. v. Interstate Protective Services, Inc., (In re Alert Holdings, Inc.)*, 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992) (Brozman, C.J.).

[46]    *See id.  See also Calpine-Bankruptcy*, 354 B.R. at 48.

[47]    *See* n.37 above.

While I don't find irreparable injury here as a consequence of potential
application of *res judicata*, collateral estoppel or *stare decisis*, I find that irreparable
injury would plainly result if an involuntary insolvency proceeding were commenced
against LBIAF or its subsidiaries—to the Debtors' ability to reorganize and, in addition,
to the Debtors themselves.[48]

The objectors do not seem seriously to dispute that if an involuntary bankruptcy
in Europe were to take place, the damage to the Debtors' estate's here would be
devastating.  But they argue that after my exclusion of the evidence of the Wachovia
Threat, there was no other evidence of an actual, imminent, threat of an involuntary
petition filing.  From that, they argue that the evidence of imminent (or irreparable) harm
was conjectural, providing insufficient basis for protection against that possibility.

I cannot agree.  The potential injury to the estate would be no different if a
prospective involuntary filing were announced in advance or not.  As we discussed in
oral argument, if the involuntary filing were made without advance notice—"in the dead
of night," as one or more of us stated—the resulting injury would be no less severe.
Situations where the damage to be avoided would be grievous, but the probability of such
damage is uncertain, present challenges for a judge.  But as Judge Brozman noted in *Alert
Holdings,* noted above, there is an exception to the irreparable harm requirement in the
bankruptcy context where the action to be enjoined is one that threatens the

---

[48]   I don't find irreparable harm as a consequence of ConocoPhillips perfecting its attachment, so
long as it takes no further steps to enforce it.  While that may give ConocoPhillips a leg up against
other unsecured creditors of LBIAF, that is a matter of insufficient concern to the Debtors' ability
to reorganize here to constitute a legally cognizable harm, especially an irreparable one.  While I
have some material doubts as to the utility of the ConocoPhillips attachment (as it at least
seemingly would be junior to billions of dollars of secured debt), there is no material harm
resulting from ConocoPhillips' trying to obtain a junior lien position.  If, of course,
ConocoPhillips were to then seek to *enforce* its lien, or if, even with just an attachment, it were try
to *block* or *impede* the passage of funds between LBIAF and its subsidiaries, that would, by
contrast, result in irreparable harm.  I will not permit any of the latter measures.

29

reorganization process.  And where the movant shows "that the action sought to be enjoined would burden, delay or otherwise impede the reorganization proceedings or if the stay is necessary to preserve or protect the debtor's estate or reorganization prospects, the Bankruptcy Court may issue injunctive relief."  I must give great weight to the *injury to protect against*, as contrasted to the certainty of the threat.

So long as injunctive relief is warranted by due consideration of the balance of hardships (and other factors, such as the severity of the injury to be avoided, and public interest concerns), I do not believe that uncertainty as to the probability of the damage should disable a judge from acting.  Protecting the estate from such grievous injury is in my view not just permissible; it's my job.

Subject to a carveout for providing notice of the ConocoPhillips attachment, this requirement has been satisfied.

### C.  Balance of Harms

As my Findings of Fact as to the consequences of involuntary proceedings and prejudice discuss at greater length, the balance of harms dramatically tips in favor of the grant of at least some relief, for some period of time.  I won't repeat my earlier discussion, in my Findings of Fact, as to the irreparable injury to the Debtors, but instead will merely incorporate that by reference here.  If creditors are allowed to commence involuntary insolvency proceedings against LBIAF, the result would indeed be, as the Creditors' Committee argues, "incalculable disaster."  The foreseeable, if not also inevitable, result would a freefall of subsequent involuntary insolvency proceedings for the Debtors' European affiliates, with the attendant loss of going concern value and the benefits of integrated operations.  It will also result in a default under the DIP financing

facility, which in turn will result in the loss of the ability to enforce the forbearance agreements.

By contrast, Guaranty Creditors and 2015 Noteholders will not lose their rights to assert their claims, but will merely be delayed somewhat in asserting them—and for reasons I will discuss below, my injunction will last only for 60 days.

As my Findings of Fact above discuss, because LBIAF has virtually no liquid assets to satisfy the Guaranty Claims and its only meaningful assets are indirect equity interests in, and receivables from, European subsidiaries, Guaranty Creditors will only recover after all of the creditors of LBIAF's subsidiaries are satisfied, a matter as to which they were on notice from the 2015 Notes' offering memorandum. Thus they are very unlikely to have their Guaranty Claims satisfied in any event.

Likewise, by reason of the constraints imposed by the 2015 Notes Indenture and the intercreditor agreement, the 2015 Noteholders can do little in the short run to enforce their rights in any useful way. While I fully understand their frustration in not getting paid their interest, that is a hardship that unfortunately is the rule, not the exception, in the cases I see. And even if they got anything, the 2015 Noteholders would have to turn over any recoveries they might secure to the lenders to whom their positions were subordinated.

There are, to be sure, some theoretical harms that the Guaranty Creditors and 2015 Noteholders might suffer by entry of an injunction here, but those harms can largely be ameliorated by an injunction of the duration and with the extra conditions that I am of a mind to impose. The first is that if the Guaranty Creditors and 2015 Noteholders were enjoined here, they could be prejudiced if LBIAF dissipated its assets during the duration

31

of the injunction.  But the risks of that can be ameliorated by conditioning my injunction

on provisions to prevent such from happening—by conditioning relief on a prohibition

against the  transfer or encumbrance by LBIAF of the Basell Funding stock; on a

prohibition against the transfer, encumbrance, release, settlement, or compromise of

LBIAF's receivables; and a prohibition against payments outside of the ordinary course.[49]

The second is that they might be prejudiced if statutes of limitation were to run

for fraudulent conveyance claims or other rights of action that might be assertable by

LBIAF or its creditors.  But the risks of that can be ameliorated by conditioning my

injunction on the submission of one or more tolling agreements protecting against that

risk.

And the third is the risk that Guaranty Creditors and 2015 Noteholders might

suffer if other (*e.g.* European) creditors of LBIAF were to get a leg up on the Guaranty

Creditors and 2015 Noteholders while the latter were enjoined by an injunction issued

here.[50]  But on the facts presented to me at the hearing, the only way by which this would

be likely to happen in a material way would be if LBIAF were to have to pay on its

guaranties of the debt of its European nondebtor subsidiaries.  And as of now, the

European nondebtor subsidiaries are currently paying all of their debts as such become

due—with the result that nothing would be due on the guaranties of the nondebtor

---

[49]     As *Collier* notes in its discussion of section 105(a) doctrine:

> Once the link is made to the likely effect on the provisions of
> the Bankruptcy Code, the most important element will be the
> balancing of harms.  In this regard, the bankruptcy court, as a
> court of equity, has almost plenary discretion in fashioning the
> injunction so as to maximize protection and minimize
> prejudice.

2 *Collier* ¶102.02[2] at 105-14.

[50]     Of course that might nevertheless be immaterial, since they likely would all be junior to Senior
Secured Debt anyway.

obligations.  Thus I see little prejudice in the short term.  (While I recognize that at some

time in the future that might change, that is one of the factors informing the exercise of

my discretion on the duration of the injunction.)

Thus, for the reasons noted here and by comparison of the "Prejudice" sections of

my Findings of Fact above, I conclude that for a delay of the duration I envision, the

balance of harms tips dramatically in favor of granting relief.

*D.  Public Interest*

This factor is a matter of greater concern to me under the facts presented here than

it has been in most of the section 105(a) injunction matters I've considered in the past.

The request here places constraints on the enforcement of guaranties, raises a risk of

theoretical unequal treatment of creditors, and impairs creditors from proceeding with

their normal remedies, when the more traditional way by which that would be done

would be by resort to court-supervised insolvency processes.

Most of the Guaranty Creditors have argued, and some have backed up their

arguments with evidence, that guaranties are an important device in commercial

transactions, and that as a matter of public policy their enforcement should not be limited.

They further point out, persuasively, that of the various alternatives for giving vendors

and other contract counterparties comfort that they'll get paid, parent guaranties are

among the most cost-effective and beneficial to the primary obligors—more cost

effective, by way of example, than letters of credit would be, or arrangements for

payment COD or CBD.  They further point out that the very purpose of guaranties is to

protect the party that asked for the guaranty from the insolvency of the primary obligor,

and that any regular practice permitting the enforcement of guaranties to be blocked or

33

impaired when the primary obligor went into bankruptcy would frustrate the very purpose

for which the guaranties were secured in the first place.

I agree that for those reasons, and perhaps others, guaranties should be respected

and honored wherever possible, and believe that courts should be wary of placing limits

on the enforcement of commercial guaranties except in cases of the most pressing need.

But I do not believe that the law does or should require that the enforcement of guaranties

can *never* be blocked. First, as a practical matter, as counsel for the Creditors'

Committee observed, guaranties are hardly iron-clad assurances of payment. They are

much less reliable than letters of credit. The Guaranties are only as good as the financial

strength of the guarantor, and their enforcement may be delayed, or blocked, by senior

claims or security interests tapping the assets of the guarantor; bankruptcy of the

guarantor; failure of consideration; and fraudulent conveyance doctrine—all apart from

the imposition of limits on enforcement under section 105(a). Here, for instance, where

LBIAF has billions of dollars of secured debt ahead of unsecured claims, and the

Guaranty Creditors' claims against their guarantor are structurally subordinated, it is not

at all clear that the guaranties, notwithstanding their commercial importance, might yield

anything anyway. Secondly, there will sometimes be a harm requiring judicial

intervention where the needs and concerns of other creditors simply trump commercial

predictability. That, in my view, is the case here.

Another public interest concern arises from the potential for the unequal treatment

of creditors similarly situated—as, for example, might result if the defendants here were

enjoined, but other unpaid LBIAF creditors were free to pursue remedies. I agree that we

should try to avoid this if at all possible.

34

Related to that is a third public interest concern.  Where entities are insolvent, it probably is better that they enter into either an out-of-court workout, or a reorganization or restructuring under court supervision, to the end that similarly situated creditors are treated fairly—especially if, as is sometimes the case, it is also desirable to bring avoidance actions.

Those considerations, when considered cumulatively (and with the nuances that accompany each), lead me to conclude that while the "Public Interest" factor is not strong enough to cause me to wholly deny relief, it is much more than strong enough to require me to deny an injunction of the duration that the Debtors request.  In fact, these considerations lead me to conclude that I should issue the injunction for only 60 days—a duration that I regard as sufficient to permit the filing of the LBIAF insolvency proceeding that probably needs to be brought somewhere, either in the U.S. or abroad. With the injunction lasting only 60 days, the interference with the "sanctity" of guaranties will be minimized, and as importantly or more so, risks of disparate treatement of creditors will be minimized as well.  Then, if there is a bankruptcy filing (at least if it is under U.S. law) within or shortly after the expiration of the 60-day period, transactions resulting in disparate creditor treatment during that period would at least seemingly be subject to avoidance actions.  And finally, conditions to my injunction that I can and will impose, such as restraints on dissipation of assets, can further address Public Interest concerns.

For all of these reasons, I conclude that the Public Interest factor does not apply strongly enough to warrant denial of the requested injunction in all respects, but that it does require limiting the injunction to a duration of 60 days.

<u>Bond</u>

Several of the defendants have asked me to condition the grant of any injunction on the Debtors posting a bond. I reject the suggestion.

Fed.R.Civ.P. 65(a) provides that the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." But Fed.R.Bankr.P. 7065 provides that while Fed.R.Civ.P. 65 applies in adversary proceedings, a preliminary injunction "may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)."

While I agree that the effect of the quoted language is to simply make the requirement for posting a bond optional, rather than mandatory,[51] I believe, in the exercise of my discretion, that there is no reason to depart from the general rule in adversary proceedings here. The brief duration of the preliminary injunction I will issue, coupled with the safeguards I will require and the lack of likelihood that either the Guaranty Creditors or the 2015 Noteholders could recover anything during the period in which they would be enjoined, leads me strongly to believe that the chances of their suffering any injury that I would need to protect them against are remote.

<u>Conclusion</u>

The requested injunctions will be issued, but for a period of only 60 days. As a condition to the grant of the injunction, additional restraints will be placed on LBIAF itself, to protect the value of its assets while the defendants in this adversary proceeding are restrained. Subject to parties' rights to be heard hereafter on fine-tuning the

---

[51]    *See* 10 *Collier* ¶ 7065.01 (Bankruptcy Rule 7065 authorizes the court to relieve the debtor in possession of the security requirement of Rule 65(c), "but does not prohibit such requirement in an appropriate case.")

injunction, I will also be enjoining the following, as conditions to granting the requested injunction:

> (a) the transfer or encumbrance by LBIAF of the Basell Funding stock;

> (b) the transfer, encumbrance, release, settlement, or compromise of LBIAF's receivables; and

> (c) payments outside of the ordinary course

I will also provide that if Access Industries and its affiliates (collectively, "**Access Group"**) fail to file with this Court, within 5 calendar days, tolling agreements with respect to any and all causes of action that might exist, on behalf of either LBIAF or its creditors, in connection with avoidance actions either might bring against Access Group or its affiliates arising from transfers by LBIAF to any member of Access Group, any defendant may move to vacate this preliminary injunction on three business days' notice.

In addition, the injunction will have certain carveouts.  First, ConocoPhillips will be permitted to take such actions to perfect the security interest that might result from its attempted attachment as would be permitted if it were a creditor in a case under the Bankruptcy Code and section 546(b) were applicable; *provided* that ConocoPhillips may not take any steps to enforce any lien or attachment that would otherwise result, or intercept or disrupt the transmission of any cash or assets to enforce its rights; and *provided further* that in the event of any LBIAF insolvency proceeding under the laws of the United States or any foreign country, nothing in this order will relieve ConocoPhillips of any exposure it might have in connection with the avoidance of preferences or preferential transfers.  For the avoidance of doubt, I emphasize that ConocoPhillips will

not be permitted to restrict the payment of any funds (or the transmission of any assets) to or from LBIAF—including, without limitation, enforcing any restraint on payments from LBIAF affiliates to LBIAF.

Nothing in the injunction will prevent a consensual workout or restructuring of LBIAF debt (either Guaranty Claims or with respect to the 2015 Notes), nor will it prevent the negotiation or filing of a *voluntary* plan of reorganization or arrangement for LBIAF or any nondebtor affiliate, in this or any other (including European) court.

A preliminary injunction that I have prepared after revisions to the preliminary injunction proposed by the Debtors is being entered with this decision. Parties may, if they wish, request additions, deletions, or clarifications of the Court-prepared preliminary injunction (so long as not inconsistent with this decision), but unless and until it is revised, parties will be bound by the preliminary injunction in its present form.

Dated: New York, New York          _s/Robert E. Gerber_____
      February **26**, 2009          United States Bankruptcy Judge

38